FRIEDMAN DUMAS & SPRINGWATER LLP
CECILY A. DUMAS (S.B. NO. 111449)
M. ELAINE HAMMOND (S.B. NO. 197444)
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone Number: (415) 834-3800
Facsimile Number: (415) 834-1044

Proposed Attorneys for Debtor
THE WILKES BASHFORD COMPANY

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>The Wilkes Bashford Company,<br><br>        Debtor.<br><br>Tax I.D. 94-2944325 | Case No. 09-33497 TEC<br><br>Chapter 11<br><br>EMERGENCY MOTION TO ESTABLISH BID PROCEDURES AND ALLOW BREAK-UP FEE IN CONNECTION WITH THE SALE OF ASSETS PURSUANT TO BANKRUPTCY CODE § 363<br><br>Date: November 10, 2009<br>Time: 9:30 a.m.<br>Place: United States Bankruptcy Court<br>       235 Pine Street, Courtroom 23<br>       San Francisco, CA<br>Judge: Thomas E. Carlson |

        The Wilkes Bashford Company ("Debtor"), debtor and debtor-in-possession in the above-captioned case, hereby moves this Court on an emergency basis for entry of an order establishing bidding procedures in connection with a proposed sale of the Debtor's assets free and clear of liens (the "Bid Procedures Motion"). The Bid Procedures Motion is brought pursuant to 11 U.S.C. § 363 and 365, Federal Rules of Bankruptcy Procedure 6004 and 6006, and Bankruptcy Local Rule 6004-1.

        As soon as the Court sets a hearing on the Bid Procedures Motion, the Debtor will serve a notice to (1) the parties asserting a security interest in the Debtor's assets, (2) the

Debtor's creditors holding the twenty largest unsecured claims, and (3) the Office of the United States Trustee.

## I. RELIEF REQUESTED

The Debtor intends to seek court approval of a sale of assets of the bankruptcy estate pursuant to an asset purchase agreement (the "Agreement") with a stalking horse bidder, Ed Mitchell West, LLC ("Mitchell"). A copy of the Agreement is attached to the sale motion filed concurrently. In connection with the Agreement, the Debtor will schedule an auction to consider proposals from other bidders for some or all of the Debtor's assets. The assets to be sold pursuant to the Agreement include substantially all assets used in the operation of the Debtor's business, including inventory, accounts receivable, customer lists, the Debtor's interest in certain agreements, furniture, fixtures, equipment, intellectual property, and certain property leases, as described more fully in the Agreement (the "Assets").

The Debtor requests that the Court approve the Bidding Procedures detailed below. The proposed Bidding Procedures are intended to establish the framework for a prompt sale of the Assets and maximize the return to the estate and all creditors. The procedures are designed to attract multiple and competing bids, represent the sound business judgment of the Debtor, and will ensure a good faith sale of the Assets. Accordingly, the procedures should be approved by the Court.

The Debtor is requesting the associated sale motion to be heard on shortened time in order to provide for a closing of the sale on or before November 30, 2009. The holiday shopping season is the busiest season for retailers and it is imperative that the sale close and the operations be transitioned prior to December in order to maintain continuity of operations. Based on the Debtor's extensive marketing efforts to date, the Debtor believes that the proposed schedule (though accelerated) will provide interested parties with sufficient time to consider the terms of the sale and participate in the sale process if interested.

## II. STATEMENT OF FACTS

### A. The Chapter 11 Filing

On November 6, 2009, the Debtor filed a voluntary petition with this court for reorganization under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### B. The Debtor's Business and Anticipated Sale

The Debtor is a San Francisco institution and a global icon in luxury specialty retail. Founded in 1966 by Wilkes Bashford, the company offers unmatched merchandise quality and an exceptional level of service to its customers. The stores have a loyal and upscale clientele that appreciates the high-quality garments, superb craftsmanship and masterful coordination offered by the Debtor. The company's exceptional customer service is fully-realized in the long-term relationships established between the members of its sales team and loyal customers.

