FRIEDMAN DUMAS & SPRINGWATER LLP
CECILY A. DUMAS (S.B. NO. 111449)
M. ELAINE HAMMOND (S.B. NO. 197444)
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone Number: (415) 834-3800
Facsimile Number: (415) 834-1044

Proposed Attorneys for Debtor
THE WILKES BASHFORD COMPANY

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>The Wilkes Bashford Company,<br><br>        Debtor.<br><br>Tax I.D. 94-2944325 | Case No. 09-33497 TEC<br><br>Chapter 11<br><br>DECLARATION OF MICHAEL APPEL IN SUPPORT OF FIRST DAY MOTIONS OF THE DEBTOR<br><br>Date: November 10, 2009<br>Time: 9:30 a.m.<br>Place: United States Bankruptcy Court<br>       235 Pine Street, Courtroom 23<br>       San Francisco, CA<br>Judge: Thomas E. Carlson |

I, Michael Appel, hereby declare as follows:

1. I am the Interim CEO of The Wilkes Bashford Company ("Debtor"), debtor and debtor in possession in the above-captioned bankruptcy case, and the designated responsible individual for the Debtor. I make this declaration in that capacity and in support of the following "first day" motions of the Debtor:

    (a) *Emergency Motion for Order Authorizing Debtor to: (A) Use Cash Collateral; (B) Incur Postpetition Debt; (C) Grant Certain Liens and Provide Security and Other Relief to Ed Mitchell West, LLC; and (D) Grant Certain Liens and Provide Adequate Protection to Comerica Bank* (the "DIP Financing Motion"),

(b) *Emergency Motion for Order Authorizing Use of Cash Collateral and Granting Replacement Liens Pursuant to Bankruptcy Code §§ 361 and 363* (the "<u>Cash Collateral Motion</u>"),

(c) *Emergency Motion for Order Authorizing Use of Existing Bank Accounts, Cash Management System and Business Forms* (the "<u>Cash Management Motion</u>"),

(d) *Emergency Motion for Order Authorizing (A) Payment of Prepetition Wages, Salaries and Commissions and (B) Payment or Honoring of Prepetition Employee Benefits* (the "<u>Employee Wage Motion</u>"),

(e) *Emergency Motion for Order Authorizing Continued Use of Customer Programs and the Honoring of Prepetition Obligations to Customers* (the "<u>Customer Programs Motion</u>"),

(f) *Emergency Motion for Order Authorizing Payment of Funds Held in Trust* (the "<u>Trust Funds Motion</u>"), and

(g) *Emergency Motion to Establish Bid Procedures and Allow Break-up Fee in Connection with the Sale of Assets Pursuant to Bankruptcy Code § 363* (the "<u>Bid Procedures Motion</u>").

2. If called upon to do so, I could and would testify, of my own personal knowledge, to the facts set forth herein.

3. I have served as the Interim CEO of the Debtor since March 2009, and have extensive experience as an executive of retail businesses, with particular expertise in the operations and turnaround of specialty retailers. In my capacity as Interim CEO I have obtained information regarding the operations of the Debtor and its financial performance. If called upon to testify as to the matters set forth in this declaration, I could and would competently testify thereto, as the facts set forth herein are personally known to me or I have gained knowledge of them from the business records of the Debtor maintained in the ordinary course of business.

**The Chapter 11 Filing**

4. On the Petition Date, the Debtor filed a voluntary petition with this court for reorganization under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor continues to manage and operate its business as a debtor in

possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated.

5. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**The Debtor's Business and Anticipated Sale**

6. The Debtor is a San Francisco institution and a global icon in luxury specialty retail. Founded in 1966 by Wilkes Bashford, the company offers unmatched merchandise quality and an exceptional level of service to its customers. The stores have a loyal and upscale clientele that appreciates the high-quality garments, superb craftsmanship and masterful coordination offered by the Debtor. The company's exceptional customer service is fully-realized in the long-term relationships established between the members of its sales team and loyal customers.