The Debtor's flagship store is located in the Union Square district of San Francisco. It houses six floors of merchandise, segmented by men's and women's collections and a home store, and offers a range of product lines. In 1995, the Debtor opened a "Wilkes Sport" store in Mill Valley, California. In 2001, the Debtor opened its Palo Alto store in the Stanford Shopping Center to better serve its customers in Silicon Valley. In 2006, the Debtor expanded to the Monterey Peninsula, opening a store in Carmel, California.

The 2008-2009 recession resulted in poor performance in the luxury sector of the consumer market, including the Debtor. In Spring 2009, the Debtor retained Quest Turnaround Advisors, LLC ("<u>Quest</u>") to assist it in assessing its financing and strategic alternatives, and to improve operating performance. The result of the Debtor's and Quest's

efforts was the closure of the Mill Valley store in September 2009 and the Carmel store in October 2009, and a restructuring of the Debtor's prepetition trade payables. The Debtor's principal liabilities consist of its unsecured obligations to vendors, its secured obligation to Comerica Bank and certain shareholders, and its unsecured obligations to landlords.

Ultimately, a sale of the business presented the best alternative to address the Debtor's needs. The Debtor entered into negotiations to sell substantially all of its assets to Mitchell. Mitchell is affiliated with a private luxury apparel retailer located on the East Coast. After the closing of the acquisition, Mitchell will continue to operate the San Francisco and Palo Alto stores. This case is filed in order to consummate the sale according to the terms of the agreement and obtain approval of a sale pursuant to Bankruptcy Code § 363. A motion to approve the sale is being filed concurrently; the sale is subject to higher and better offers. The Debtor anticipates obtaining court approval and closing the sale by the end of November; maximizing the value to the estate by providing for a transition prior to the holiday shopping season.

### C. The Debtor's Prepetition Financing and Marketing Efforts

For over eight months, Debtor has worked to improve its operations, while seeking outside financing, and marketing the company. In this process, the Debtor has been assisted by three investment bankers and financial advisors. Through these advisors, the Debtor has pursued potential sales with financial and strategic buyers. Prior to the filing, the Debtor engaged in extensive, targeted marketing efforts that resulted in a significant exposure to appropriate markets for this company. Additional detail on the Debtor's prepetition financing and marketing efforts is provided in the Declaration of Michael Appel in support of the Sale Motion, filed concurrently herewith.

### D. The Asset Purchase Agreement

Prepetition, the Debtor negotiated a sale of the Assets to Mitchell to be accomplished through a sale approved by the Court pursuant to Bankruptcy Code § 363. Mitchell submitted an all cash offer of $4,600,000, plus or minus adjustments for inventory

{00471325.DOC v 6}00471325

4    MOTION TO ESTABLISH BID PROCEDURES

Case: 09-33497    Doc# 11    Filed: 11/09/09    Entered: 11/09/09 18:41:15    Page 4 of 14

(the "Asset Purchase Price"). Mitchell will be the stalking horse bidder and Debtor is seeking approval to sell Assets to Mitchell subject to the opportunity for parties to submit higher or better offers as set forth herein.

**E.     The Proposed Bidding Procedures**

The Debtor has designed these Bidding Procedures, including the Break-Up Fee, to compensate Mitchell for its efforts to date and to facilitate a process that will attract multiple and competing bids in order to maximize the value of the Assets for the benefit of the Debtor's estate.  The Bidding Procedures are as follows:

1.     <u>Sale Hearing</u>:  A hearing on the motion to approve the sale of the Assets and to approve the assumption and assignment of executory contracts and unexpired leases (the "<u>Sale Motion</u>"), will be held at _____ .m. on November 25, 2009 (the "<u>Sale Hearing</u>").