7. The Debtor's flagship store is located in the Union Square district of San Francisco. It houses six floors of merchandise, segmented by men's and women's collections and a home store, and offers a range of product lines. In 1995, the Debtor opened a "Wilkes Sport" store in Mill Valley, California. In 2001, the Debtor opened its Palo Alto store in the Stanford Shopping Center to better serve its customers in Silicon Valley. In 2006, the Debtor expanded to the Monterey Peninsula, opening a store in Carmel, California.

8. The 2008-2009 recession resulted in poor performance in the luxury sector of the consumer market, including the Debtor. In Spring 2009, the Debtor retained Quest Turnaround Advisors, LLC ("Quest") to assist it in assessing its financing and strategic alternatives, and to improve operating performance. The result of the Debtor's and Quest's efforts was the closure of the Mill Valley store in September 2009 and the Carmel store in October 2009, and a restructuring of the Debtor's prepetition trade payables. The Debtor's principal liabilities consist of its unsecured obligations to vendors, its secured obligation to Comerica Bank and certain shareholders, and its unsecured obligations to landlords.

9. Ultimately, a sale of the business presented the best alternative to address the Debtor's needs. The Debtor entered into negotiations to sell substantially all of its assets to Ed Mitchell West, LLC ("Mitchell"). Mitchell is affiliated with a private luxury apparel retailer located on the East Coast. After the closing of the acquisition, Mitchell will continue to operate the San Francisco and Palo Alto stores. This case is filed in order to consummate the sale according to the terms of the agreement and obtain approval of a sale pursuant to Bankruptcy Code § 363. A motion to approve the sale will be filed shortly after filing; the sale is subject to higher and better offers. The Debtor anticipates obtaining court approval and closing the sale by the end of November; maximizing the value to the estate by providing for a transition prior to the holiday shopping season.

**Creditors Asserting an Interest in Cash Collateral**

10. There are five entities that claim a security interest in assets that are "Cash Collateral" within the meaning of Section 363(a). Following is a summary of the five entities:

- Comerica Bank ("Comerica"). Comerica claims a security interest in all personal property of the Debtor, including accounts, inventory, goods and deposit accounts. It asserts a claim of approximately $ 3,145,237.
- Shareholder Lien Claims. Three shareholders of the Debtor, Wilkes Bashford, Joseph Callahan and Joseph Callahan (collectively, the "Shareholder Lenders"), claim a security interest in Cash Collateral consisting of accounts and inventory of the Debtor and proceeds therefrom. The Shareholder Lenders assert a claim of $750,000 in the aggregate. The security interests of the Shareholder Lenders are subordinate to that of Comerica.
- RAI Credit, LLC ("RAI"). RAI asserts a security interest in Cash Collateral consisting of accounts of the Debtor. RAI provides credit card processing services for purchases made using The Wilkes Bashford

Company credit card. As RAI deducts its fees prior to distribution of payments received to the Debtor, RAI is holding funds of the Debtor in excess of the amounts owed to RAI.

**The DIP Financing Motion**

11. The two months prior to Christmas are a critical period of the year for the Debtor and almost all retailers. It is essential that the Debtor immediately obtain new merchandise in order to increase sales during this defining period. Due to the Debtor's eroding cash position it has been unable to purchase sufficient inventory in recent weeks. The proposed DIP Facility of $650,000 will be used primarily for the purchase of new inventory; thereby enabling the Debtor to prepare for November and December sales and allowing for an orderly sale and transition to the Purchaser. The Debtor shall be permitted to borrow under the DIP Facility in accordance with the terms of the Operating Budget and the Inventory Budget. In order to purchase and obtain inventory in a timely fashion and to provide sufficient funding for ongoing operations, it is essential that the DIP Financing Motion be approved on an emergency interim basis. The ability of the Debtor to obtain sufficient financing for new inventory and ongoing operations is vital to the preservation and maintenance of the going concern value of the Debtor.