2.     <u>Service of Sale-Related Pleadings</u>:

(a)     <u>Notice of Sale Hearing</u>.  The Debtor shall cause, on or before November 10, 2009, service by first class mail of notice of the hearing on the Sale Motion and notice of the Bidding Procedures approved by the Court on all known creditors.

(b)     <u>Moving Papers</u>.  The Debtor shall cause, on or before November 10, 2009, service by first class mail of (a) the Sale Motion (which service shall attach the Agreement and include the Agreement and the order on this Bid Procedures Motion filed by the Court), all declarations in support, and information supporting Mitchell's ability to provide adequate assurance of future performance, on (1) all parties asserting a security interest in the Debtor's assets, (2) all parties to the unexpired leases and executory contracts proposed to be assumed and assigned under the sale agreement (the "<u>Assumed Contracts</u>") and their counsel, if known, (3) the Debtor's creditors holding the twenty largest unsecured claims, (4) the Office of the United States Trustee, (5) all parties having filed and served request for notice in the Chapter 11 case, (6) Mitchell, and (7) all entities, and if known, their counsel, who have expressed a bona fide interest in acquiring the Assets or that the Debtor believes may be interested in proposing a competing bid upon assets of the Debtor.  The sale

motions shall set forth any amount required to satisfy the requirements of Bankruptcy Code § 365(b)(1)(A) and (B) (the "Cure Amount") according to the Debtor's books and records.

3. <u>Due Diligence</u>. Any party interested in bidding for the Assets may conduct reasonable due diligence upon the signing of an agreement acceptable to the Debtor providing that such party will not disclose to any third party non-public information regarding the Debtor or its affairs and consistent with the terms of any such agreement executed by Mitchell.

4. <u>Objection Bar Dates</u>

(a) <u>Objection to Asset Sale</u>. Any objection to the Sale Motion must be in writing, comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules, be filed with the Court on or before November 19, 2009, and be served on (1) Debtor's counsel, (2) counsel for Mitchell, and (3) the Office of the United States Trustee no later than November 19, 2009.

(b) <u>Objection to Assumption and Cure Amounts</u>. Any objection to assumption of the Assumed Contracts on grounds other than lack of adequate assurance of future performance must be in writing, comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules, be filed with the Court on or before November 19, 2009, and be served on (1) Debtor's counsel, (2) counsel for Mitchell, and (3) the Office of the United States Trustee no later than November 19, 2009. Such objection must set forth (a) the basis for the objection, and, if applicable, (b) the amount the party asserts as the Cure Amount. If no such objection is received by November 19, 2009, then the Debtor shall be determined not to owe any Cure Amount that otherwise could have been asserted by the non-debtor party to the Assumed Contracts against the Debtor, Mitchell or such other Mitchell of the Assets through the effective date of the assumption and assignment in respect of such Assumed Contract.

(c) <u>Objection to Lack of Adequate Assurance of Future Performance</u> Any bidder other than Mitchell who wishes to become a Qualified Bidder to the

Assets ("Prospective Bidder") shall give notice by electronic mail of such desire to the Debtor's counsel at their electronic mail addresses no later than 1 p.m. PT on November 13, 2009. Any such Prospective Bidder shall include with such notice all information in .pdf format that the Prospective Bidder deems appropriate to qualify it as an entity that could provide adequate assurance of future performance, as that term is used in Bankruptcy Code § 365 ("Adequate Assurance Package"). The Debtor shall, on or before 4 p.m. PT on November 14, 2009, provide by electronic mail, facsimile or first class mail to the parties to the Assumed Contracts the names of the Prospective Bidders together with their Adequate Assurance Package. The parties to the Assumed Contracts shall have until November 20, 2009 to file with the court and serve on (1) Debtor's counsel, (2) counsel for Mitchell, (3) counsel for each of the Prospective Bidders and (4) the Office of the United States Trustee any objection to the Adequate Assurance of Future Performance by Mitchell or any of the Prospective Bidders ("Adequate Assurance Objection"). If an Adequate Assurance Objection is timely filed, such objection shall be heard and resolved at a hearing immediately prior to the Auction (defined below). If the Court finds that any party has not provided adequate assurance of future performance, such party shall not be deemed a Qualified Bidder, and will not be qualified to bid on the Assets.