12. Concurrently with the negotiation and execution of the Loan Agreement, the Debtor negotiated an Asset Purchase Agreement with Mitchell, whereby Mitchell has agreed to purchase substantially all of the Debtor's assets for the sum of $4,600,000, subject to an inventory-based price adjustment. Mitchell has agreed to allow the Debtor to obtain financing under the Loan Agreement only upon the following terms and conditions, inter alia: (a) approval of the Bid Procedures Order (defined below) identifying Mitchell West as the lead bidder with certain overbid protections, (b) entry of an order (the "Interim Order") authorizing the DIP Financing on an interim basis, on the terms set forth in the form of Interim Order attached to the Introductory Statement, and (c) on the terms set forth in the subsequent final order authorizing postpetition financing.

13. Prior to entering into the Loan Agreement with Mitchell, I conducted a diligent search on behalf of the Debtor to obtain credit. In addition to discussions with Comerica, I contacted senior directors at two additional financial lenders regarding potential advances of funds. Each of these lenders provides financial lending to retail companies. Based on the company's financial performance in 2008 and 2009, the presence of a senior secured lender, the interest rate being provided by Mitchell, and the fact that they would not be providing exit financing, the two additional financial lenders were unwilling to provide postpetition financing to the Debtor.

14. The Debtor is unable to obtain unsecured credit pursuant to Bankruptcy Code §§ 364(a), 365(b), and 503(b)(1). Further, the Debtor has been unable to obtain secured credit pursuant to Bankruptcy Code §§ 364(c)(2) or 364(c)(3), except under the terms and conditions set forth in the proposed Interim Order and Loan Agreement.

15. The relief requested in the DIP Financing Motion is necessary, essential and appropriate for the acquisition of inventory, the continued operations of the Debtor's business, and the preservation of the value of the Debtor's assets for the benefit of its creditors.

16. Mitchell is not a financial institution and is not in the business of lending money. There are no fees associated with this loan. The amount of Mitchell's legal fees that the Debtor is responsible for in negotiating and preparing the Loan Agreement is limited to $15,000. I am informed and believe that the interest is set at a below market interest rate. Mitchell is making the loan because no one else, including Comerica, would, and, absent this loan, there would not sufficient cash to purchase inventory for the business for the holiday season, thus diminishing the value of the company as a going concern to Mitchell (or any other buyer) significantly, perhaps to the point of zero. Thus, in a real sense, without this loan, there may be no buyer for the business, and the Debtor may be forced to liquidate, costing many jobs and greatly diminishing the recovery to unsecured creditors in this case. But with this loan, Mitchell will become a stalking horse bidder for the Debtor's

{00473664.DOC v 4}00473664

6   DECLARATION OF MICHAEL APPEL IN SUPPORT OF FIRST DAY MOTIONS OF THE DEBTOR

Case: 09-33497   Doc# 14   Filed: 11/09/09   Entered: 11/09/09 20:46:18   Page 6 of 17

assets, and they almost certainly will be sold at a going concern—either to Mitchell, or to someone willing to bid more. Thus, it is without doubt in the best interests of the Debtor's estate to enter into this Loan Agreement.

17. The Debtor requests that the Court authorize the Debtor's entry into the Loan Agreement prior to the expiration of the 15 day period. The Debtor requires immediate interim approval in order to obtain the financing necessary to purchase and receive inventory during the month of November, and to finance business operations. If the Debtor is unable to obtain new inventory and pay its postpetition operating expenses, the Debtor's estate will be immediately and irreparably harmed. The new inventory is essential to meeting customer expectations and maintaining sales. Further, sales of new inventory are likely to generate associated sales of inventory currently held by the Debtor. Failure to obtain the additional inventory, would likely result in a significant reduction in sales during the most profitable period for the sales, thereby negatively impacting the value associated with the Debtor for the sale. In order to maintain its operations, the Debtor also needs financing for its on-going operations including the payment of wages and administrative obligations as set forth on the Budget. The Debtor and Mitchell have worked to create the Budget and believe the initial payments anticipated are limited to reasonable and necessary expenses requiring immediate payment to avoid immediate and irreparable harm to the estate.