(d) Effect of Failure to Object. The failure of any person to file a timely objection shall bar the assertion at the Sale Hearing or thereafter of any objection to the Sale Motion and the Debtor's consummation and performance of the Agreement with Mitchell or any Prospective Bidder.

(e) Modifications to the List of Assumed Contracts. The Debtor, at the request of Mitchell, may remove any contract from the list of Assumed Contracts at any time prior to the fifth business day prior to the Closing Date. Additional contracts may be added to the list of Assumed Contracts, provided that to the extent contracts are added following service of the Sale Motion and notice of hearing, assumption of any such contracts shall be requested by separate motion.

5. <u>Alternative Bid Deadline</u>. All alternative bids must be submitted to Debtor's counsel by hand delivery or electronic mail not later than 1 p.m. PT on November 23, 2009 (the "<u>Alternative Bid Deadline</u>"). Debtor shall immediately distribute a copy of each alternative bid received to Mitchell, Mitchell's counsel, each alternative bidder and their counsel.

6. <u>Qualified Alternative Bid</u>. An alternative bid will only be considered if the alternative bid is a "<u>Qualified Alternative Bid</u>." To be a Qualified Alternative Bid, the alternative bid must:

(a) Identify the party submitting the alternative bid and such party must be a "Qualified Bidder." A Qualified Bidder shall mean Mitchell and any other person (i) that the Debtor has determined in the exercise of its reasonable business judgment is financially able to consummate the purchase of the Assets if the Court enters an order approving such purchase and (ii) who can give adequate assurance of future performance of the Assumed Contracts through the procedure set forth above;

(b) Propose in writing a transaction that the Debtor determines, in good faith, is not materially more burdensome or conditional than the terms set forth in the Agreement, identifies the assets subject to the offer, provides the proposed closing date, and has a value that exceeds the Asset Purchase Price by $250,000;

(c) Consist of an agreement in the form of the Agreement, marked to show changes thereto, that is when taken as a whole on terms and conditions no less favorable to Debtor than the terms and conditions contained in the Agreement, including but not limited to price, time of closing and additional financing through closing;

(d) Not be subject to termination by the Prospective Bidder except on the same terms as the Agreement;

(e) Include evidence acceptable to the Debtor of the Prospective Bidder's financial capabilities to fully consummate the purchase, including reference to the Adequate Assurance Package previously provided by the Prospective Bidder;

(f) Not be subject to any contingencies, including any financing, corporate approval or due diligence contingencies;

(g) Be accompanied by an initial deposit in the amount of $250,000, which deposit is immediately refundable only if the Prospective Bidder is not selected to purchase the Assets; and

(h) Provide for payment in full of any debtor in possession financing at closing.

7. <u>Auction, Bidding Increments and Bids Remaining Open</u>

(a) If the Debtor receives at least one Qualified Alternative Bid, the Debtor shall conduct an auction (the "<u>Auction</u>") at the Sale Hearing. Only Mitchell and Qualified Bidders shall be allowed to make any additional bids ("<u>Subsequent Bids</u>") at the Auction. The Debtor may announce at the Auction procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures.

(b) At the Auction, bidding shall begin with the highest offer submitted by a Qualified Bidder and continue in minimum increments of at least $100,000 higher than the previous bid. Mitchell shall have the right but not the obligation to participate in the Auction. Mitchell shall have the right to match any overbid and to credit bid the "Break-Up Fee" (defined below) in the Auction.

(c) At the conclusion of the bidding, the Debtor shall announce its determination as to the Qualified Bidder submitting the successful bid, and shall seek approval of the Court for such bid at the Sale Hearing, or shall determine that it will not proceed with a sale, subject to the terms of the Agreement.