**The Cash Collateral Motion**

18. The Debtor requires immediate authority to use of Cash Collateral to maintain its business operations and pay its ongoing operational expenses, including without limitation the payment of its employees and on-going costs and expenses necessary to maintain the Debtor's operations for the period prior to the Debtor's sale of assets as an on-going concern. Without the ability to use Cash Collateral, the Debtor cannot meet these expenses and is in jeopardy of having to cease operations.

19. The Debtor needs the use of cash collateral now to avoid immediate and irreparable harm to the Debtor and its bankruptcy estate. In exchange for the use of cash

collateral, the Debtor proposes to maintain the security interests of each of the cash collateral secured creditors by granting them replacement liens to the same validity and extent as their prepetition liens on collateral, and to provide Comerica and the Shareholder Lenders with superpriority administrative claims.

20. The proposed adequate protection to be provided to each of the entities asserting a security interest in Cash Collateral is as follows:

- <u>Comerica</u>. Comerica has stipulated to the use of Cash Collateral and a copy of that stipulation (the "<u>Stipulation</u>") is attached as Exhibit A to the Cash Collateral Motion. The Debtor intends to provide Comerica with adequate protection in the form of a replacement lien in postpetition assets to the same extent, priority and validity as its lien in prepetition assets and a superpriority administrative claim, each to the extent of any diminution in value of Comerica's Cash Collateral.

- <u>Shareholder Lenders</u>. The security interests of the Shareholder Lenders are subordinate to that of Comerica. They have consented to the use of Cash Collateral on the same terms and conditions as Comerica. As adequate protection, the Debtor will provide each of the Shareholder Lenders a replacement lien in postpetition assets to the same extent, priority and validity as its lien in prepetition assets and a superpriority administrative claim, each to the extent of any diminution in value of the Shareholder Lenders' Cash Collateral.

- <u>RAI</u>. As RAI deducts its fees prior to distribution of payments received to the Debtor, RAI is holding funds of the Debtor in excess of the amounts owed to RAI. As adequate protection, the Debtor will provide RAI a lien in postpetition assets to the same extent, priority and validity as its lien in prepetition assets.

21. The Debtor requires authorization on an interim and final basis for use of Cash Collateral in order to maintain its business operations and pay ongoing operational expenses, including employee wages, during the period prior to a sale of the Debtor's assets. The Debtor anticipates a sale of substantially all assets within thirty days of the filing of the case. The Debtor's value in such sale is based on its on-going business operations. Without this authorization the Debtor will be unable to meet its continuing obligations and will be forced to close its doors. In so doing, the Debtor's value will be significantly reduced, thereby reducing the potential recovery to creditors.

22. I have reviewed the Stipulation and the introductory statement and certification of compliance with Guidelines (the "Introductory Statement") submitted in support of the Cash Collateral Motion and declare that the terms of the Stipulation are as provided in the Introductory Statement.

**The Cash Management Motion**

23. Prepetition, the Debtor maintained nine bank accounts with Comerica Bank. The accounts consist of a concentration account, a payroll account, a depository account for receivables paid through American Express, a depository account for receivables paid through MasterCard, Visa and Diner's Club, a depository account to hold funds in trust that are received from customers for custom orders, and depository accounts for each of the four store locations (collectively, the "Bank Accounts"). All of the Bank Accounts, except for the concentration account, are zero balance accounts.

24. In the normal course of operations, funds are received into the appropriate depository account and automatically transferred into the concentration account. Payments are then made from the concentration account, with the exception of manually cut payroll checks which are paid from the payroll account. Upon presentment of a check for payment from the payroll account, funds are automatically withdrawn from the concentration account into the payroll account. A flow chart of the Debtor's Bank Accounts and cash management system is attached to the Cash Management Motion as Exhibit A.