(d) If the Debtor does not receive any Qualified Alternative Bids, the Debtor will report the same to the Court and will proceed with the sale to Mitchell on the terms set forth in the Agreement at the Sale Hearing, unless the Debtor terminates the Agreement pursuant to its terms.

{00471325.DOC v 6}00471325                                    9                    MOTION TO ESTABLISH BID PROCEDURES

Case: 09-33497    Doc# 11    Filed: 11/09/09    Entered: 11/09/09 18:41:15    Page 9 of 14

(e) <u>Break-up Fee</u>. If the Agreement is terminated for any reason, other than (i) if there has been a material breach by Mitchell of its representations and warranties or in the observance, or in the due and timely performance, of any of the covenants or agreements contained in the Agreement on Mitchell's part to be performed, and such breach shall not have been cured within ten (10) days after written notice thereof, (ii) a termination by Mitchell prior to approval of the Break-up Fee based on its dissatisfaction with its due diligence review of the business and assets to be purchased, or (iii) a termination by Mitchell based on a material adverse effect with respect to Mitchell, then the Debtor shall pay, or cause to be paid to Mitchell a "<u>Break-up Fee</u>" of $100,000, plus out-of-pocket expenses of Mitchell (not to exceed an additional $250,000). Such Break-up Fee shall be in addition to the return to Mitchell of its deposit. The obligation of the Debtor to pay the Break-up Fee to Mitchell shall: (a) be entitled to administrative expense claim status under Bankruptcy Code §§ 503(b)(1)(A) and 507(a)(2); (b) not be subordinate to any other administrative expense claim against the Seller, other than any superpriority claim granted under any debtor-in-possession order; (c) survive the termination of the Agreement; and (d) in the event of consummation of a sale to an alternate purchaser be satisfied from the proceeds of such sale. Any payment to Mitchell of a Break-up Fee shall constitute Mitchell's sole and exclusive remedy against the Debtor on account of the termination of the Agreement due to acceptance of a Qualified Alternative Bid.

8. Deposits shall be returned within two (2) days of Court approval of another party's bid.

## III. ARGUMENT

Section 363(b)(1) of the Bankruptcy Code provides that the Debtor may, after notice and hearing, sell property of the estate other than in the ordinary course of business. *See* 11 U.S.C. § 363(b)(1). In connection with this authority, bankruptcy courts are empowered to establish sale procedures, including incremental overbid requirements. *See Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d 774 (9th Cir. 1982) (noting that the district court had required specified minimum overbid amounts, deposit, and the form of purchase agreement to be used by bidder); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 878-879 (Bankr. S.D.N.Y. 1990) (noting that the bankruptcy court had entered an order requiring that overbids be made in specified minimum increments with deposits). Courts frequently approve the implementation of bidding procedures prior to a sale.

More generally, courts have considerable discretion to authorize the debtor's use of estate property where the debtor's request is based upon the sound business judgment of the debtor. *See Walter v. Sonwest Bank (In re Walter)*, 83 B.R. 14, 16 (B.A.P. 9th Cir. 1987); *In re Lionel Corp.*, 722 F.2d 1063, 1066 (2d Cir. 1983). This authority is supplemented by the Court's broad powers to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986).

The hallmarks of good faith in any sale procedures are the receipt of adequate value through the potential for higher and better offers, and full and accurate disclosure of the terms of the proposed sale to third parties invited to bid. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986). Additionally, courts consider whether bidding procedures allow third parties to submit higher and better bids and whether potential bidders have adequate time to conduct due diligence in determining whether requested bidding procedures are appropriate. *See, e.g., In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991).

Finally, the primary intent in any sale of estate property is to obtain the greatest possible recovery on proceeds for the estate assets. *See Official Comm. of Subordinated*

*Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1998)).