25. The Debtor's cash management system is the standard operating procedure for a retail business operation. Its usage assists the Debtor in reconciling payments received and allows the Debtor to maintain strict control of and visibility into disbursements of the company, thereby efficiently monitoring the Debtor's transactions.

26. In the ordinary course of business, the Debtor uses correspondence and business forms, including letterhead, purchase orders and invoices (collectively, the "<u>Business Forms</u>"). The Debtor is requesting authorization to continue using the Business Forms without modification or reference to its debtor in possession status. The Debtor asserts that requiring new or modified Business Forms creates an unnecessary an expensive burden on the estate.

27. It is in the best interests of the Debtor, the Debtor's estate and potential purchasers for the Debtor to maintain the Bank Accounts and its cash management system. By doing so, the Debtor will avoid the inevitable disruption associated with opening and closing of accounts, will not risk confusion or errors in its accounting from a change in accounts, and will ensure that all payments are properly received and available for use in the Debtor's operations.

28. Each of the Bank Accounts is maintained with Comerica Bank, an authorized depository for the Northern District of California approved by the United States Trustee for Region 17, and the Debtor will change the signature cards on each account to reflect the Debtor's "debtor-in-possession" status. If granted the relief requested in the Cash Management Motion, the Debtor will work with Comerica Bank to ensure that payments issued for prepetition obligations will not be honored postpetition, except as authorized by orders of this Court.

29. Requiring the Debtor to close its prepetition accounts and open new postpetition accounts will cause significant and unnecessary disruption in the Debtor's business, particularly where it is anticipated that the Debtor's assets will be sold within sixty days.

30. Requiring the Debtor to acquire new or modified Business Forms will create an unnecessary and expensive burden on the Debtor's estate. Allowing the Debtor to maintain its current Business Forms will protect and preserve the Debtor's goodwill with its consumers and vendors. Further, requiring a reference to the Debtor's debtor in possession status on Business Forms is unnecessary where creditors and vendors doing business with the Debtor will be aware of the Debtor's bankruptcy filing, pursuant to the notice of case commencement that will be served on all creditors in this case.

**The Employee Wage Motion**

31. The Debtor currently has 56 full-time employees. Many of these employees have been with the company for over 25 years. These long-standing employees, and the specialized knowledge they have acquired through well-established relationships with the company's customers, are a key asset of the Debtor. Where, as here, the Debtor anticipates a sale of its operations on a going-concern basis, one of the significant factors considered by potential purchasers is the continued employment of these employees. If the Debtor were not to pay these employees their prepetition wages and commissions, many of them may move to other luxury retailers, taking their client relationships with them. This movement could have a precipitous effect on the value of the Debtor. In addition, the employees are dependent on their on-going earnings for their basic living expenses and many will suffer extreme personal hardship if the wages are not paid.

32. In the business judgment of the Debtor, the relief requested in the Employee Wage Motion is essential to maintaining the Debtor's value in anticipation of a sale of the Debtor as a going concern. The Debtor is fortunate to have employees who have been with the company many years. The specialized knowledge these employees have acquired through their well-established relationships with customers, are a key asset of the Debtor. Where, as here, the Debtor anticipates a sale of its operations on a going-concern basis, one of the significant factors considered by potential purchasers is the continued employment of these employees.

{00473664.DOC v 4}00473664

11    DECLARATION OF MICHAEL APPEL IN SUPPORT OF FIRST DAY MOTIONS OF THE DEBTOR

Case: 09-33497    Doc# 14    Filed: 11/09/09    Entered: 11/09/09 20:46:18    Page 11 of 17

**The Prepetition Wages and Benefits**

33. The Debtor's employees are paid on the fifteenth and final day of each month in the ordinary course of the Debtor's business. In addition, certain of the employees are paid commissions on the 15th of each month based upon sales made during the prior period. The Debtor estimates that, as of the Petition Date, accrued but unpaid wages are approximately $32,752 and unpaid commissions are approximately $50,371, for an aggregate obligation of approximately $83,123 (the "Prepetition Wages"). None of the employees are anticipated to receive Prepetition Wages in excess of $10,950, the priority claim allowance of Bankruptcy Code § 507(a)(4).