Here, the Debtor submits that the Bidding Procedures proposed are fair and equitable and designed to maximize the value received for the Debtor's Assets for the following reasons:

<u>Due Diligence</u>. The procedures balance the need of bidders to conduct due diligence against the interests of the Debtor and creditors in protecting the bankruptcy estate. The procedures provide potential bidders with a full opportunity to conduct due diligence, but all such parties will be required to execute non-disclosures agreements with terms consistent to those executed by Mitchell.

<u>Bidding Qualifications</u>. The Debtor has proposed that each Prospective Bidder be required to meet some very basic qualifications before they are permitted to bid upon the Assets. The requirement that Qualified Bidders be required to make an earnest money deposit guards against frivolous bidding, and the condition that Prospective Bidders produce evidence of their financial position helps to assure that a winning bidder is actually able to close a sale.

<u>Terms of Overbid</u>. The Debtor requires all overbids to be in cash and on the same terms as the Agreement between the Debtor and Mitchell. The requirement of an all cash offer is justified given the risk of non-payment associated with non-cash offers. In addition, limiting bids to a mark-up of the form of Agreement agreed to by Mitchell creates an orderly process that facilitates the Debtor's ability to compare and evaluate competing offers to determine which yields the highest and best return for the estate.

<u>Break-up Fee</u>. The Debtor believes that the break-up fee included in the Bidding Procedures has been and will be beneficial to maximizing value. In support of this

position, the Debtor asserts that each of the elements recognized by courts in determining whether a break-up fee is appropriate are satisfied because the break-up fee: (1) is the result of an arm's length negotiation, (2) is designed to encourage, rather than hamper bidding, and (3) the amount of the break-up fee is reasonable relative to its overall benefit of the estate. *See In re Integrated Resources, Inc.*, 147 B.R. at 657-63 (discussing appropriate factors for allowance of break-up fee). A break-up fee which was not tainted by self-dealing and was the product of arms-length negotiations should generally be upheld by the bankruptcy court. *See In re 995 5th Avenue Associates*, 96 B.R. 24 (Bankr. S.D.N.Y. 1989). The benefits of a break-up fee are particularly evident where necessary to convince a lead bidder to enter the bidding providing some compensation for the risks it is taking. *See id*. at 28.

The Debtor believes that granting the Break-up Fee to Mitchell provided it with an incentive to act as a "stalking horse" purchaser and to negotiate the initial terms of sale. As set forth in the Declaration of Michael Appel, Mitchell was the only party willing to incur the time and expense of completing the necessary due diligence to negotiate and document an agreement to purchase the Assets. Moreover, Mitchell did so in a compressed timeframe and during the very busy weeks leading up to the holiday season, which season is key not only to the Debtor's operations but also to the affiliated retail business operated by Mitchell's principals. The Break-up Fee is the result of an arms-length negotiation between the parties. Mitchell's offer now sets a threshold for determining and encouraging serious alternative bidders, who would be able to take advantage of the time and expense invested by Mitchell in negotiating and documenting the Agreement. Further, the amount of the Break-up Fee is reasonable and equal to approximately 2.25% of the minimum sales price, plus reasonable expenses incurred by Mitchell. As such, the Break-up Fee appropriately compensates Mitchell for its investment of time and finances in negotiating the Agreement without prohibiting Prospective Bidders from participating in the sale process.

The Debtor submits that the Bidding Procedures help to motivate the sale of the Assets and encourage the participation of Prospective Bidders by providing reasonable notice of the sale and the terms for participation to all parties in interest.

### IV. CONCLUSION

The Debtor respectfully requests that the Court enter an order establishing the Bidding Procedures for the sale of the Assets, as well as granting such other and further relief as the Court deems appropriate.

Dated: November 9, 2009

Respectfully submitted,

FRIEDMAN DUMAS & SPRINGWATER LLP

By: */s/ Cecily A. Dumas*
Cecily A. Dumas
Proposed Attorneys for Debtor
THE WILKES BASHFORD COMPANY