34. In addition, the Debtor's employees have accrued prepetition vacation and sick time of $333,500. The Debtor is seeking authorization to allow employees to use vacation and sick time accrued prepetition in the ordinary course of business, but is not at this time requesting authorization to pay employees the accrued amounts upon termination of their employment.

35. In the ordinary course, certain deductions for taxes, insurance and 401K plan contributions are deducted from each employee's payroll by ADP, the Debtor's payroll processing service. The Debtor believes these continued deductions are authorized in the ordinary course of business. However, to provide assurance to third-parties, the Debtor further requests that the Court authorize the Debtor to process, apply, deduct and pay all standard payroll-deductions from each employee's Prepetition Wages.

**Payment of Taxes on the Prepetition Wages**

36. The Debtor's payroll processor, ADP, automatically calculates the applicable payroll taxes related to the Prepetition Wages, obtains funding from the Debtor for wages and associated taxes, and forwards the payment to the tax authorities when payroll is paid. Consistent with this practice, the Debtor further requests authorization to pay the payroll taxes associated with the Prepetition Wages.

**The Customer Programs Motion**

37. In the ordinary course of its business, the Debtor provides essential customer programs and practices including, its store return policy, store credit and the issuance of gift certificates (the "Customer Programs"). The Customer Programs are directed at customers and cost very little but generate significant benefits for the Debtor. The customer loyalty generated from these programs is essential in the luxury specialty retail business of the Debtor, as approximately 70% of the Debtor's sales are from repeat customers. The Customer Programs are described below:

- Return Policy: The Debtor allows returns of merchandise for 10 days following purchase, excluding sale merchandise.
- Store Credit: The Debtor maintains store credit accounts for customers that return merchandise or provide services to the Debtor. When a return is made or service is provided, instead of payment the Debtor will provide store credit to the customer to be applied toward future purchases. The Debtor currently has outstanding obligations for store credit of $95,815.05.
- Gift Certificates: Customers may purchase gift certificates in varying amounts. The Debtor currently has outstanding obligations for gift certificates of $44,131.60.

38. The Debtor intends to continue operations through the closing of a sale of the business as an on-going concern. It is critical to the Debtor's viability and continued market presence that it be allowed to maintain and continue its Customer Programs and to honor its related prepetition obligations without interruption. Discontinuation of Customer Practices would disrupt business operations, generate adverse publicity and undermine the Debtor's customer base. These changes would impact the Debtor's reputation and could negatively impact its value to the detriment of creditors.

**The Trust Funds Motion**

39. Prepetition, the Debtor held several special events, or trunk shows, for select vendors. The trunk shows are attended by some of the Debtor's most valued customers. As a result of the trunk shows, the Debtor currently holds funds received from customers in a separate account (the "Trust Funds"). The total value of Trust Funds is $95,892.20. The Trust Funds are held in trust for special orders and custom clothing ordered by customers from the following vendors:

| | |
|---|---|
| Kiton ("Kiton"): | $41,689.00 |
| Ermenegildo Zegna ("Zegna"): | $8,556.00 |
| Donald Deal ("Deal"): | $19,031.76 |
| Others (the "Other Vendors"): | $26,615.44 |

40. The Debtor received funds from customers for custom, made-to-order merchandise. These funds are held in a separate account from the Debtor's general account. The Debtor asserts that these funds are held in trust and may not be used for the benefit of the Debtor's estate.

41. The Debtor continues to hold trunk shows and receive customer deposits for special order merchandise in the ordinary course of its business. The Debtor is aware of approximately $20,000 in customer deposits authorized for payment but not received prior to the filing. The Debtor anticipates receiving additional customer deposits for special order clothing postpetition. The Debtor will receive the funds associated with these transactions as credit card payments are processed.

42. The Debtor further requests that the Court order Kiton, Zegna, Deal, and the Other Vendors to apply the Trust Funds, and subsequent funds received for custom orders, to the associated custom orders. This requirement is necessary in order to maintain the benefit to the customer of the Trust Funds. The Debtor believes it is also in the benefit of these vendors to maintain the loyalty of some of their most valued repeat customers.

**Bid Procedures Motion**

43. For over eight months, Debtor has worked to improve its operations, while seeking outside financing, and marketing the company. In this process, the Debtor has been assisted by three investment bankers and financial advisors. Through these advisors, the Debtor has pursued potential sales with financial and strategic buyers. Prior to the filing, the Debtor engaged in extensive, targeted marketing efforts that resulted in a significant exposure to appropriate markets for this company.

44. Prepetition, the Debtor negotiated a sale of the Assets to Mitchell to be accomplished through a sale approved by the Court pursuant to Bankruptcy Code § 363. Mitchell submitted an all cash offer of $4,600,000, plus or minus adjustments for inventory (the "Asset Purchase Price"). Mitchell will be the stalking horse bidder and Debtor is seeking approval to sell Assets to Mitchell subject to the opportunity for parties to submit higher or better offers as set forth herein.

45. The Debtor seeks an order approving the bidding procedures and a break-up fee as set forth in the Bid Procedures Motion. Here, the Debtor submits that the Bidding Procedures proposed are fair and equitable and designed to maximize the value received for the Debtor's Assets for the following reasons:

46. Due Diligence. The procedures balance the need of bidders to conduct due diligence against the interests of the Debtor and creditors in protecting the bankruptcy estate. The procedures provide potential bidders with a full opportunity to conduct due diligence, but all such parties will be required to execute non-disclosures agreements with terms consistent to those executed by Purchaser.

47. Bidding Qualifications. The Debtor has proposed that each Prospective Bidder be required to meet some very basic qualifications before they are permitted to bid upon the Assets. The requirement that Qualified Bidders be required to make an earnest money deposit guards against frivolous bidding, and the condition that Prospective Bidders

produce evidence of their financial position helps to assure that a winning bidder is actually able to close a sale.

48. <u>Terms of Overbid</u>. The Debtor requires all overbids to be in cash and on the same terms as the APA between the Debtor and Purchaser. The requirement of an all cash offer is justified given the risk of non-payment associated with non-cash offers. In addition, limiting bids to a mark-up of the form of APA agreed to by Purchaser creates an orderly process that facilitates the Debtor's ability to compare and evaluate competing offers to determine which yields the highest and best return for the estate.

49. <u>Break-up Fee</u>. The Debtor believes that the break-up fee included in the Bidding Procedures has been and will be beneficial to maximizing value. In support of this position, the Debtor asserts that the Break-up Fee: (1) is the result of an arm's length negotiation, (2) is designed to encourage, rather than hamper bidding, and (3) the amount of the break-up fee is reasonable relative to its overall benefit of the estate.

50. The Debtor believes that granting the Break-up Fee to Mitchell provided it with an incentive to act as a "stalking horse" purchaser and to negotiate the initial terms of sale. The Break-up Fee is the result of an arms-length negotiation between the parties. Mitchell's offer now sets a threshold for determining and encouraging serious alternative bidders. Further, the amount of the Break-up Fee is reasonable and equal to approximately 2.25% of the minimum sales price, plus reasonable expenses incurred by Mitchell. As such, it appropriately compensates Mitchell for its investment of time and finances in negotiating the Agreement without prohibiting Prospective Bidders from participating in the sale process.

51. The Debtor submits that the Bidding Procedures help to motivate the sale of the Assets and encourage the participation of Prospective Bidders by providing reasonable notice of the sale and the terms for participation to all parties in interest.

///

///

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 8th day of November, 2009 at Purchase, New York.

*/s/ Michael Appel*
Michael Appel