FRIEDMAN DUMAS & SPRINGWATER LLP
CECILY A. DUMAS (S.B. NO. 111449)
M. ELAINE HAMMOND (S.B. NO. 197444)
150 Spear Street, Suite 1600
San Francisco, CA 94105
Telephone Number: (415) 834-3800
Facsimile Number: (415) 834-1044

Proposed Attorneys for Debtor
THE WILKES BASHFORD COMPANY

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 09-33497 TEC |
| The Wilkes Bashford Company, | Chapter 11 |
| Debtor. | **MOTION FOR ORDER (I) AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS PURSUANT TO BANKRUPTCY CODE § 363, (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO BANKRUPTCY CODE § 365, AND (III) MAKING FINDINGS PURSUANT TO BANKRUPTCY CODE § 363(m)** |
| Tax I.D. 94-2944325 | |

**Being Heard on Shortened Time**

Date: [TBD]
Time: [TBD]
Place: United States Bankruptcy Court
235 Pine Street, Courtroom 23
San Francisco, CA
Judge: Thomas E. Carlson

}0807043733.DOC v
4}

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 1 of 144

# TABLE OF CONTENTS

Page

I. RELIEF REQUESTED ..................................................................................................... 1

II. STATEMENT OF FACTS ............................................................................................... 2

    A.    The Chapter 11 Filing ..................................................................................... 2

    B.    The Debtor's Business and Anticipated Sale ................................................. 2

    C.    The Debtor's Prepetition Financing and Marketing Efforts............................. 4

    D.    The Asset Purchase Agreement with Purchaser.............................................. 5

    E.    The Assumed Contracts ................................................................................. 7

    F.    Sale Free and Clear of Liens .......................................................................... 8

III. ARGUMENT ................................................................................................................. 9

    A.    Authority for Approval of the Sale ................................................................ 9

    B.    Authority for Sale Free and Clear of Liens. ................................................. 10

        1.    Sale with Consent ........................................................................... 11

        2.    Sale for Price in Excess of Liens ..................................................... 11

    C.    Authority for Section 363(m) and 363(n) Findings. ..................................... 12

    D.    Authority for the Assumption and Assignment of Executory Contracts or Unexpired Leases. ................................................................. 13

    E.    Waiver of Stay Pursuant to Federal Rule of Bankruptcy Procedure 6004(g). ...................................................................................... 14

VI.    CONCLUSION.......................................................................................................... 14

00471733

i

MOTION FOR ORDER AUT{00471733.DOC v 4}HORIZING
SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS
PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 2 of
144

# **TABLE OF AUTHORITIES**

Page

FEDERAL CASES

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),*
    94 B.R. 343 (E.D. Pa. 1988) .................................................................. 11

*Community Thrift & Loan v. Suchy (In re Suchy),*
    786 F.2d 900 (9th Cir. 1985) .................................................................. 14

*Fulton State Bank v. Schipper (In re Fulton State Bank),*
    933 F.2d 513 (7th Cir. 1991) .................................................................. 9

*In re Braniff Airways, Inc.,*
    700 F.2d 935 (5th Cir. 1983) .................................................................. 10

*In re Canonigo,*
    276 B.R. 257 (Bankr. N.D. Cal. 2002) .................................................... 12

*In re Chrysler LLC,*
    576 F.3d 108, 117–18 (2d Cir. 2009) ...................................................... 10

*In re Circus Time, Inc.,*
    5 B.R. 1 (Bankr. D. Me. 1979) .............................................................. 13

*In re Continental Air Lines, Inc.,*
    780 F.2d 1223 (5th Cir. 1986) ................................................................ 10

*In re Evelyn Byrnes, Inc.,*
    32 B.R. 825 (Bankr. S.D.N.Y. 1983) ...................................................... 15

*In re Exennium, Inc.,*
    715 F.2d 1401 (9th Cir. 1983) ................................................................ 14

*In re Financial News Network, Inc.,*
    126 B.R. 152 (S.D.N.Y. 1991 .................................................................. 8

*In re Shary,*
    152 B.R. 724 (Bankr. N.D. Ohio 1993) .................................................. 12

*In re Tabone, Inc.,*
    175 B.R. at 858 ...................................................................................... 11

*In re Work Recovery, Inc.,*
    202 B.R. 301 (Bankr. D. Ariz. 1996) ...................................................... 9

*Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re
    Continental Air Lines, Inc.),*
    780 F.2d 1223 5th Cir. 1986) .................................................................. 9

*Mann v. Alexander Dawson, Inc. (In re Mann),*
    907 F.2d 923 (9th Cir. 1990) .................................................................. 13

00471733

ii

MOTION FOR ORDER AUT{00471733.DOC v 4}HORIZING
SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS
PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 3 of
144

*Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.),*
  846 F.2d 1170 (9th Cir. 1988) ................................................................... 14

*Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments),*
  159 B.R. 821 (N.D. Ill. 1993) .................................................................... 12

*VanHuffel v. Harkelrode,*
  284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931) ...................................... 11

*Veltman v. Whetzal,*
  93 F.3d 517 (8th Cir. 1996) ....................................................................... 11

*Walter v. Sunwest Bank (In re Walter),*
  83 B.R. 14 (9th Cir. BAP 1988) .................................................................. 9

FEDERAL STATUTES

11 U.S.C. § 1107 ............................................................................................ 2

11 U.S.C. § 1108 ............................................................................................ 2

11 U.S.C. § 330 ............................................................................................ 10

11 U.S.C. § 363 ........................................................................................ 1, 3

11 U.S.C. § 363(f)(1) ................................................................................... 11

11 U.S.C. § 363(f)(2) ................................................................................... 11

11 U.S.C. § 363(f)(3) .............................................................................. 11, 12

11 U.S.C. § 363(m) .............................................................................. 12, 13, 14

11 U.S.C. § 363(n) .............................................................................. 12, 13, 14

11 U.S.C. § 365 ............................................................................................ 14

11 U.S.C. § 365(b) ....................................................................................... 13

11 U.S.C. § 365(b)(1) ................................................................................... 13

11 U.S.C. § 365(f) ........................................................................................ 13

11 U.S.C. § 365(f)(2) ................................................................................... 13

28 U.S.C. § 1334 ........................................................................................... 2

28 U.S.C. § 1408 ........................................................................................... 2

28 U.S.C. § 1409 ........................................................................................... 2

28 U.S.C. § 157 ............................................................................................. 2

28 U.S.C. § 157(b)(2) .................................................................................... 2

00471733

iii

MOTION FOR ORDER AUT{00471733.DOC v 4}HORIZING
SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS
PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 4 of
144

1  FEDERAL RULES

2  Fed. Bankr. Proc. 6004 ................................................................................................... 1

3  Fed. Bankr. Proc. 6004(g) ........................................................................................... 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00471733

iv      MOTION FOR ORDER AUT{00471733.DOC v 4}HORIZING
SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS
PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

**TO LIENHOLDERS OF RECORD, NON-DEBTOR PARTIES TO ASSUMED CONTRACTS, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, THE UNITED STATES TRUSTEE, AND ED MITCHELL WEST, LLC:**

The Wilkes Bashford Company ("Debtor"), debtor and debtor-in-possession in the above-captioned case, hereby moves this Court for entry of an order authorizing the Debtor to sell substantially all of its assets free and clear of liens, claims, rights and interests (the "Sale Motion"). The Sale Motion is brought pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 6004. The Sale Motion is based on the discussion below, the memorandum of points and authorities contained herein, the concurrently filed declaration of Michael Appel in support of the Sale Motion ("Appel Declaration"), the other papers of record, and upon such further evidence as may be presented prior to or at the time of the hearing on such motion.

Notice of the Sale Motion is being served on (1) all known creditors, (2) all persons having filed requests for special notice, and (3) all parties to unexpired leases and executory contracts proposed to be assumed and assigned under the sale agreement (the "Assumed Contracts"). Further, this motion, all declarations in support, and a notice of the hearing are being served on (1) all parties asserting a lien on the assets to be sold, (2) all parties to the Assumed Contracts, (3) the Debtor's creditors holding the twenty largest unsecured claims, (3) the Office of the United States Trustee, (4) all persons having filed requests for special notice, and (5) all entities, and if known, their counsel, who have expressed a bona fide interest in acquiring the Debtor's assets or that the Debtor believes may be interested in proposing a competing bid upon assets of the Debtor.

## I.   RELIEF REQUESTED

By the Sale Motion, the Debtor proposes to sell substantially all its assets to Ed Mitchell West, LLC ("Mitchell") for the purchase price of $4,600,000, subject to a purchase price adjustment based on inventory levels, pursuant to the Asset Purchase Agreement (the "Agreement"), attached hereto as Exhibit A.[1]  In connection with the Agreement, the Debtor

---

[1] In the event of any conflict between the provisions of the Agreement and the description of the Agreement in this Sale Motion, the Agreement shall control.

1

will schedule an auction pursuant to Court approved bid procedures to consider alternative proposals or overbids from other parties for some or all of the Debtor's assets. The assets to be sold pursuant to the Agreement include substantially all assets used in the operation of the Debtor's business, including inventory, accounts receivable, customer lists, the Debtor's interest in certain agreements, real property leases, including those related to the Debtor's San Francisco and Palo Alto locations, furniture, fixtures, equipment, and intellectual property, as described more fully in the Agreement (the "Assets"). The Assets will be sold free and clear of liens, except as provided for in the Agreement, with interests to attach to proceeds of the sale.

## II. STATEMENT OF FACTS

### A. The Chapter 11 Filing

On November 8, 2009, the Debtor filed a voluntary petition with this court for reorganization under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed in this chapter 11 case and no committee has been appointed or designated. *See* Appel Decl. ¶ 4.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### B. The Debtor's Business and Anticipated Sale

The Debtor is a San Francisco institution and a global icon in luxury specialty retail. Founded in 1966 by Wilkes Bashford, the company offers unmatched merchandise quality and an exceptional level of service to its customers. The stores have a loyal and upscale clientele that appreciates the high-quality garments, superb craftsmanship and masterful coordination offered by the Debtor. The company's exceptional customer service is

00471733

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 7 of 144

fully-realized in the long-term relationships established between the members of its sales team and loyal customers. *See* Appel Decl. ¶ 5.

The Debtor's flagship store is located in the Union Square district of San Francisco. It houses six floors of merchandise, segmented by men's and women's collections and a home store, and offers a range of product lines. In 1995, the Debtor opened a "Wilkes Sport" store in Mill Valley, California. In 2001, the Debtor opened its Palo Alto store in the Stanford Shopping Center to better serve its customers in Silicon Valley. In 2006, the Debtor expanded to the Monterey Peninsula, opening a store in Carmel, California. *See* Appel Decl. ¶ 6.

The 2008-2009 recession resulted in poor performance in the luxury sector of the consumer market, including the Debtor. In Spring 2009, the Debtor retained Quest Turnaround Advisors, LLC ("Quest") to assist it in assessing its financing and strategic alternatives, and to improve operating performance. The result of the Debtor's and Quest's efforts was the closure of the Mill Valley store in September 2009 and the Carmel store in October 2009, and a restructuring of the Debtor's prepetition trade payables. The Debtor's principal liabilities consist of its unsecured obligations to vendors, its secured obligation to Comerica Bank and certain shareholders (as discussed below), and its unsecured obligations to landlords. *See* Appel Decl. ¶ 7.

Ultimately, a sale of the business presented the best alternative to address the Debtor's needs. The Debtor entered into negotiations to sell substantially all of its assets to Mitchell. Mitchell is affiliated with a private luxury apparel retailer located on the East Coast. After the closing of the acquisition, Mitchell will continue to operate the San Francisco and Palo Alto stores. This case is filed in order to consummate the sale according to the terms of the Agreement and obtain approval thereof pursuant to Bankruptcy Code § 363. *See* Appel Decl. ¶ 8.

### C. The Debtor's Prepetition Financing and Marketing Efforts

Beginning in November 2008, the Debtor worked with North Point Advisors, LLC ("North Point") to raise investment capital for the company through sales of common stock. As a part of its efforts, North Point prepared and distributed detailed marketing information on the company, its assets, its operations, and its people to potential investors. Ultimately, the Debtor was unable to raise sufficient capital to continue pursuing this course of action. *See* Appel Decl. ¶ 9.

Then, in March 2009, the Debtor engaged Quest, whose actions focused on improving the operating performance of the stores, while assessing the financial and strategic alternatives for the company. Through Quest's involvement, Debtor reduced its cost base and expense year-to-date by approximately 35%. This operational improvement was obtained by closing underperforming stores, negotiating a standstill or forbearance on significant debt, generating cash to support inventory purchases through a warehouse sale, and negotiating purchase terms advantageous to the company given its financial situation. As a result the company positioned itself to operate more efficiently and effectively without sacrificing the service that is a hallmark of luxury retail success. These actions increased the marketability of the Debtor, ultimately resulting in the purchase offer from Mitchell. *See* Appel Decl. ¶ 10.

During this restructuring period, in May 2009, the Debtor formally engaged North Point to continue seeking private investment or a sale of the company. Using its experience in the retail marketing area and familiarity with the company, North Point targeted and contacted nineteen potential purchasers. Again, their efforts were unsuccessful. *See* Appel Decl. ¶ 11.

The Debtor then engaged the investment banker Stephens, Inc. ("Stephens") in September 2009 to provide additional assistance in exploring potential sale options. Applying its extensive experience in the luxury retail sector, Stephens identified potential financial and strategic purchasers of the company. Further, Stephens reached out to potential

00471733

4

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 9 of
144

national and international buyers to determine their level of interest in purchasing the company. Their efforts are on-going. *See* Appel Decl. ¶ 12.

Throughout its restructuring process, the Debtor recognized that it would need additional capital in Fall 2009 to fund inventory purchases and support operations. Despite its best efforts, the Debtor was unable to raise capital from outside sources. In order to partially bridge the funding gap, the Debtor obtained $750,000 in additional financing through secured loans from three of its shareholders in August 2009. In addition, the Debtor sought additional financing from customers and community contacts but its efforts were unsuccessful. Despite the cash infusion from the shareholder lenders, the Debtor's cash position has continued to erode and its sales have suffered based on its inability to purchase adequate inventory to support its projected sales plan. *See* Appel Decl. ¶ 13.

Meanwhile, during Quest's engagement as financial advisor, it also marketed the company through its contacts in specialty-retail and private equity markets. Based on its contacts and experience, Quest contacted a dozen potential purchasers. Mitchell was one of the strategic purchaser's contacted by Quest. Despite the targeted and extensive marketing efforts of North Point, Stephens, and Quest, the Mitchell offer is the only purchase offer received by the Debtor. *See* Appel Decl. ¶ 14.

### D. The Asset Purchase Agreement with Purchaser

The Debtor and Mitchell have entered into the Agreement for the purchase of Debtor's Assets. The primary terms of the Agreement are summarized as follows:[2]

> **Purchase Price**: $4,600,000 in cash, subject to an inventory-based purchase price adjustment as set forth in section 3.4 of the Agreement.
>
> **Assets**: Substantially all of the assets of the Debtor, other than Excluded Assets, including Leased Real Property, Fixed Assets, Assumed Contracts, Records, goodwill, customer lists, Prepaid Expenses, Intellectual Property, Permits, Inventory, Accounts Receivable, certain claims/causes of action, Insurance Contracts and Other Assets. The Excluded Assets include Cash, Rejected Contracts, Avoidance Actions, Seller Plans, refunds and claims for refunds of Taxes accrued or accruing as of the Closing Date and certain other assets.

---

[2] Capitalized terms used, but not defined, herein have the meaning ascribed to such terms in the Agreement.

**Assumed Liabilities**: Only the liabilities and obligations of the Debtor under the Assumed Contracts (excluding any liabilities or obligations arising out of any breach by Debtor of the terms thereof, violations of law and further excluding any Cure Costs), but only to the extent such liabilities and obligations first arise and are related to periods subsequent to the Closing Date.

**Assumed Contracts**: The current list of Assumed Contracts is set forth in Exhibit B attached to this Motion. The Assumed Contracts include the Leases for the Leased Real Property, which are subject to the Lease Assignments and Amendments.

Pursuant to the Agreement, Mitchell may remove contracts from this list at any time on or prior to the fifth (5th) business day prior to the Closing Date. The Debtor will pay from the Purchase Price all Cure Costs, including any Cure Costs relating to the Leased Real Property. Additional contracts may be added to the list of Assumed Contracts, provided that to the extent any such contracts are added following service of the Sale Motion and notice of hearing, assumption of such contracts shall be requested by separate motion.

**Closing**: The Closing shall occur no later than November 30, 2009 unless Mitchell consents in writing to a later date.

**Representations and Warranties**: Generally usual and customary for each of the Debtor and Mitchell.

**Covenants**: Generally usual and customary for each of the Debtor and Mitchell.

**Employees**: Mitchell may, in its sole and absolute discretion, offer employment to any or all Employees.

**Conditions Precedent**: Generally usual and customary, including entry of the Sale Order.

**Termination:** The Agreement may be terminated (a) by mutual consent of the Debtor and Mitchell; (b) by either party for the other's material breach, (c) by Mitchell based on its due diligence review of the Purchased Assets and the Business, provided that such termination right becomes inapplicable upon Bankruptcy Court approval of the Breakup Fee, (d) by Mitchell based upon a Material Adverse Effect event, condition or matter, (e) by Mitchell, (i) if the DIP Order is not entered by the Bankruptcy Court on or before November 10, 2009, (ii) the Bid Procedures Order is not entered by the Bankruptcy Court on or before November 10, 2009, (iii) the Sale Order is not entered by the Bankruptcy Court on or before November 25, 2009, (iv) the Closing has not occurred by November 30, 2009, (v) the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed or if the Debtor files a plan of reorganization or liquidation that does not include the consummation of the transactions contemplated hereby with Purchaser, or (vi) if the Seller sells, disposes or transfers any of its material assets or enters into any similar alternative transaction with respect to its assets or equity securities; or (f) by Mitchell or the Debtor, if Mitchell is not the winning bidder at the Auction in accordance with the Bidding Procedures.

00471733

6   MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 11 of 144

The Agreement contemplates that following the closing Mitchell will continue to operate the stores in San Francisco and Palo Alto, California. The Debtor understands that the November 30, 2009 closing deadline and the economic terms of the Agreement are based on Mitchell's ability to operate the stores during the holiday season. Historically, December sales represent approximately 13.5% of the company's annual sales. As these sales are generally not discounted prior to Christmas the return on cost of goods is significantly greater in December than in January. *See* Appel Decl. ¶15.

The Agreement is the result of extensive, arms-length negotiations between the parties, and Mitchell is a good faith purchaser of estate assets. *See* Appel Decl. ¶ 16.

The proposed sale is subject to higher and better offers. An immediate sale on the shortened time requested is appropriate where the company was marketed extensively prepetition, and information on the Assets is readily available.

**E.     The Assumed Contracts**

As noted above, the Agreement provides for the assumption of certain Assumed Contracts by Mitchell, including the Leases for the Leased Real Property, which are subject to the Lease Assignments and Amendments. The Lease Assignments and Amendments are being negotiated by Mitchell and the respective landlords. The Assumed Contracts are necessary for the ongoing operation of the business. The Debtor intends to assume and assign the Assigned Contracts as provided in the Agreement. A list of the Assumed Contracts and cure amounts associated with their assumption and assignment is attached hereto as Exhibit B.[3] The Debtor will separately provide each of the parties to the Assumed Contracts notice of the Cure Amount based on the Debtor's books and records. As noted above and pursuant to the Agreement, Mitchell may remove contracts from this list at any time on or prior to the fifth (5th) business day prior to the Closing Date. Additional contracts may be added to the list of Assumed Contracts, provided that to the extent any such contracts are added following service of the Sale Motion and notice of hearing, assumption of

---

[3] Nothing herein shall be deemed a waiver of the Debtor's right to assert that any agreement listed on Exhibit B is not an executory contract or unexpired lease.

such contracts shall be requested by separate motion.  The Debtor will pay from the Purchase Price all Cure Costs, including any Cure Costs relating to the Leased Real Property.

### F. Sale Free and Clear of Liens

The sale shall be free and clear of liens, except as otherwise provided in the Agreement, provided that such liens may attach to the proceeds.  The following entities assert liens on all or a portion of the Assets:

1. <u>Comerica Bank ("Comerica")</u>:  Comerica has a lien upon all assets of the Debtor.  Comerica consents to the sale free and clear, provided that its lien shall attach to the proceeds.

2. <u>"Shareholder Lenders"</u>:  Three of the Debtor's shareholders assert security interests in the Assets pursuant to secured loans provided to the Debtor.  The Shareholder Lenders consent to the sale free and clear, provided that their liens shall attach to the proceeds.  Further, the Shareholder Lenders have agreed to reduce the outstanding obligations owed to them from $750,000, in the aggregate, to $300,000, in the aggregate.

3. <u>RAI Credit, LLC ("RAI")</u>:  RAI asserts a security interest in Cash Collateral consisting of accounts of the Debtor.  RAI provides credit card processing services for purchases made using The Wilkes Bashford Company credit card.  As RAI deducts its fees prior to distribution of payments received to the Debtor, RAI is holding funds of the Debtor in excess of the amounts owed to it.  The Agreement provides that the agreement with RAI will not be assumed and assigned to Mitchell.

4. <u>Winthrop Resources Corporation ("Winthrop")</u>:  Winthrop leased computer equipment and software to the Debtor.  Winthrop asserts that its lease is a true lease and has filed a precautionary UCC-1 financing statement.  Pursuant to the Agreement, the leases with Winthrop will be assigned to Mitchell, subject to Winthrop's lien.  If Mitchell determines to reject the Winthrop leases, then its collateral will not be included in the sale.  *See* Appel Decl. ¶ 17.

# III. ARGUMENT

The Debtor submits that a sale of its business as a going concern is most likely to yield the maximum recovery to creditors. This Sale Motion seeks approval of the sale of the Assets to Purchaser, subject to higher and better bids at an auction to be held in the bankruptcy court. *See, e.g., In re Financial News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (legitimate purpose of sales procedures is "to ensure fair comparability between competing bids or to protect other bidders who have limited their bids to the announced terms"). Following extensive marketing efforts, the Debtor believes that the Agreement with Mitchell provides a fair return on the Assets and a greater recovery than the Debtor would obtain in a liquidation.

## A. Authority for Approval of the Sale

In general, the Court should approve a sale of property of the estate under § 363(b) if there exists "some articulated business justification" for the transaction. *See Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. BAP 1988) (quoting *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re Lionel Corporation*, 722 F.2d 1063 (2nd Cir. 1983) (same); *Fulton State Bank v. Schipper (In re Fulton State Bank)*, 933 F.2d 513, 515 (7th Cir. 1991) (requiring articulated business justification, notice to creditors, and hearing on proposed sale). Before approving a sale of substantially all of the debtors assets, the Court should also consider whether the proposed transaction will further the diverse interests of the debtor, creditors, and equity holders, whether the assets are increasing or decreasing in value, and whether allowing the transaction would render meaningless the protections afforded to creditors under chapter 11. *See In re Work Recovery, Inc.*, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986)); *see also In re Chrysler LLC*, 576 F.3d 108, 117–18 (2d Cir. 2009); *Lionel*, 722 F.2d at 1071; *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983).

00471733

9

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 14 of
144

For over eight months, Debtor has worked to improve its operations, while seeking outside financing, and marketing the company; the best, and only, offer it has received is the Mitchell offer. The Debtor negotiated the Agreement with Mitchell at arms' length. The Debtor submits that the proposed sale provides the best potential return to the estate and its creditors. If the sale is not approved and closed on the terms provided, the Debtor will likely be forced to liquidate, resulting in employment losses and a reduced recovery for creditors.

The Debtor anticipates that the sale proceeds will provide a positive recovery for the estate. In connection with the sale, the Shareholder Lenders have agreed to reduce their secured claims from an aggregate of $750,000 to $300,000. Additionally, to the extent that Quest is entitled to recover a success fee in connection with this sale, allowance of such fee shall be subject to Court authorization pursuant to Bankruptcy Code § 330, and has been voluntarily capped at $250,000. Following payment of administrative costs and allowed cure amounts, the Debtor anticipates that the sale proceeds will be sufficient to satisfy the secured claims in full (with the Shareholder Lender reduction) and may produce a recovery for general unsecured creditors.

### B. Authority for Sale Free and Clear of Liens.

The power of the bankruptcy court to sell property free and clear of liens has long been recognized. *See VanHuffel v. Harkelrode*, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931). Section 363(f) of the Bankruptcy Code provides that the Court may authorize a sale of the Assets, free and clear of any interest of an entity other than the estate, if:

> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is in a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f).

00471733

10   MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 15 of 144

### 1. Sale with Consent

A debtor in possession may sell property of the estate free and clear of liens or other interests when the lienholder consents to the sale. 11 U.S.C. § 363(f)(1). Consent may be express or may be implied from the circumstances surrounding the sale. *See e.g., Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale constituted consent); *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),* 94 B.R. 343 (E.D. Pa. 1988) (failure to object satisfied consent requirement of section 363(f)(2)); *In re Tabone, Inc.*, 175 B.R. at 858 (failure to object to notice of sale or attend hearing deemed consent to sale); *In re Shary*, 152 B.R. 724 (Bankr. N.D. Ohio 1993) (failure to object to transfer of liquor license constituted consent to sale).

The Debtor has obtained the consent of Comerica and the Shareholder Lenders to a sale free and clear of their liens, provided that such liens attach to the proceeds. If any additional lienholders, all of which will have received notice of this Sale Motion, do not object, they will be deemed to have consented to the requested relief and the proposed sale free and clear of their claim of lien will be appropriate under Bankruptcy Code § 363(f)(2).

### 2. Sale for Price in Excess of Liens

A debtor in possession may sell assets free and clear of liens or interests where the price at which the property is to be sold is greater than the aggregate value of all liens on the property. 11 U.S.C. § 363(f)(3); *see e.g., In re Canonigo*, 276 B.R. 257, 262 (Bankr. N.D. Cal. 2002) (free and clear sale is authorized where the sale price of the property exceeds the full face amount of the claims that the liens secure). The rationale is that such a sale will fully compensate the secured creditors and produce some equity for the benefit of the bankruptcy estate. *Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments)*, 159 B.R. 821 (N.D. Ill. 1993). Even when creditors' claims against estate's property have not yet been determined, a free and clear sale of such property may still be authorized, where the amount to be realized from a proposed sale exceeds the aggregate value of the liens in property and the price offered by the purchaser is fair and reasonable, and is best possible offer obtainable.

1  *See In re Circus Time, Inc.*, 5 B.R. 1 (Bankr. D. Me. 1979).  Such secured creditors are

2  afforded adequate protection by having their interests attached to the proceeds of the sale.  *Id*.

3       Therefore, a sale free and clear is appropriate under Bankruptcy Code §

4  363(f)(3) if the price for which the Assets are to be sold exceeds the amount of the claim of

5  lien.  Here, the Purchase Price is in excess of the claim amounts of Comerica and the

6  Shareholder Lenders.  The voluntary reduction in claims of the Shareholder Lenders provides

7  an additional inducement and benefit to the estate.  As RAI is holding funds in excess of any

8  amounts due to it, the Debtor asserts that it has no claim to be addressed and the Assets may

9  be sold free and clear of its lien.

10      **C.      Authority for Section 363(m) and 363(n) Findings.**

11      The Debtor requests as part of the approval of the proposed sale that the Court

12  find that Mitchell will be completing the sale in good faith within the meaning of Bankruptcy

13  Code § 363(m) and that Mitchell has not engaged in any conduct that would cause the sale to

14  be avoided as contemplated in § 363(n) of the Bankruptcy Code.

15      Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or

16  modification on appeal of an authorization under subsection (b) or (c) of this section of a sale

17  or lease of property does not affect the validity of a sale or lease under such authorization to

18  an entity that purchased or leased such property in good faith . . . ."  11 U.S.C. § 363(m).

19  Under Bankruptcy Code § 363(m), "an appeal of a bankruptcy court's ruling on a foreclosure

20  action [or sale] generally cannot affect the rights of a good faith purchaser of the foreclosed

21  property, unless the debtor [or other complaining party] stays the foreclosure [or other] sale

22  pending an appeal."  *Mann v. Alexander Dawson, Inc. (In re Mann)*, 907 F.2d 923, 926 (9th

23  Cir. 1990)  "[T]he primary goal of the mootness rule [embodied in section 363(m)] 'is to

24  protect the interest of a good faith purchaser . . . of the property,' thereby assuring finality of

25  sales."  *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d

26  1170, 1173 (9th Cir. 1988) (quoting *Community Thrift & Loan v. Suchy (In re Suchy)*, 786

27  F.2d 900, 901-02 (9th Cir. 1985).  Lack of good faith for purposes of Bankruptcy Code §

28

363(m) is generally determined by the existence of fraudulent conduct or insider dealing during the sale process. *See, e.g., In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir. 1983).

Section 363(n) of the Bankruptcy Code authorizes the avoidance of a sale transaction if "the sale price was controlled by an agreement among potential bidders at such sale." 11 U.S.C. § 363(n).

In this case, no such collusive conduct or insider dealings have occurred as of the date of this Sale Motion and will not occur prior to the hearing on the sale. Mitchell is not an insider of the Debtor, and the Debtor negotiated the Agreement with Mitchell at arms' length. Mitchell has or will file a declaration in support of this relief in accordance with the local guidelines. Accordingly, the protection of Bankruptcy Code § 363(m) is appropriate in this case and the avoidance powers of § 363(n) are not applicable.

### D.    Authority for the Assumption and Assignment of Executory Contracts or Unexpired Leases.

Bankruptcy Code § 365(f) of the Bankruptcy Code provides that debtors in possession may assign executory contracts or unexpired leases if they first assume such contracts or leases and provide adequate assurance of future performance by the assignees of such contracts or leases. 11 U.S.C. § 365(f)(2). Section 365(b), in turn, provides that:

> [I]f there has been a default in an executory contract or unexpired lease of the debtor, the [debtor in possession] may not assume such contract or lease unless, at the time of assumption, the [debtor in possession] … cures, or provide adequate assurance that the [debtor in possession] will promptly cure, such default.

Id. § 365(b).

Cure payments for the Assumed Contracts, to the extent required pursuant to Bankruptcy Code § 365(b)(1)(A)&(B), will be made or reserved from the sale proceeds at the time of the sale closing. As provided in the Bid Procedures, the Debtor will present information from Mitchell and any potential bidders regarding their financial capability and willingness to perform such obligations as will constitute sufficient "adequate assurance of future performance" to justify a proposed assumption and assignment of the agreements. *See*

00471733

13    MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 18 of 144

*e.g., In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 828-29 (Bankr. S.D.N.Y. 1983) ("The terms 'adequate assurance' of future performance are not words of art; the legislative history of the Code shows that they were intended to be given a practical, pragmatic construction. As such, its primary focus centers on the assignee's ability to satisfy the financial obligations imposed by the lease.") (citation omitted).

**E. Waiver of Stay Pursuant to Federal Rule of Bankruptcy Procedure 6004(g).**

Federal Rule of Bankruptcy Procedure 6004(g) provides that, unless the Court orders otherwise, an order authorizing the sale will be stayed for ten days after entry. Fed. R. Bankr. Pro. 6004(g). Here, the Debtor requests that the Court waive the ten day stay pursuant to Rule 6004(g). The sale is premised on Mitchell being able to close the transaction on or before November 30, 2009, so that Mitchell can operate the business for the crucial holiday season. This key timing component to the transaction means that the parties cannot afford to wait the automatic ten days contemplated by Rule 6004(g).

## VI. CONCLUSION

The Debtor respectfully requests that the Court enter an order (1) authorizing the Debtor to sell the Assets to Mitchell, subject to higher and better offers, pursuant to the terms of the Agreement and Bankruptcy Code § 363(b), (2) authorizing the Debtor to sell the Assets free and clear of liens pursuant to Bankruptcy Code § 363(f), (3) authorizing the Debtor to assume and assign the Assumed Contracts pursuant to the terms of the Agreement and Bankruptcy Code § 365, (4) finding that Mitchell is a good faith purchaser within the meaning of Bankruptcy Code § 363(m), such that the reversal or modification on appeal of such order shall not affect the validity of the sale unless the sale is stayed pending appeal, (5) finding that Mitchell has not engaged in any conduct that would cause the sale to be avoided as contemplated in Bankruptcy Code § 363(n), (6) waiving the stay of such order pursuant to Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, and (7) granting such other and further relief as is just and proper.

00471733

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS PURSUANT TO BANKRUPTCY CODE § 363 ET AL.

1    Dated: November 9, 2009             Respectfully submitted,

2

3                                      FRIEDMAN DUMAS & SPRINGWATER LLP

4

5                             By:   */s/ Cecily A. Dumas*

6                                  Cecily A. Dumas

                                    Proposed Attorneys for Debtor

7                                  THE WILKES BASHFORD COMPANY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00471733

15    MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
           ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
           BANKRUPTCY CODE § 363 ET AL.

# EXHIBIT A

ASSET SALE AND PURCHASE AGREEMENT

BY AND AMONG

THE WILKES BASHFORD COMPANY,

AS SELLER,

AND

ED MITCHELL WEST LLC,

AS PURCHASER,


November 7, 2009

# TABLE OF CONTENTS

SECTION 1.          DEFINITIONS ....................................................................................1

SECTION 2.          PURCHASE AND SALE OF THE PURCHASED ASSETS. ...................7
   Section 2.1.      Purchased Assets. ...............................................................................7
   Section 2.2.      Sale at Closing Date ........................................................................10
   Section 2.3.      Assumption of Assumed Liabilities; Exclusion of Excluded
                   Liabilities ........................................................................................10
   Section 2.4.      Prorations and Charges ....................................................................11
   Section 2.5.      Disclosure Schedule Updates; Cure Costs ...............................11

SECTION 3.          PURCHASE PRICE ...........................................................................12
   Section 3.1.      Purchase Price ..................................................................................12
   Section 3.2.      Allocation of Purchase Price ...........................................................12
   Section 3.3.      Purchase Price Deposit ....................................................................12
   Section 3.4.      Purchase Price Adjustment ..............................................................13

SECTION 4.          CLOSING. .........................................................................................14
   Section 4.1.      Closing. .............................................................................................14
   Section 4.2.      Deliveries at Closing .......................................................................14

SECTION 5.          REPRESENTATIONS AND WARRANTIES OF SELLER ..................14
   Section 5.1.      Corporate Organization ...................................................................14
   Section 5.2.      Qualification to Do Business ...........................................................14
   Section 5.3.      Authorization and Validity of Agreement .......................................15
   Section 5.4.      No Conflict or Violation ..................................................................15
   Section 5.5.      Consents and Approvals ...................................................................15
   Section 5.6.      Good Title; Sufficiency of Assets ...................................................15
   Section 5.7.      Absence of Certain Changes or Events ...........................................16
   Section 5.8.      Real Property. ...................................................................................17
   Section 5.9.      Intellectual Property. .......................................................................18
   Section 5.10.     Permits ..............................................................................................19
   Section 5.11.     Compliance with Law ......................................................................19
   Section 5.12.     Litigation ..........................................................................................19
   Section 5.13.     Material Contracts ............................................................................19
   Section 5.14.     Tax Matters. ......................................................................................21
   Section 5.15.     Seller Plans .......................................................................................21
   Section 5.16.     Employees .........................................................................................22
   Section 5.17.     Labor Matters; Employment Agreements ........................................22
   Section 5.18.     Bank Accounts ..................................................................................22
   Section 5.19.     Environmental Matters and Employee Health and Safety Matters. ..........22
   Section 5.20.     Affiliate Relationships .....................................................................23
   Section 5.21.     Financial Instruments ......................................................................24
   Section 5.22.     Insurance ...........................................................................................24
   Section 5.23.     Financial Statements ........................................................................24

i

Section 5.24. Brokers/Finders ...................................................................................24

SECTION 6. REPRESENTATIONS AND WARRANTIES OF PURCHASER. .........24
Section 6.1. Formation ...............................................................................................24
Section 6.2. Authorization and Validity of Agreement .............................................25
Section 6.3. No Conflict or Violation ........................................................................25
Section 6.4. Consents and Approvals .........................................................................25

SECTION 7. COVENANTS OF SELLER. ...........................................................25
Section 7.1. Conduct of Business Before the Closing Date ........................................25
Section 7.2. Consents and Approvals .........................................................................27
Section 7.3. Access to Properties and Records ...........................................................27
Section 7.4. Notices of Certain Events .......................................................................27
Section 7.5. Name Change .........................................................................................28
Section 7.6. Financial Reports ...................................................................................28
Section 7.7. Budgets ..................................................................................................28
Section 7.8. Appel as Chief Executive Officer ...........................................................28

SECTION 8. COVENANTS OF PURCHASER. ....................................................28
Section 8.1. Actions Before Closing Date ..................................................................28
Section 8.2. Consents and Approvals .........................................................................29
Section 8.3. Notices of Certain Events .......................................................................29

SECTION 9. COVENANTS OF SELLER AND PURCHASER ...............................29
Section 9.1. Amendments to Leases ...........................................................................29
Section 9.2. Retained Jurisdiction ..............................................................................29
Section 9.3. Assignability of Certain Contracts .........................................................29
Section 9.4. Further Agreements ................................................................................30

SECTION 10. EMPLOYEES ...............................................................................30
Section 10.1. Offers of Employment ...........................................................................30
Section 10.2. Terms of Employment of Transferred Employees ..................................30
Section 10.3. Employee Benefits for Transferred Employees.......................................31
Section 10.4. WARN Act Liability ..............................................................................31
Section 10.5. Appel Employment ................................................................................32

SECTION 11. CONDITIONS PRECEDENT TO PERFORMANCE BY
SELLER. .................................................................................................32
Section 11.1. Representations and Warranties of Purchaser .........................................32
Section 11.2. Performance of the Obligations of Purchaser.........................................32
Section 11.3. Consents and Approvals .........................................................................32
Section 11.4. No Violation of Orders ..........................................................................32
Section 11.5. Delivery of Ancillary Agreements .........................................................32
Section 11.6. Resolutions; Secretary's Certificate .......................................................33

SECTION 12. CONDITIONS PRECEDENT TO PERFORMANCE BY
PURCHASER.............................................................................................33

ii

Section 12.1.     Representations and Warranties of Seller ................................................. 33
Section 12.2.     Performance of the Obligations of Seller ............................................... 33
Section 12.3.     Consents and Approvals ........................................................................ 33
Section 12.4.     No Violation of Orders ......................................................................... 33
Section 12.5.     Delivery of Ancillary Agreements ........................................................ 33
Section 12.6.     No Material Adverse Effect ................................................................... 34
Section 12.7.     Resolutions; Secretary's Certificate ...................................................... 34
Section 12.8.     Permits ................................................................................................... 34
Section 12.9.     Completion of Due Diligence ................................................................ 34
Section 12.10.    Employment, Non-Competition, Non-Solicitation and Confidentiality Agreements ....................................................................... 34
Section 12.11.    Leased Real Property ............................................................................. 34
Section 12.12.    Concession Arrangements ..................................................................... 34

SECTION 13.         CONDITIONS PRECEDENT TO PERFORMANCE BY THE PURCHASER AND THE SELLER. ........................................................ 34

SECTION 14.         BANKRUPTCY PROCEDURES. .......................................................... 35
Section 14.1.     Bankruptcy Court Approval of Purchaser as Stalking Horse ................... 35
Section 14.2.     Motions and Notices Regarding Sale of Acquired Assets and Assumption and Assignment of Seller Contracts ..................................... 35
Section 14.3.     Requests for Information ....................................................................... 35
Section 14.4.     Breakup Fee .......................................................................................... 36
Section 14.5.     Certain Bankruptcy Undertakings by Seller. ......................................... 36

SECTION 15.         TERMINATION. .................................................................................. 37
Section 15.1.     Conditions of Termination .................................................................... 37
Section 15.2.     Effect of Termination ........................................................................... 38

SECTION 16.         MISCELLANEOUS. ............................................................................. 38
Section 16.1.     Successors and Assigns ........................................................................ 38
Section 16.2.     Governing Law, Jurisdiction ................................................................. 38
Section 16.3.     Expenses ............................................................................................... 39
Section 16.4.     Broker's and Finder's Fees .................................................................... 39
Section 16.5.     Severability ........................................................................................... 39
Section 16.6.     Notices .................................................................................................. 39
Section 16.7.     Amendments; Waivers .......................................................................... 40
Section 16.8.     Public Announcements .......................................................................... 40
Section 16.9.     Entire Agreement .................................................................................. 40
Section 16.10.    Parties in Interest .................................................................................. 41
Section 16.11.    Section and Paragraph Headings .......................................................... 41
Section 16.12.    Construction ......................................................................................... 41
Section 16.13.    Counterparts ......................................................................................... 41

CHI 58778967v2

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 25 of 144

# ASSET SALE AND PURCHASE AGREEMENT

This Asset Sale and Purchase Agreement (the "**Agreement**") is dated as of November 7, 2009 (the "**Execution Date**"), by and among The Wilkes Bashford Company, a California corporation (the "**Seller**"), and Ed Mitchell West LLC, a Delaware limited liability company ("**Purchaser**").

## PREAMBLE

A.    Seller is engaged in the retail sale of designer clothing and related merchandise in Northern California (the "**Business**").

B.    On the Filing Date, Seller will file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "**Bankruptcy Court**"), at which time a Case Number will be assigned (the "**Bankruptcy Case**").

C.    Seller currently wishes to sell, transfer, convey, assign and deliver the Purchased Assets to Purchaser, in accordance with Sections 363(f) and 365 and other applicable provisions of the Bankruptcy Code (the "**Sale of Assets**").  On the Filing Date, Seller will file the Motions referred to in Section 14.

D.    Seller proposes to complete the Sale of Assets to Purchaser pursuant to this Agreement and in accordance with the Sale Order to be entered by the Bankruptcy Court.

E.    Therefore, the parties, intending to be legally bound, hereby agree as follows:

SECTION 1.    <u>DEFINITIONS</u>.

As used in this Agreement, the following terms have the following meanings:

"**Accounts Receivable**" has the meaning set forth in Section 2.1(a)(xi).

"**Adjustment Inventory**" means the following types of Inventory included in the Purchased Assets with full right, title and interest transferred to Purchaser at Closing (free and clear of all Liens): mens' and womens' clothing, shoes, accessories and jewelry.

"**Affiliate**" means any Person that, directly or indirectly, controls, is controlled by, or is under common control with, the subject party.  For purposes of the preceding sentence, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power (i) to vote more than 20% of the securities having ordinary voting power for the election of directors or managers of the controlled Person, or (ii) to direct or cause the direction of management and policies of the controlled Person, whether through the ownership of voting securities or by Contract or otherwise.

"**Agent**" means  Comerica Bank, N.A.

"**Agreement**" means this Agreement, as amended and in effect from time to time.

"**Allocation Statement**" has the meaning set forth in Section 3.2.

"**Ancillary Agreements**" means collectively the Bill of Sale, the Lease Assignments and Amendments, the Trademark Assignments, the Domain Name Assignments, the Assignment and Assumption Agreement and the other agreements, documents and instruments to be executed in connection with the Closing.

"**APA Term Sheet**" means the Term Sheet With Respect to the Asset Acquisition From The Wilkes Bashford Company, executed by Seller and by an Affiliate of Purchaser, dated October 21, 2009 (as amended from time to time).

"**Appel**" means Michael Appel, a managing director of Quest Turnaround Advisors LLC based in Purchase, New York, who is currently serving as the interim Chief Executive Officer of Seller.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 2.3(a).

"**Assumed Contracts**" has the meaning set forth in Section 2.1(a)(iii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3(a).

"**Avoidance Actions**" has the meaning set forth in Section 2.1(b).

"**Bankruptcy Case**" has the meaning set forth in Paragraph B of the Preamble.

"**Bankruptcy Code**" means the United States Bankruptcy Code 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in Paragraph B of the Preamble.

"**Bashford**" means Wilkes Bashford, an individual resident of California and the founder of Seller.

"**Bid Deadline**" has the meaning set forth in the Bid Procedures Order.

"**Bidding Procedures**" means certain procedures providing buyer protections for the benefit of Purchaser and governing any potential overbid for the Purchased Assets, which procedures shall (a) be in form and substance acceptable to Purchaser, (b) be consistent with the APA Term Sheet, (c) designate the Purchaser as a "Stalking Horse Purchaser" for the Purchased Assets, and (d) include, without limitation, the Breakup Fee and other protections for the Purchaser as Stalking Horse Purchaser.

"**Bid Procedures Order**" means an order of the Bankruptcy Court approving the Bidding Procedures, which order shall be in form and substance acceptable to Purchaser.

2

"**Bill of Sale**" has the meaning set forth in Section 2.2.

"**Breakup Fee"** has the meaning set forth in Section 14.4.

"**Business**" has the meaning set forth in Paragraph A of the Preamble.

"**Business Days**" means days other than Saturdays, Sundays and days on which banks in California are authorized or obligated by law to be closed.

"**Cash**" shall mean all cash and cash.

"**Cash Purchase Price"** has the meaning set forth in Section 3.1.

"**CERCLA"** has the meaning set forth in Section 5.19(a).

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**COBRA**" means the provisions of the Code, ERISA and the Public Health Service Act enacted by Sections 10001 through 10003 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (P.L. 99-272), including any subsequent amendments to such provisions.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any written or oral contract, service order, employment agreement, consulting agreement, collective bargaining agreement with any labor union, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, including without limitation any construction contracts or subcontracts, engineering contracts, architect contracts, option agreements and management agreements.

"**Cure Costs**" has the meaning set forth in Section 2.3(b).

"**Cure Obligees**" has the meaning set forth in Section 14.2(b).

"**Deposit Amount**" has the meaning set forth in Section 3.3.

"**DIP Agent**" means Purchaser.

"**DIP Credit Agreement**" means Debtor-in-Possession Credit and Security Agreement by and between the Seller and the DIP Agent, dated as of the date hereof (as amended from time to time).

"**DIP Order**" has the meaning set forth in Section 14.4(b).

"**Disclosure Letter**" has the meaning set forth in Section 5.

3

"**Disclosure Schedule**" means any numbered schedule referenced herein or delivered herewith.

"**Dollars**" and "**$**" mean United States dollars.

"**Domain Name Assignments**" has the meaning set forth in Section 2.2.

"**Embargoed Person**" shall have the meaning set forth in Section 5.23.

"**Employees**" has the meaning set forth in Section 5.16.

"**Environmental Laws**" has the meaning set forth in Section 5.19(a).

"**Environmental Permits**" has the meaning set forth in Section 5.19(a).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning set forth in Section 2.1(b).

"**Excluded Liabilities**" has the meaning set forth in Section 2.3(c).

"**Execution Date**" means the date of execution of this Agreement.

"**Fall 2009 Inventory**" has the meaning set forth in Section 3.4(a).

"**Filing Date**" means the date on which Seller files a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and which shall be on or before November 8, 2009.

"**Financial Statements**" has the meaning set forth in Section 5.23.

"**Fixed Assets**" has the meaning set forth in Section 2.1(a)(ii).

"**Hazardous Materials**" means any chemicals, pollutants, contaminants, wastes and toxic substances: (a) the presence of which requires reporting, investigation, removal or remediation under any Environmental Law; (b) that are defined as a "hazardous waste," "hazardous substance," "pollutant" or "contaminant" under any Environmental Law; (c) that are toxic, explosive, corrosive, flammable, ignitable, infectious, radioactive, reactive, carcinogenic, mutagenic or otherwise hazardous and are regulated as such under any Environmental Law; (d) the presence of which poses a hazard to the health or safety of humans; or (e) that contain polychlorinated biphenyls, asbestos and urea formaldehyde.

"**Insurance Contract**" shall mean any pre-petition automobile liability insurance policies, commercial liability, workers compensation insurance policies, insurance policies related to real property (whether leased or owned), cargo insurance policies, general liability policy, key man insurance policy, life insurance policy, or other policies of insurance under which Seller was the insured or, in the case of key man, life, or other similar policies, under which Seller was the beneficiary as of the Filing Date and all rights of any nature with respect

4

thereto including, without limitation, all insurance recoveries thereunder and all rights to assert claims with respect thereto.

"**Intellectual Property**" has the meaning set forth in Section 2.1(a)(viii).

"**Inventory**" means all inventory acquired for sale, and any related merchandise, finished goods, work-in-process, raw materials, and packaging (including, without limitation, boxes, bags and hangars).

"**Inventory Budget**" has the meaning set forth in Section 7.7(b).

"**Inventory Statement**" has the meaning set forth in Section 3.4.

"**Knowledge of Seller**" means the knowledge of all officers and directors of Seller, including, but not limited to, Appel, following reasonable and due inquiry.

"**Lease Assignments and Amendments**" has the meaning set forth in Section 2.2.

"**Leased Real Property**" has the meaning set forth in Section 2.1(a)(i).

"**Leases**" has the meaning set forth in Section 5.8(b)(iv).

"**Lien**" means any mortgage, pledge, charge, security interest, encumbrance, lien (statutory or other), conditional sale agreement or other legally cognizable security interest of any kind.

"**Material Adverse Effect**" means (i) with reference to Seller, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially and adversely affects the Purchased Assets, the Business, Seller's financial condition, results of operations or prospects, or the designer clothing and related merchandise retail industry as a whole, or materially impairs or delays Seller's ability to effect the Closing, or (ii) with reference to Purchaser, a circumstance, state of facts, event, consequence or result that, individually or in the aggregate, materially impairs or delays Purchaser's ability to effect the Closing.

"**Material Contract**" has the meaning set forth in Section 5.13(a).

"**New Inventory**" has the meaning set forth in Section 3.4(a).

"**Old Inventory**" has the meaning set forth in Section 3.4(a).

"**Operating Budget**" has the meaning set forth in Section 7.7(a).

"**Organizational Amendments**" has the meaning set forth in Section 7.8.

"**Other Assets**" has the meaning set forth in Section 2.1(a)(xv).

"**Permits**" has the meaning set forth in Section 5.10.

"**Permitted Liens**" has the meaning set forth in Section 5.6(a).

5

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust or unincorporated organization.

"**Prepaid Expenses**" means (i) all credits, prepaid expenses, deferred charges, and advance payments made by Seller, (ii) all deposits with carriers, lessors, and other vendors related to any Assumed Contracts, and (iii) any other deposits with carriers, lessors, and other vendors agreed upon by Seller and Purchaser (which are listed on Schedule 2.1(a)(vii)).

"**Proposed Cure Notice**" has the meaning set forth in Section 14.2(b).

"**Purchase Price**" has the meaning set forth in Section 3.1, as the same may be adjusted pursuant to Section 3.4.

"**Purchased Assets**" has the meaning set forth in Section 2.1(a).

"**Purchaser**" has the meaning set forth in the introductory paragraph of this Agreement.

"**RCRA**" has the meaning set forth in Section 5.19(a).

"**Records**" has the meaning set forth in Section 2.1(a)(iv).

"**Rejected Contracts**" has the meaning set forth in Section 2.1(a).

"**Release**" means any release of any Hazardous Substance into the environment in violation of any Environmental Law.

"**Sale of Assets**" has the meaning set forth in Paragraph C of the Preamble.

"**Sale and Bidding Procedures Motion**" means one or more motions to be filed with the Bankruptcy Court on the Filing Date seeking entry of the Sale Order and the Bid Procedures Order, which is intended to give sufficient notice to all persons required in accordance with the requirements of the Bankruptcy Code, the Bankruptcy Rules and the terms and conditions of this Agreement and the provisions of the Bidding Procedure Order and the Sale Order, in form and substance acceptable to Purchaser.

"**Sale Order**" means an order of the Bankruptcy Court approving the Sale of Assets to the Purchaser pursuant to the terms of this Agreement, which order shall, without limitation, (a) be in form and substance acceptable to Purchaser, (b) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement; (c) authorize and empower Seller to assume and assign to the Purchaser the Assumed Contracts; and (d) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to Seller and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code.

"**Schedule**" has the meaning set forth in Section 5.

6

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 31 of
144

"**Seller**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Seller Plans**" has the meaning set forth in Section 5.15.

"**Seller Savings Plans**" has the meaning set forth in Section 10.3(b).

"**Sutter Street Term Sheet**" means the Term Sheet With Respect to Lease for 375 Sutter Street, executed by an Affiliate of Purchaser and Seller, dated October 21, 2009.

"**Taxes**" means all taxes however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any governmental body, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, unemployment insurance, social security, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature, whether arising before, on or after the Closing; and "**Tax**" shall mean any one of them.

"**Tax Returns**" means any return, report, information return or other document (including any related or supporting information) filed or required to be filed with any governmental body in connection with the determination, assessment, collection or administration of any Taxes.

"**Trademark Assignment**" has the meaning set forth in Section 2.2.

"**Transferred Employees**" has the meaning set forth in Section 10.1.

SECTION 2.   <u>PURCHASE AND SALE OF THE PURCHASED ASSETS.</u>

Section 2.1.   <u>Purchased Assets.</u>

(a)      Subject to the terms and upon the conditions set forth herein, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, on the Closing Date, all legal and beneficial right, title and interest of Seller in and to any and all assets of every kind and description, whether tangible or intangible, real, personal or mixed, wherever situated, owned, held or used by Seller or in which Seller has any right, title or interest that is owned, directly or indirectly, leased or otherwise held by Seller, except for the Excluded Assets and provided that executory Contracts and leases will only include those that are to be assigned to or assumed by Purchaser as listed on <u>Schedule 2.1(a)(iii)</u> (such other executory Contracts and leases (including, without limitation, those listed on Schedule 2.1(a)), the "**Rejected Contracts**") (collectively, the "**Purchased Assets**").  The Purchased Assets shall be sold, transferred, assigned and delivered free and clear of any Liens except Permitted Liens, and shall specifically include, without limitation, Seller's legal and beneficial right, title and interest in and to the following:

(i)      all of the title, rights and interests in and to real property leased to Seller, which are identified on <u>Schedule 5.8(a)</u> as being assigned to Purchaser,

7

subject to the Lease Assignments and Amendments (the street addresses of which are also set forth on Schedule 5.8(a)), together with all buildings, facilities, structures and improvements located on such real property, all rights and privileges pertaining to such real property or to any of such buildings, facilities, structures and improvements, and all equipment, machinery, fixtures, furniture and other tangible property owned by Seller located at any such location, including, without limitation, all attachments, appliances, lighting fixtures, signs, doors, partitions, plumbing, heating, air conditioning, wiring, telephones, security systems, carpets, floor coverings, wall coverings, office equipment, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements, fixtures, installations, machinery, equipment and other property attached thereto (the "**Leased Real Property**");

(ii)     all machinery, furniture, fixtures, tooling, spare parts, supplies, office equipment, computers, telephone and other communications systems and switches, other office assets, maintenance equipment, inventory (whether on hand or on consignment), finished goods, raw materials and work in progress and all other tangible personal property owned by Seller, including the items listed on Schedule 2.1(a)(ii) (collectively, the "**Fixed Assets**");

(iii)     all executory Contracts (other than Rejected Contracts) identified by the parties for assignment to Purchaser on Schedule 2.1(a)(iii) (collectively, the "**Assumed Contracts**"), which may include (A) those Fixed Asset leases to which Seller is a party, (B) license agreements to which Seller is a party and that provide Seller with rights to technology, products and/or trademarks, or by which Seller grants rights to third parties for Intellectual Property, (C) all purchase orders, Contracts or other commitments of Seller to suppliers and vendors of goods and services for materials, supplies or other items, specifically excluding the Vendor Terms Agreement and the Supplier Terms Agreement, and any side letters related thereto, (D) all sales orders, Contracts or other similar commitments of Seller, (E) all confidentiality agreements, non-competition, assignment of inventions and similar agreements to which Seller is a party, (F) the Leases for the Leased Real Property (subject to the Lease Assignments and Amendments), (G) all rights of Seller to the rebates, indemnities, warranties and licenses received from lessors, manufacturers and sellers of the Purchased Assets, (H) other executory Contracts and unexpired leases and each other Contract or arrangement designated as an Assumed Contract by Purchaser;

(iv)     All financial books, accounting records, files, lists, publications, and other records and data of Seller regardless of the medium on which such information is stored or maintained (the "**Records**");

(v)     all goodwill of Seller relating to the Business;

(vi)     all customer lists used by the Business;

8

(vii)   Cash held in trust on behalf of Seller's customers (collectively, "Customer Cash Deposits") and all Prepaid Expenses;

(viii)   all registered trademarks or service marks and all trademark and service mark applications, all common law trademarks, trade names, trade dress and logos, all copyrights (including copyrighted content on internet sites to the extent related to the Business), all domain names, websites, and extensions thereof, all know-how, trade secrets and other confidential information, inventions, ideas, discoveries, patent applications and granted patents (including any and all continuations, continuations-in-part, additions and divisions thereof, and any and all patents issuing from the patent applications, and any reissues, reexaminations, renewals, extensions, and substitutions of any of the patents), and all industrial designs, owned by Seller or any Affiliate of Seller (the "**Intellectual Property**"), and any registrations and applications therefor, and all databases, design databases, schematics and data collections and all rights therein owned by Seller or any Affiliate of Seller;

(ix)   all Permits and all financial assurance instruments, including letters of credit and surety or other bonds;

(x)   all Inventory wherever located;

(xi)   all accounts receivable and all notes and other receivables of every kind or character, and any instruments evidencing the foregoing (the "**Accounts Receivable**") and all causes of action specifically pertaining to the collection of the foregoing;

(xii)   all claims, rights and causes of action relating to the Purchased Assets that are listed on Schedule 2.1(a)(xii);

(xiii)   the telephone and facsimile numbers currently used in connection with the Business;

(xiv)   all bank accounts and lockbox arrangements benefiting the Business, including those listed on Schedule 5.18, but excluding the Cash therein pursuant to Section 2.1(b)(i);

(xv)   all Insurance Contracts; and

(xvi)   any other assets (whether tangible or intangible, real, personal or mixed) owned, held or used by Seller including Tax attributes (excluding Tax refunds accruing as of the Closing Date, but including any other refunds, loss carryforwards, claims, defenses, credits or similar benefits), and all other assets of any kind or nature whatsoever whether or not used in the Business (the "**Other Assets**").

(b)   The Purchased Assets shall not include any of Seller's right, title or interest in or to any of the following assets (collectively, the "**Excluded Assets**"):

9

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 34 of 144

(i)     all of Seller's Cash on hand;

(ii)    any Rejected Contracts and all Contracts and agreements that are rejected or are subject to a motion to reject by Seller, and consented to by Purchaser, in Bankruptcy Court;

(iii)   any corporate minute books, organizational documents, stock ledgers and other corporate books and records of Seller;

(iv)    all of Seller's deposits with carriers, lessors and other vendors that are not Prepaid Expenses, including but not limited to such deposits that are related to the Rejected Contracts;

(v)     all claims and causes of action under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Seller or its estate (collectively, "**Avoidance Actions**"), other than those specifically described in Section 2.1(a)(xii) and those relating to the Purchased Assets;

(vi)    all Seller Plans (except to the extent set forth on <u>Schedule 2.1(a)(iii)</u>);

(vii)   any refunds and claims for refunds of Taxes accrued or accruing as of the Closing Date; and

(viii)  Seller's rights under this Agreement and the Ancillary Agreements.

Section 2.2.    <u>Sale at Closing Date</u>.  The sale, transfer, assignment and delivery by Seller of the Purchased Assets to Purchaser, as herein provided, shall be effected on the Closing Date by the due execution and delivery (notarized where necessary) of the bill of sale ("**Bill of Sale**"), trademark assignments ("**Trademark Assignments**"), and domain name assignments ("**Domain Name Assignments**"), in the forms attached hereto as <u>Exhibits A</u>, <u>B</u>, and <u>C</u>, respectively, and assignments and, where agreed to by Purchaser and the lessors thereof, amendments of or new leases with respect to the Leased Real Property ("**Lease Assignments and Amendments**"). Further, on the Closing Date, Seller, on the one hand, and Purchaser, on the other hand, shall each deliver to the other such other documents, estoppels or instruments of sale, assignment or transfer as are customary in transactions such as the transactions contemplated by this Agreement and as the other shall reasonably request.

Section 2.3.    <u>Assumption of Assumed Liabilities; Exclusion of Excluded Liabilities</u>.

(a)     <u>Assumed Liabilities</u>.  On the Closing Date, Purchaser shall assume and agree to pay, perform and discharge when due only (i) the liabilities and obligations of Seller under the Assumed Contracts (excluding any liabilities or obligations arising out of any breach by Seller of the terms thereof, violations of law and further excluding any Cure Costs), but only to the extent such liabilities and obligations first arise and are related to periods subsequent to the Closing Date (the liabilities so assumed, collectively,

10

the "**Assumed Liabilities**"), (ii) the liabilities to the extent provided in Sections 10.2 and 10.3(a)(i), and (iii) the delivery of finished Inventory to customers for which Purchaser has received the Customer Cash Deposits as a Purchased Asset. Purchaser expressly assumes no other liabilities of Seller or the Business. The assumption of the Assumed Liabilities shall be effected on the Closing Date pursuant to an Assignment and Assumption Agreement in the form attached hereto as Exhibit D (the "**Assignment and Assumption Agreement**").

(b)     Amounts Due Under Executory Contracts and Unexpired Leases; Cure Costs. Seller shall pay from the Purchase Price all cure costs, compensation and expenses required to be paid in connection with the assumption and assignment of any Assumed Contract as set forth in Section 365 of the Bankruptcy Code ("**Cure Costs**"), including any Cure Costs relating to the Leased Real Property.

(c)     Excluded Liabilities. Except as otherwise expressly assumed by Purchaser pursuant to Section 2.3(a) hereof, Purchaser shall not assume or pay, perform or discharge, nor shall Purchaser be responsible, directly or indirectly, for any debts, liabilities, obligations, accounts or trade payables, Contracts (including liabilities for breach of contract and any Cure Costs), liabilities relating to Taxes, Environmental Laws, Hazard Materials or ERISA, liabilities related to any Seller Plans, bulk sales liabilities, transfer Taxes, violation of law, torts, and legal proceedings relating to any Excluded Assets, or any other liability of Seller or any of its Affiliates that is not an Assumed Liability (all such debts, obligations, payables, Contracts or liabilities being herein referred to as the "**Excluded Liabilities**"). All such Excluded Liabilities shall remain liabilities of Seller and Seller shall satisfy and discharge such Excluded Liabilities and hold harmless Purchaser from the same.

(d)     Consent to Assumption. Seller will timely file appropriate motions and/or take such other actions as may be necessary or appropriate to obtain an order from the Bankruptcy Court (which may be the Sale Order) authorizing Seller to assume and assign the Assumed Contracts to Purchaser.

Section 2.4.     Prorations and Charges. With respect to the Leased Real Property, rent, real estate Taxes, operating costs (e.g., CAMs) and any other amounts (other than payments attributable to a breach of the lease by Seller, which shall be Seller's responsibility) due or payable by tenant under the lease shall be prorated as of the Closing Date (including reasonable estimates thereof if such amounts are unknown as of the Closing Date). The foregoing prorations shall be treated as an adjustment to the Purchase Price.

Section 2.5.     Disclosure Schedule Updates; Cure Costs. Notwithstanding anything in this Agreement to the contrary, the Purchaser may revise any schedule setting forth the Purchased Assets and the Excluded Assets to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets any Contract or asset of Seller not previously included in the Purchased Assets, at any time on or prior to the fifth (5th) Business Day prior to the Closing Date and require Seller to give notice to, or obtain consent from, the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of

11

Excluded Assets, any Assumed Contract or other asset of Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, at any time on or prior to the fifth (5th) Business Day prior to the Closing Date; provided, that from and after November 20, 2009, Purchaser may not, without Seller's written consent, add into the definition of Purchased Assets any additional Contract listed on a Schedule hereto as of the date hereof that Seller reasonably determines would require Seller to pay material Cure Costs as part of any assumption and assignment of such Contract (unless Purchaser agrees to pay for such Cure Cost related thereto). If any Contract is added to (or excluded from) the Purchased Assets as permitted by this Section 2.5, Seller shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Costs and prompt delivery of notice to the non-debtor counterparty and obtaining approval of the Bankruptcy Court, to cause such Contracts to be assumed by Seller, and assigned to Purchaser, on the Closing Date (or excluded under the Sale Order and this Agreement).

SECTION 3.   PURCHASE PRICE.

Section 3.1.   Purchase Price. In consideration of the sale and transfer of the Purchased Assets, Purchaser shall, at the Closing, pay, deliver or assume (collectively, the "**Purchase Price**") the following for the benefit of the Seller: (i) Four Million Six Hundred Thousand Dollars ($4,600,000), plus (or minus, as applicable) the Inventory Adjustment (collectively, the "**Cash Purchase Price**"), in cash or by wire transfer of immediately available funds, as the same may be adjusted pursuant to the terms of Section 3.4 and (ii) the assumption of Assumed Liabilities. Notwithstanding the foregoing, the Purchaser (i) may elect to receive a credit against the Purchase Price at the Closing equal to the amount then due and owing under the DIP Credit Agreement and the parties shall deliver all documentation necessary to effect such credit and deemed payment and (ii) shall receive a credit in the amount of the Deposit delivered to the Seller pursuant to Section 3.3(a) below.

Section 3.2.   Allocation of Purchase Price. Purchaser and Seller agree to allocate the Purchase Price for all Tax purposes in accordance with an allocation statement to be prepared by Purchaser and presented to Seller not less than five (5) days prior to the Closing Date (the "**Allocation Statement**"), which Allocation Statement shall be prepared in accordance with Section 1060 of the Code, including the regulations promulgated thereunder, and shall be acceptable to Seller in its reasonable discretion. All Tax Returns, including IRS Form 8594, shall be filed consistent with such Allocation Statement. Neither Purchaser nor Seller shall voluntarily take a position on any Tax Return or before any governmental agency charged with the collection of any such Tax that is any manner inconsistent with the terms of such Allocation Statement.

Section 3.3.   Purchase Price Deposit. Within two (2) Business Days following entry of the Bid Procedures Order, Purchaser shall immediately deliver to Wells Fargo Bank, N.A. the aggregate sum of Two Hundred Fifty Thousand Dollars ($250,000) by wire transfer of immediately available funds (the "**Deposit Amount**"), to be governed by a mutually agreed escrow agreement providing as follows:

(a)     If the Closing occurs, the Deposit Amount shall be applied in partial satisfaction of the cash portion of the Purchase Price owing by Purchaser to Seller at the Closing pursuant to Section 3.1 and any interest thereon shall be returned to Purchaser;

(b)     If this Agreement is validly terminated by Seller pursuant to Section 15.1(b)(i) or by Purchaser pursuant to Section 15(e)(ii), the Deposit Amount, together with all accrued investment income thereon, if any, shall be delivered to Seller, and delivery of the Deposit Amount, together with such accrued interest, shall be Seller's sole remedy for, and Seller shall not be entitled to any other damages (or injunctive relief) related to or arising from, any such termination and the Deposit Amount shall be considered liquidated damages for the benefit of Seller; or

(c)     If this Agreement is validly terminated for any other reason (including, without limitation, by Seller in accordance with Section 15.1(b)(ii)), the Deposit Amount, together with all accrued investment income thereon, if any, shall be returned to Purchaser.

Section 3.4.     <u>Purchase Price Adjustment</u>.

(a)     Fourteen (14) days prior to Closing, Seller shall perform a physical inventory using an outside consulting service agreed to by Seller and Purchaser (the cost of which shall be borne 50% by Purchaser and 50% by Seller) (the "<u>Physical Inventory Review</u>") and Purchaser shall supervise such Physical Inventory Review.  Two (2) Business Days prior to the Closing Date, the Seller and Purchaser shall jointly prepare a statement of the Seller's Adjustment Inventory included in Purchased Assets as of such date which will be updated as of the opening of business on the Closing Date by Seller and the Purchaser (the "<u>Inventory Statement</u>").  The Inventory Statement shall set forth for such Inventory: (i) the original invoice cost of all Adjustment Inventory owned by Seller as of the opening of business on the Closing Date that was originally purchased for retails seasons prior to the Fall season of 2009 (the "<u>Old Inventory</u>"), (ii) the original invoice cost of all Adjustment Inventory owned by the Seller as of the opening of business on the Closing Date that was acquired for the Fall season of 2009 and received by Seller prior to the date hereof (the "<u>Fall 2009 Inventory</u>") and (iii) the original invoice cost of all Adjustment Inventory owned by the Seller as of the opening of business on the Closing Date that was received on or after the date hereof (the "<u>New Inventory</u>").  The Inventory Statement shall be determined in accordance with original invoice cost.  The Seller shall give Purchaser reasonable access to their books and records, location and personnel and shall reasonably cooperate with Purchaser in connection with the preparation of the Inventory Statement.

(b)     The Cash Purchase Price shall be: (i)  reduced by 50% of the amount, if any, that the original invoice cost of the Old Inventory (as set forth on the Inventory Statement) is less than $5,300,000, (ii) reduced by 100% of the amount, if any, that the original invoice cost of the Fall 2009 Inventory (as set forth on the Inventory Statement) is less than $1,045,000 and (iii) increased by 100% of the amount, if any, of the original invoice cost of the New Inventory (as set forth on the Inventory Statement), in the case of (i) or (ii), the reduction amount shall be increased dollar for dollar by the amount of any

13

Assumed Liabilities with respect to such Old Inventory and/or Fall 2009 Inventory assumed by Purchaser, if any, and in the case of (iii), the increase in the Cash Purchase Price shall be reduced dollar for dollar by the amount of any Assumed Liabilities with respect to such New Inventory assumed by Purchaser, if any (collectively, the "Inventory Adjustment").  Schedule 3.4(b) sets forth the process with respect to, and an example of, for illustrative purposes only, the Inventory Adjustment as applied to hypothetical original invoice costs of Old Inventory, Fall 2009 Inventory and New Inventory.  If there is any conflict between the calculations in Schedule 3.4(b) and the terms of this Section 3.4(b), this Section 3.4(b) shall govern and control.

## SECTION 4.    CLOSING.

Section 4.1.    Closing.  Subject to the satisfaction of the conditions set forth in Sections 11, 12, and 13 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the sale and purchase of the Purchased Assets and of the other transactions contemplated hereby (the "**Closing**") shall take place within eleven (11) days after the date on which the Bankruptcy Court enters the Sale Order (which shall be final and non-appealable unless waived by the Purchaser), but in no event shall the Closing occur (subject to the conditions herein) after November 30, 2009 without the written consent of Purchaser.  The Closing shall take place at the offices of Greenberg Traurig, LLP at 1900 University Avenue, 5th Floor, East Palo Alto, CA 94303, or at such other place as may be mutually agreed to by the parties hereto.  The term "**Closing Date**," as used in this Agreement, shall mean the date on which such Closing takes place and the Closing shall be deemed effective as of the opening of business on the Closing Date.  The parties acknowledge and agree that time is of the essence with respect to a Closing on or prior to November 30, 2009 due to the nature of the Seller's business, including 2009 holiday sales and corresponding marketing, sales and employee, customer and supplier relationships with respect thereto.

Section 4.2.    Deliveries at Closing.  At the Closing, the parties shall deliver to each other the Ancillary Agreements and Purchaser shall deliver to Seller the Purchase Price.

## SECTION 5.    REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as set forth on the corresponding numbered sections or otherwise readily apparent on its face in another section (each, a "**Schedule**") of the disclosure letter delivered by Seller to Purchaser immediately prior to the Execution Date (the "**Disclosure Letter**"), Seller hereby represents and warrants as true and correct to Purchaser as follows on and as of the Execution Date and on and as of the Closing Date:

Section 5.1.    Corporate Organization.  Seller is a corporation duly organized, validly existing and in good standing under the laws of California and has all requisite corporate power and authority to own its properties and assets and to conduct the Business as now conducted and to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be a party.

Section 5.2.    Qualification to Do Business.  Seller is duly qualified and/or licensed to transact business in all jurisdictions where the conduct of its Business or the ownership of the

14

Purchased Assets make such qualification and/or licensing necessary, which jurisdictions are set forth on Schedule 5.2.

Section 5.3.    Authorization and Validity of Agreement.   (a) Seller has all requisite corporate power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder, and (b) the execution and delivery of this Agreement and the Ancillary Agreements to which Seller is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action by the Board of Directors of Seller, and no other corporate proceeding on the part of Seller will be necessary to authorize such execution, delivery and performance.  This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Seller is a party will be, duly executed by Seller and constitutes, or as of the Closing Date will constitute, the valid and binding obligation of Seller, enforceable against it in accordance with its terms.

Section 5.4.    No Conflict or Violation.  Subject to the approval of the Bankruptcy Court pursuant to the Sale Order, the execution, delivery and performance by Seller of this Agreement and of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby: (a) do not and will not violate or conflict with any provision of the Certificate of Incorporation or Bylaws of Seller, (b) do not and will not violate any provision of law or any order, judgment or decree of any court or other governmental or regulatory authority, (c) do not and will not violate or result in a breach of (with due notice or lapse of time or both), conflict with, or result in any violation of or default (with due notice or lapse of time or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller or Purchaser to make any payment under any provision, in each case under any Assumed Contract or Permit, (d) will not result in the creation or imposition of any Lien (other than Permitted Liens) upon any of the Purchased Assets, and (e) will not result in the cancellation, modification, revocation or suspension of any material Contract or Permit.

Section 5.5.    Consents and Approvals.  Schedule 5.5 sets forth a true and complete list of each consent, waiver, authorization or approval of (a) any governmental or regulatory authority, domestic or foreign, and each declaration to or filing or registration with any such governmental or regulatory authority, and (b) any Person under any Material Contract or Permit, in each case that is required in connection with the execution and delivery of this Agreement by Seller or the performance by Seller of its obligations hereunder and under any Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 5.6.    Good Title; Sufficiency of Assets.

(a)      Except as set forth on Schedule 5.6(a), Seller has good and marketable title in and to the Purchased Assets owned by Seller, and Seller has (and will have and will convey to Purchaser at the Closing) valid and enforceable leasehold interests in the Purchased Assets leased by Seller, in each case free and clear of any Liens other than Permitted Liens.  As used in this Agreement, the term "**Permitted Liens**" means (i) Liens for Taxes not yet payable; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments

15

against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the ownership, operation or development of the Purchased Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the ownership of the Purchased Assets or materially detract from the value of the Leased Real Property and (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law.

(b)     The Purchased Assets have been maintained in accordance with Seller's standard practices and manufacturers' recommendations, and Seller has not deferred any reasonable maintenance or repairs of any of the Purchased Assets. The Purchased Assets are in good operating condition, reasonable wear and tear excepted, suitable for the purposes for which they have been used by Seller.

(c)     Except for the Excluded Assets, the Purchased Assets will be sufficient in all material respects for the continued conduct of the Business at and after the Closing in substantially the same manner as conducted prior to the Closing by Seller.

Section 5.7.     Absence of Certain Changes or Events.

(a)     Except as set forth on Schedule 5.7, since January 31, 2009, Seller has not:

(i)     acquired any material assets, other than acquisitions of Inventory in the ordinary course of business;

(ii)     suffered any material uninsured loss, damage, destruction or other casualty to the Purchased Assets;

(iii)     sold, leased, transferred or assigned any material assets, tangible or intangible, other than the disposition of obsolete or immaterial assets not necessary for the conduct of the business by Seller or the sale of Inventory in the ordinary course of business;

(iv)     accelerated, terminated, modified, amended, or cancelled any Assumed Contract, or waived, released or assigned any material rights or claims thereunder, in each case, in a manner adverse to Seller (and, to the Knowledge of Seller, no other party to any such Assumed Contract has accelerated, terminated, modified, amended, or cancelled such Assumed Contract, or waived, released or assigned any rights or claims thereunder);

(v)     imposed or created any Liens (other than Permitted Liens) upon any of the Purchased Assets, tangible or intangible, that would be binding on the Purchaser;

(vi)     incurred or made any capital expenditure;

(vii)     created, incurred, assumed, or guaranteed any indebtedness;

16

(viii)   granted any bonus opportunity or any increase in any type of compensation or benefits, including severance or termination pay, to any of its current or former directors, Employees or consultants, except for increases in base compensation in the ordinary course of business;

(ix)   paid any bonus, except for bonuses paid or accrued in the ordinary course of business;

(x)   delayed or postponed the payment of undisputed accounts payable or any other undisputed liabilities of Seller in any material respect (except as required by the Bankruptcy Code);

(xi)   adopted, made or agreed to (a) any welfare, pension, retirement, profit-sharing, incentive compensation or similar plan, program, payment or arrangement for any Employee except pursuant to the existing Seller Plans or (b) any new employment or change of control agreement;

(xii)   made any material addition to or modification of any Seller Plan, other than (a) contribution to such plans made in the ordinary course of business or (b) the extension of coverage to Employees of the Seller who became eligible after the January 31, 2009;

(xiii)   changed any finance or Tax accounting methods, principles or practices, except insofar as may have been required by a change in generally accepted accounting principles or applicable law;

(xiv)   made any Tax election or any settlement or compromise of any material Tax liability; or

(xv)   received any written notice of any proposed cancellation or termination of any Assumed Contract.

Section 5.8.   Real Property.

(a)   Schedule 5.8(a) sets forth the street addresses of each parcel of Leased Real Property, and such other real property leased by Seller that does not constitute Leased Real Property. Except for the locations listed on Schedule 5.8(a), Seller does not lease any real property used in the Business.

(b)   Except as set forth on Schedule 5.8(b):

(i)   There are no leases, subleases, options, rights of first offer, rights of first refusal or other conditional or unconditional rights, options or agreements, written or oral, granting to any Person the right to purchase, use or occupy the Leased Real Property or any portion thereof.

(ii)   There is no pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of the Leased Real Property,

17

and, to the Knowledge of Seller, no such proceeding is threatened. Seller enjoys peaceful and undisturbed possession of the Leased Real Property sufficient for the current operations and uses of such Leased Real Property by Seller in connection with the Business.

(iii)　There are no proceedings pending and brought by, or to the Knowledge of Seller, threatened by, any third party which would result in a change in the allowable uses of the Leased Real Property or which would modify the right of Purchaser to use the Leased Real Property (including access rights) for its current uses after the Closing Date.

(iv)　Seller has delivered to Purchaser true and complete copies of the leases with respect to the Leased Real Property (the "**Leases**"), and the Leases are each in full force and effect. Neither Seller nor, to the Knowledge of Seller, the respective landlords are in breach or default under any Lease that has not been cured or waived, and, to the Knowledge of Seller, no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under any Lease. Seller's possession and quiet enjoyment of the Leased Real Property under the Leases has not been disturbed or threatened, and there are no currently pending material disputes with respect to any Lease. No security deposit or portion thereof deposited with respect to any Lease has been applied in respect of a breach of or default under a Lease that has not been redeposited in full.

Section 5.9.　Intellectual Property.

(a)　Schedule 5.9(a) sets forth a complete and correct listing of all (i) registered trademarks and service marks and applications therefore, (ii) patent applications and granted patents, (iii) domain names, and (iv) any other Intellectual Property, in each case that are owned or used by Seller and forming part of the Purchased Assets. Except as described on Schedule 5.9(a), all Intellectual Property listed therein is owned by Seller free and clear of all Liens (other than Permitted Liens) and is not the subject of any pending or, to the Knowledge of Seller, threatened challenge. Except as described in Schedule 5.9(a), there are no unresolved claims made and there has not been communicated to Seller the threat of any claim that the use of such Intellectual Property is in violation or infringement of any service mark, patent, trademark, trade name, trademark or trade name registration, copyright or copyright registration of any other Person. Except as set forth on Schedule 5.9(a), Seller has not granted any license to any of such Intellectual Property and Seller has no legal obligation to grant any such license.

(b)　Schedule 5.9(b) lists all licenses to Intellectual Property received by Seller with respect to the Business. Except as set forth in Schedule 5.9(b), Seller is under no obligation to pay any royalties or similar payments in connection with any Intellectual Property license to any of their Affiliates or to any third party.

18

Section 5.10.   Permits.   Schedule 5.10 sets forth a true and complete list of all material licenses, permits, franchises, authorizations and approvals issued or granted to Seller with respect to the Business by the federal government, any state or local government, any foreign national or local government, or any department, agency, board, commission, bureau or instrumentality of any of the foregoing and all pending applications therefore (collectively, the "**Permits**"). Each Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Seller, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect. The Permits are sufficient and adequate to permit the continued lawful conduct of the Business in the manner currently conducted by Seller, and none of the operations of the Business is being conducted in a manner that violates any of the terms or conditions under which any Permit was granted.

Section 5.11.   Compliance with Law. Seller has owned, leased and used its properties and assets, including the Purchased Assets, and has operated the Business in compliance with all applicable laws, regulations, orders and other requirements of all courts and other governmental or regulatory authorities having jurisdiction over Seller and/or the Purchased Assets. There is no unresolved written notice from any governmental authority that the Purchased Assets or the operations of the Business are not being conducted in accordance with all applicable laws, regulations, orders and other requirements of all courts and other governmental or regulatory authorities having jurisdiction over Seller and/or the Purchased Assets.

Section 5.12.   Litigation. Except as set forth on Schedule 5.12, there are no claims, actions, suits, proceedings, labor disputes or investigations pending or, to the Knowledge of Seller, threatened, before any national, state or local court or governmental or regulatory authority, domestic or foreign, or before any arbitrator of any nature, brought by or against Seller or Seller's respective directors, employees, agents or Affiliates, involving, affecting or relating to the Business, the Purchased Assets or the transactions contemplated by this Agreement. Neither the Business nor the Purchased Assets is subject to any order, writ, judgment, award, injunction or decree of any national, state or local court or governmental or regulatory authority or arbitrator, domestic or foreign.

Section 5.13.   Material Contracts.

(a)      Schedule 5.13(a) sets forth a true and correct list and description of each of the following Contracts (each a "**Material Contract**"), and Seller has delivered (or otherwise made available) to Purchaser or its representatives true and correct copies of all such Material Contracts in Seller's possession:

(i)      each pension, profit sharing, stock option, employee stock purchase, bonus or other plan or arrangement providing for deferred or other compensation to Employees, former Employees or consultants, or any other employee benefit plan or arrangement, or any collective bargaining agreement or any other Contract with any labor union, or severance agreements, programs, policies or arrangements;

(ii)      all vendor, broker, distributor, dealer, manufacturer's representative, sales, distribution, vendor rebate, product purchase, sale discount,

19

franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which Seller is a party;

(iii)　each Contract for the employment of any officer, individual Employee or other Person on a full-time, part-time, consulting or other basis or relating to loans to officers, directors, managers or Affiliates;

(iv)　all agreements or indentures relating to borrowed money or other indebtedness or the mortgaging, pledging or otherwise placing a Lien on any asset or group of assets of Seller;

(v)　all Contracts under which Seller has advanced or loaned any other Person amounts;

(vi)　all Contracts that limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(vii)　any document granting a power of attorney with respect to the conduct of the Business;

(viii)　any option or preferential right to purchase any assets or property rights of the Business;

(ix)　any guaranty, performance bond or similar agreement;

(x)　any lease or Contract under which the Seller is lessee of or holds or operates any personal property owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed One Thousand Dollars ($1,000);

(xi)　any Contract or group of related Contracts with the same party or group of affiliated parties the performance of which involves consideration in the aggregate in excess of Five Thousand Dollars ($5,000);

(xii)　any assignment, license, indemnification or agreement with respect to any intangible property (including any Intellectual Property);

(xiii)　any warranty agreement with respect to Seller's services rendered or its products sold or leased;

(xiv)　any agreement with a term of more than six months which is not terminable by Seller upon less than thirty (30) days' notice without penalty and involves a consideration in excess of Five Thousand Dollars ($5,000) annually; and

(xv)　all other Contracts, whether or not made in the ordinary course of business, which are material to the Purchased Assets, the conduct of the Business,

20

or that involves consideration in excess of Five Thousand Dollars ($5,000) annually.

(b)    Each Material Contract is valid, binding and enforceable against Seller in accordance with its terms, and is in full force and effect on the Execution Date. Seller has performed in all material respects the obligations required to be performed by it to date under, and is not in default or delinquent in the performance (claimed or actual) in connection with, any Material Contract, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default. No other party to any Material Contract is in default in respect thereof, and no event has occurred which, with due notice or lapse of time or both, would constitute such a default. Seller has not received any written notice that any Person intends or desires to modify, waive, amend, rescind, release, cancel or terminate any Material Contract.

Section 5.14.   <u>Tax Matters</u>.  Seller has timely filed, or prior to the Closing Date will have timely filed (taking into account all relevant extensions of time to file), all Tax Returns that are required to have been filed in connection with or relating to the Purchased Assets or the Business, and Seller has, or will have by the Closing Date (taking into account all relevant extensions of time to file), paid, accrued or otherwise adequately reserved for the payment of all Taxes required to be paid in respect of the periods covered by such returns, with the exception of all Taxes being contested in good faith by Seller, and has or will have by the Closing Date adequately reserved for the payment of all Taxes with respect to periods ended on or before the Closing Date for which Tax Returns have not yet been filed. There is no Tax Return filed by Seller, either separately or as a member of an Affiliated Group, and there are no outstanding assessments or Taxes otherwise due for any pre-closing period, that will result, on or after the Closing Date, in any Taxes or other governmental charges upon the Purchased Assets or Purchaser, whether as transferee of the Purchased Assets or otherwise. There are no Liens for Taxes on any of the Purchased Assets other than Permitted Liens and Liens set forth on <u>Schedule 5.14</u>. There is no pending or, to the Knowledge of Seller, threatened claim, audit, investigation, dispute or other proceeding concerning any Taxes of Seller that may result in a Lien against any of the Purchased Assets after Closing.

Section 5.15.   <u>Seller Plans</u>. Except as set forth on <u>Schedule 5.15</u>, neither Seller nor any Affiliate of Seller maintains, contributes to, or is a party to, (i) any "employee benefit plan," as defined in Section 3(3) of ERISA, or (ii) any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers compensation, unemployment compensation and other government programs, under which Seller or any of its respective Affiliates has any present or future obligation or liability with respect to the Transferred Employees (collectively, the "**Seller Plans**"). Copies of Seller Plans, and related trust documents and summary plan descriptions in the possession of Seller, have been made available to Purchaser by Seller. No Seller has been a party to or sponsored a multi-employer plan or a defined benefit plan. Seller and all fiduciaries of the Seller Plans have fully complied with their obligations under the Seller Plans and all duties under ERISA. There has been no prohibited transaction under Section 4975 of the Code or Section 406 or ERISA or otherwise with respect to any Seller Plan. Each Seller Plan has been maintained in accordance with applicable laws and in compliance with its terms. Seller has no current or future liabilities with respect to post-employment or post-retirement benefits for former or retired employees.

21

Section 5.16. <u>Employees</u>. <u>Schedule 5.16</u> sets forth an accurate list of (a) all of the employees of the Business as of the Execution Date (collectively with employees of the Business hired by Seller after the Execution Date and prior to the Closing Date, the "**Employees**"), and (b) those Employees on disability, FMLA, military or other leave or absence other than scheduled vacation or jury duty as of the Execution Date.

Section 5.17. <u>Labor Matters; Employment Agreements</u>.

(a) Seller is not a party to any union or collective bargaining agreements covering any of the Employees nor, to the Knowledge of Seller, are there currently any union organizing efforts by or with respect to any such Employees. Seller has not experienced any actual or threatened employee strike or employee related work stoppage, slowdown or lockout.

(b) Other than as set forth on <u>Schedule 5.17(b)</u>, Seller has no employment agreements with any of the Employees which are not terminable at will and without material cost or expense at the election of Seller. Other than as set forth on <u>Schedule 5.17(b)</u>, Seller is not a party to any change of control severance agreements.

(c) There are no administrative charges or court complaints against Seller concerning alleged employment discrimination or other employment related matters that are pending or, to the Knowledge of Seller, threatened before the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor or any other governmental authority. Seller is in compliance with all applicable laws relating to employment and employment practices, wages, hours, and terms and conditions of employment, including all immigration laws.

(d) All independent contractors providing equipment and/or services to Seller have been retained under valid Contracts and qualify for independent contractor status under all applications laws, including existing Internal Revenue Service rules and interpretations.

(e) Seller has timely paid or adequately accrued all contributions required to be paid by Seller to any unemployment compensation fund or other fund to which Seller is required to contribute under the laws of any applicable state with respect to periods through the Closing.

(f) Seller has not taken any action in respect of the Employees that would require notice or create any liability under the Worker Adjustment and Retraining Notification Act, and Seller does not have any present plans to take such action.

Section 5.18. <u>Bank Accounts</u>. <u>Schedule 5.18</u> sets forth a list of all banks and other financial institutions with which Seller has an account, a lock box, a safe deposit box or borrowing authority, specifying with respect to each the name and address of the bank or other financial institution, the account number and the names of persons authorized as signatories thereon or to act or deal in connection therewith.

Section 5.19. <u>Environmental Matters and Employee Health and Safety Matters</u>.

22

(a)     Except as set forth in Schedule 5.19(a), (i) Seller is in material compliance with all Environmental Laws (as defined below); (ii) Seller has obtained all applicable Environmental Permits (as defined below); (iii) all such permits are in full force and effect; and (iv) Seller is in material compliance with all such Environmental Permits. As used herein, "**Environmental Laws**" shall mean all applicable federal, state, local and foreign laws, ordinances, rules, regulations, judgments, orders, or decrees relating to the protection or regulation of human health, safety, or the environment enacted as of the Execution Date, including to the extent applicable, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("**CERCLA**") (42 U.S.C. §§ 9601 et seq.), the Resource Conservation and Recovery Act ("**RCRA**") (42 U.S.C. §§ 6901 et seq.), the Clean Water Act (33 U.S.C. §§ 1251 et seq.), the Atomic Energy Act (42 U.S.C. § 2201 et seq.), and similar state and local laws. "**Environmental Permits**" shall mean all applicable licenses and Permits or other approvals required under applicable Environmental Laws in connection with the ownership or operation of the Business. None of the Leased Real Property is listed in the Environmental Protection Agency's National Priorities List of Hazardous Waste Sites under CERCLA or any similar state list under a comparable state statute.

(b)     Except as set forth in Schedule 5.19(b), there is no pending or, to the Knowledge of Seller, threatened claim, litigation, or administrative proceeding, or known prior claim, litigation or administrative proceeding arising under any Environmental Law involving the Purchased Assets, the Business or the Leased Real Property.

(c)     During the period that Seller has conducted the Business on the Leased Real Property, except in material compliance with all Environmental Laws, Seller has never stored, handled, recycled, reclaimed, disposed of, or contracted for the disposal of, Hazardous Materials in connection with the Business, and, to the Knowledge of Seller, no such Hazardous Materials has been disposed of on the Leased Real Property. During the period that Seller has conducted the Business on the Leased Real Property, there have been no Releases of any Hazardous Materials into the environment or onto, under or about the Leased Real Property in connection with the Business, except in compliance with all Environmental Laws.

(d)     Seller has provided or made available to Purchaser true and complete copies of all environmental audits, studies, reports, analyses and monitorings, and all material correspondence on substantial environmental matters, in its possession or control, relating to the Purchased Assets, the Business or the Leased Real Property.

Section 5.20.  Affiliate Relationships.  Except as set forth on Schedule 5.20, no (a) shareholder, officer or director of Seller, (b) entity in which any such shareholder, officer or director owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than two percent (2%) of the stock of which is beneficially owned by such shareholders, officers or directors in the aggregate), or (c) Affiliate of any of the foregoing is a party to: (i) any Contract with, or relating to, Seller, the Business, the Purchased Assets or the Assumed Liabilities; or (ii) any property (real, personal or mixed, tangible or intangible) used by the Seller in the ownership, operation and/ or development of the Purchased Assets or the Business.  Schedule 5.20 also sets

23

forth a true, correct and complete list of all Accounts Receivable, notes receivable and other receivables and accounts payable owed to or due from any such Person described above by or to Seller but solely with respect to the Purchased Assets except for any compensation payable to such officers in their capacity as Employees of Seller in the ordinary course of business, in each case, to the Knowledge of Seller.

Section 5.21.   Financial Instruments.   Schedule 5.21 contains an accurate and complete list of all outstanding financial assurance instruments related to the Permits and the Business, including performance bonds, letters of credit and surety bonds to the Knowledge of Seller. Copies of such financial assurance instruments in the possession of Seller have been provided to Purchaser.

Section 5.22.   Insurance.   Schedule 5.22 contains an accurate and complete list of all policies or binders of property, general liability, workmen's compensation, automobile liability and legal liability insurance held by or on behalf of Seller in connection with the Business.  All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and Seller has not received notice of cancellation or non-renewal of any policy of insurance, nor been refused any insurance, nor has its coverage been limited by any carrier, in each case in connection with Seller's ownership of the Purchased Assets and operation of the Business.

Section 5.23.   Financial Statements. Seller has delivered or made available to the Purchaser (a) the reviewed balance sheet and statements of operations, earnings and cash flows of Seller for the fiscal year ended January 31, 2009 and (b) the unreviewed balance sheet and statements of operations, earnings and cash flows of Seller for the fiscal month ended September 26, 2009 (collectively the "Financial Statements").  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, present fairly, in all material respects, the financial condition of Seller as of such dates and the results of operations, earnings and cash flows of Seller for such periods, and are consistent, in all material respects, with the books and records of Seller (which books and records are correct and complete in all material respects).

Section 5.24.   Brokers/Finders.   Except as set forth in Schedule 5.24, Seller has not employed, and to the Knowledge of Seller, no other Person has made any arrangement by or on behalf of Seller with any financial advisor, investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

SECTION 6.   REPRESENTATIONS AND WARRANTIES OF PURCHASER.

Purchaser hereby represents and warrants to Seller as follows on and as of the Execution Date and on and as of the Closing Date:

Section 6.1.   Formation.   Purchaser is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of Delaware, and Purchaser has all

CHI 58778967v2

limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

Section 6.2. <u>Authorization and Validity of Agreement</u>. Purchaser has all requisite limited liability company power and authority to enter into this Agreement and each of the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and each of the Ancillary Agreements to which Purchaser is a party and the performance of its obligations hereunder and thereunder have been duly authorized by all necessary action by its Manager, and no other proceedings on the part of Purchaser are necessary to authorize such execution, delivery and performance. This Agreement has been, and as of the Closing Date each Ancillary Agreement to which Purchaser is a party will be, duly executed by Purchaser and constitutes (or as of the Closing Date will constitute) its valid and binding obligation, enforceable against it in accordance with its terms.

Section 6.3. <u>No Conflict or Violation</u>. The execution, delivery and performance by Purchaser of this Agreement and each Ancillary Agreement to which it is a party (a) do not and will not violate or conflict with any provision of its certificate of incorporation or bylaws, (b) do not and will not violate any provision of law, or any order, judgment or decree of any court or other governmental or regulatory authority, and (c) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract or other material agreement or instrument to which Purchaser is a party or by which it is bound or to which its properties or assets is subject.

Section 6.4. <u>Consents and Approvals</u>. The execution, delivery and performance of this Agreement on behalf of Purchaser does not require the consent or approval of, or filing with, any government, governmental body or agency or other Person except: (i) as may be required in connection with the Bankruptcy Code, (ii) as may be required to transfer any Permits; and (iii) as may be required in connection with the assignment and assumption of the Assumed Contracts.

SECTION 7. <u>COVENANTS OF SELLER.</u>

Section 7.1. <u>Conduct of Business Before the Closing Date</u>. During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 15 or the Closing, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior written consent of the Purchaser, Seller shall not:

      (a)     make any material change in the conduct of the Business, or enter into any transaction with respect to the Business other than in the ordinary course of business consistent with past practices;

      (b)     make any sale, assignment, lease, license, transfer, abandonment or other conveyance of the Purchased Assets or any part thereof or of its equity securities, except transactions pursuant to the Assumed Contracts, dispositions of inventory (including the continual disposition below cost of "warehouse sale" merchandise consistent with Seller's existing practices), consumption of personal property, or disposition of worn out or obsolete Equipment for fair or reasonable value, in each case in the ordinary course of

25

business consistent with past practice; provided that Seller will not perform any "going out of business sales" or similar events or inventory liquidations (including dispositions of inventory below cost not otherwise permitted);

(c)     subject any of the Purchased Assets, or any part thereof, to any Lien or suffer such to exist other than Permitted Liens or Liens that will be released at or prior to the Closing Date;

(d)     acquire any assets, Inventory or properties related to the Business, or enter into any other transaction related to the Business, other than in the ordinary course of business consistent with past practice and in accordance with the terms of the Operating Budget and Inventory Budget;

(e)     enter into any new (or amend any existing) employee benefit plan, program or arrangement affecting the Employees or any new (or amend any existing) employment, severance or consulting agreement relating to any Employee, or grant any general or specific increase in the compensation (including salary and/or bonus compensation) of any Employees or consultants of Seller (including any such increase pursuant to any bonus, pension, profit-sharing or other plan or commitment, and whether payable in cash or personal property) or grant any increase in the compensation payable or to become payable to any Employee or consultants of Seller, outside the ordinary course of business provided, that Seller may enter into a new engagement or retention agreement with Appel (and Quest) after the filing of the Bankruptcy Case (on terms reasonably acceptable to the Purchaser) if such agreement is approved by the Bankruptcy Court and such agreement shall not be an Assumed Contract;

(f)     make capital expenditures or commitments not necessary for the continued operations of the Seller in the ordinary course of business which have not been previously approved by the board of directors of the Seller, or which have been committed to, or contracted for, prior to the date hereof;

(g)     knowingly take any other action that would cause any of the representations and warranties made by Seller in this Agreement not to remain true and correct in any material respect or that would cause Seller to be in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(h)     enter into, amend or terminate any Material Contact, or otherwise effect a material transaction inconsistent with Seller's past practices; or

(i)     issue, purchase, redeem, encumber, assign or transfer, or directly or indirectly Contract to issue, sell, purchase, redeem, encumber, assign or transfer any equity interest in the Seller, or any securities exchangeable for or exercisable or convertible into equity of the Seller;

(j)     declare or pay any dividends or agree to make any other distributions, including bonuses (outside of the ordinary course of business), with respect to any equity of the Seller; or

CHI 58778967v2

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 51 of 144

(k)     commit to do any of the foregoing.

Without limiting the generality of the foregoing, Seller shall, until the Closing Date, operate the Business in the usual and ordinary course, comply with the terms of the DIP Credit Agreement, shall maintain the Purchased Assets, including the Fixed Assets, in accordance with past practice, and in the event that Seller substitutes, disposes of or abandons any Purchased Assets in compliance with the terms of this Section 7.1, Seller will likewise replace such assets with Purchased Assets of like kind and quality to the extent necessary to ensure the continued operation of the Business in the ordinary course and consistent with past practice.

Section 7.2.    Consents and Approvals.   Seller shall use commercially reasonable efforts to obtain all consents and approvals of governmental entities and other third parties, if any, required to effect the transactions contemplated by this Agreement. Without limiting the foregoing, as soon as practicable after the Execution Date, Seller shall make or cause to be made all such further filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Seller agrees to promptly provide Purchaser with copies of all final consent, approval, termination or confirmation letters provided to Seller pursuant to filings made under this Section.

Section 7.3.    Access to Properties and Records.   Seller shall afford to Purchaser, and to the accountants, counsel, benefit and insurance consultants, financing sources and other representatives of Purchaser, reasonable access throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Section 15) to Seller's customers, vendors, landlords, properties, lenders, books, Records, Contracts, commitments, and personnel necessary to allow Purchaser to examine the Business, Purchased Assets and/or the Assumed Liabilities and Excluded Liabilities, during such period, and Seller shall furnish promptly to Purchaser all other information concerning the Purchased Assets, Business, and Assumed Liabilities and Excluded Liabilities as Purchaser may reasonably request. In addition, Purchaser may provide for any of its (or its Affiliates') personnel, advisors and representatives to remain on site at all of the Seller's locations prior to the Closing Date to monitor business operations.

Section 7.4.    Notices of Certain Events.   Seller shall promptly notify Purchaser (and deliver to Purchaser any related information) of:

(a)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, and any notice or other communication from any such Person alleging that such consent is not likely to be obtained prior to Closing;

(b)     any written communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement that would reasonably be expected to have a Material Adverse Effect;

(c)     any written objection or commencement of any proceeding, suit, charge, complaint, claim, or investigation that challenges or threatens to restrain or prohibit the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court; or

27

(d)     any breach of representation, warranty, covenant, or agreement of Seller under this Agreement.

Section 7.5.   <u>Name Change</u>.   Seller shall deliver to Purchaser duly and properly authorized and executed evidence as to the amendment of Seller's organizational documents (collectively, the "**Organizational Amendments**") changing Seller's name to another name which does not include its current name.  Upon the Closing, Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendments with the Secretary of State of the State of California and in each State, if any, in which each such Seller is qualified to do business on Seller's behalf.  Furthermore, after the Closing, Seller shall discontinue the use of its current name (and any other tradenames currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes any words from its current name without the prior written consent of Purchaser.

Section 7.6.   <u>Financial Reports</u>.   Seller agrees to deliver to Purchaser, as soon as is reasonably practicable after the respective period end date, but in no event later than five (5) Business Days after the respective period end date, copies of Seller's interim monthly and year-to-date financial statements for September 30 and each other month-end date between the Execution Date and the Closing Date.

Section 7.7.   <u>Budgets</u>.   From the date hereof through the Closing Date:

(a)     Seller shall comply with the operating budget set forth on <u>Schedule 7.7(a)</u> (the "**Operating Budget**"); and

(b)     Seller shall comply with the Inventory budget set forth on <u>Schedule 7.7(b)</u> (the "**Inventory Budget**"), which Inventory Budget covers, but is not limited to, the purchase of new Fall 2009 and Spring 2010 Inventory prior to Closing.

(c)     Seller agrees that it will notify Purchaser of any event or circumstance that may necessitate a change to either the Operating Budget or the Inventory Budget, and in no event shall Seller operate outside of either the Operating Budget or the Inventory Budget without the prior consent of Purchaser.  The Seller and Purchaser shall jointly update and modify the Operating Budget and Inventory Budget from time to time as reasonably necessary for the operation of the Business.

Section 7.8.   <u>Appel as Chief Executive Officer</u>.   From the Execution Date through the Closing, Seller will continue to retain Appel as Seller's acting interim Chief Executive Officer. Seller shall be solely responsible for any and all costs, expenses, and/or salary payments related to Appel's service, and shall not make any changes in the terms thereof without the prior consent of Purchaser, which consent shall not unreasonably be withheld.

SECTION 8.   <u>COVENANTS OF PURCHASER.</u>

Section 8.1.   <u>Actions Before Closing Date</u>.   Purchaser shall not take any action which shall cause it to be in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement.

CHI 58778967v2

Section 8.2.   <u>Consents and Approvals</u>.   Purchaser shall use commercially reasonable efforts to obtain all consents and approvals of third parties, if any, required to be obtained by Purchaser to effect the transactions contemplated by this Agreement. Purchaser shall make or cause to be made all filings and submissions, and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis. Purchaser agrees to promptly provide Seller with notice of receipt of all final consent, approval, termination or confirmation letters provided to Purchaser pursuant to filings made under this Section.

Section 8.3.   <u>Notices of Certain Events</u>.  Purchaser shall promptly notify Seller of:

(a)   any written communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)   any written communication from any governmental or regulatory agency or authority in connection with the transactions contemplated by this Agreement that would reasonably be expected to have a Material Adverse Effect;

(c)   any actions, suits, charges, complaints, claims, investigations or proceedings commenced or, to Purchaser's knowledge, threatened to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement; or

(d)   any breach of representation, warranty, covenant, or agreement of Seller under this Agreement.

## SECTION 9.   <u>COVENANTS OF SELLER AND PURCHASER</u>

Section 9.1.   <u>Amendments to Leases</u>.  Seller will cause its Affiliates who are lessors under those leases associated with the Leased Real Property to enter into the Lease Assignments and Amendments related thereto, and Purchaser will enter into such Lease Assignments and Amendments, in the form agreed to by Purchaser**.**

Section 9.2.   <u>Retained Jurisdiction</u>.   The Purchaser and the Seller agree that the Bankruptcy Court shall retain jurisdiction to enforce all aspects of this Agreement until such time as the Bankruptcy Case is closed, at which time jurisdiction shall be in the federal and state courts of the State of New York. The parties acknowledge and agree that time is of the essence, that any failure to timely perform their obligations hereunder would constitute irreparable harm to a party and that the Bankruptcy Court may grant specific performance to the Seller or Purchaser with relief to be granted on a shortened notice with regard to all remedies for the Seller and the Purchaser.

Section 9.3.   <u>Assignability of Certain Contracts</u>.  To the extent that the assignment to the Purchaser of any Assumed Contract or Permit to this Agreement is not permitted without the consent or approval of a third party, including, without limitation, any governmental body, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, Seller shall, if requested by Purchaser and at the direction of Purchaser, use its reasonable best efforts to (x) provide or cause to be provided to Purchaser the benefits of any such Contract or Permit (which will not be deemed assumed by Purchaser

29

hereunder), (y) cooperate in any arrangement, reasonable and lawful as to Seller, as Purchaser may request, which is designed to provide such benefits to Purchaser and (z) enforce for the account of Purchaser any rights of Seller arising from such Contracts and Permits, including the right to elect to terminate in accordance with the terms thereof on the advice of Purchaser. In such case, to the extent possible (i) the beneficial interest in or to such Contracts or Permits (collectively, the "Beneficial Rights") shall in any event pass as of the Closing Date to the Purchaser under this Agreement; and (ii) pending such consent or approval, the Purchaser shall assume or discharge the Liabilities of Seller under such Beneficial Rights (to the extent such obligations are Assumed Liabilities) as agent for Seller, and Seller shall act as the Purchaser's agent in the receipt of any benefits, rights or interest received from the Beneficial Rights and shall turn over any such benefits, rights or interest promptly upon receipt.

Section 9.4.  Further Agreements.  From and after the Closing Date, Seller shall (a) promptly deliver to the Purchaser any mail or other communication received by it after the Closing Date and relating to the Purchased Assets or the Assumed Liabilities, (b) promptly transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by Seller but solely to the extent that such cash, electronic credit or deposit are Purchased Assets and (c) promptly forward to the Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets.  From and after the Closing Date, Seller shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.  In addition, Seller agrees not to bring, directly or indirectly or through the assignment to others, any claims for Avoidance Actions against the suppliers, vendors and customers of the Company which have the same relationships with the Purchaser on and after the Closing.

SECTION 10. EMPLOYEES.

Section 10.1.  Offers of Employment.  Effective as of the Closing Date, Purchaser may, in its sole and absolute discretion, offer employment to any or all Employees and for those Employees on disability, FMLA, military or other leave or absence other than vacation or jury duty.  All of such Employees who accept Purchaser's offer of employment are referred to herein collectively as the "**Transferred Employees**". In any event, Seller agrees that it will remain responsible for all WARN (and any other related) liabilities in respect of Seller's Employees, and Seller shall indemnify and hold harmless Purchaser with respect to the same.

Section 10.2.  Terms of Employment of Transferred Employees.  Purchaser may, in its sole and absolute discretion, offer each Transferred Employees terms and conditions of employment, including but not limited to benefits, base compensation, retirement and savings plans, and incentive compensation.  To the extent requested by Purchaser, Seller will provide to Purchaser for each Transferred Employee such employees' credited years of service and current base salaries and any other relevant employment records requested by Purchaser; provided, however, that neither the request for nor the provision by Seller of such information will trigger any duty of Purchaser to provide any Transferred Employees with any benefits accruals; provided that Purchaser agrees to credit the Transferred Employees with solely the amount of vacation time and sick leave time set forth on Schedule 10.2. With respect to any bonuses earned by the Transferred Employees prior to the Closing Date, whether or not accrued, Seller will pay

30

the amount thereof directly to the Transferred Employees in accordance with Seller's past practice, and Purchaser will have no responsibility to assume the obligation to pay such amounts.

Section 10.3.   Employee Benefits for Transferred Employees.

(a)   No Credit for Service with Seller; No Successor Liabilities.  The parties agree:

(i)   that Purchaser has no obligation to grant any Transferred Employees with any credit for any years of service of such Transferred Employee credited by Seller for purposes of eligibility, vesting of benefits, calculation of severance pay, determination of vacation time, sick leave, or other approved or statutory leave of absence, or for purposes of determining the amount of benefit coverage under any plan of Purchaser providing for medical, dental, and prescription drug coverage and accrual of other benefits, and that any determination to do so will be made solely at the discretion of Purchaser; provided that Purchaser may elect, at its sole expense, to assume a medical insurance plan of Seller with respect to the Transferred Employees; and

(ii)   that Purchaser shall not be, for any purposes, a successor employer of the Transferred Employees to Seller, and that Purchaser expressly does not assume any liabilities as a successor employer.

(b)   Savings Plans.  Seller's obligation to make contributions to its profit sharing, defined contribution and savings plans ("**Seller Savings Plans**"), if any, with respect to the Transferred Employees shall cease as of the Closing Date. The account balances of Transferred Employees under Seller Savings Plans as of the Closing Date shall be fully vested. Purchaser shall reasonably cooperate with Seller in providing information to the Transferred Employees regarding transfers and rollovers of their account balances in the Seller Savings Plans; provided, however that such cooperation will not create an obligation of Purchaser to offer such savings plans on the same or materially similar terms and conditions as the Seller Savings Plans.  If Purchaser elects, in its sole discretion, to offer any continuation or replacement of the Seller Savings Plans, Purchaser shall do so at its sole expense.

(c)   COBRA.  Purchaser, at no expense to Seller, shall provide the benefits, if any, required from and after the Closing Date pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA for any Transferred Employee who is or becomes entitled to such continuation medical coverage from Purchaser after the Closing Date. Seller will provide the benefits, if any, required pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA to the Employees, and all other Persons, who became eligible for such benefits on or prior to the Closing Date from the Seller, including but not limited to those of Seller's Employees who are not Transferred Employees.

Section 10.4.  WARN Act Liability.  Seller shall be solely responsible for any obligations under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local law, rule or regulation that might arise on or prior to the Closing Date,

31

or as a consequence of the transactions contemplated by this Agreement, including, without limitation, providing any notice of layoff or plant closing, or maintaining the Employees on Seller's payroll for any period of notice required by the WARN Act. Seller shall retain all liabilities, if any, for any severance or termination costs relating to Employees who, on or at the Closing Date, experience a termination of employment by Seller as a result of the transactions contemplated by this Agreement.

Section 10.5. <u>Appel Employment</u>. The parties agree that Appel's employment as interim Chief Executive Officer of Seller shall terminate as of the Closing Date. Seller shall be solely responsible for any and all obligations to Appel for such service or severance thereof, and with respect to Quest Turnaround Advisors LLC for its services to Seller.

## SECTION 11. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY SELLER.</u>

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

Section 11.1. <u>Representations and Warranties of Purchaser</u>. All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time), and Seller shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Purchaser to that effect.

Section 11.2. <u>Performance of the Obligations of Purchaser</u>. Purchaser shall have performed in all material respects all obligations required under this Agreement to be performed by Purchaser on or before the Closing Date, and Seller shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Purchaser to that effect.

Section 11.3. <u>Consents and Approvals</u>. All consents, waivers, authorizations and approvals of any governmental or regulatory authority, domestic or foreign, and required in connection with the execution, delivery and performance of this Agreement, shall have been duly obtained and shall be in full force and effect on the Closing Date, including in connection with the Bankruptcy Code.

Section 11.4. <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order issued by any court or other governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, domestic or foreign, which declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated hereby shall be in effect or be threatened.

Section 11.5. <u>Delivery of Ancillary Agreements</u>. Purchaser shall have executed and delivered to Seller each of the Ancillary Agreements to which it is a party.

CHI 58778967v2

Section 11.6.  <u>Resolutions; Secretary's Certificate</u>.  Seller shall have received a copy of resolutions adopted by the Manager of Purchaser authorizing the execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser, and a certificate of the Secretary of Purchaser, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect at such date and setting forth the incumbency of each person executing this Agreement on behalf of Purchaser.

## SECTION 12. <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PURCHASER.</u>

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Purchaser in its sole discretion:

Section 12.1.  <u>Representations and Warranties of Seller</u>.  All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (and in all respects in the case of each representation and warranty that is qualified as to materiality) on and as of the Closing Date (other than such representations and warranties that speak as of a specific date or time other than the Closing Date, which need only be true and correct in all material respects as of such date or time), and Purchaser shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Seller to that effect.

Section 12.2.  <u>Performance of the Obligations of Seller</u>.  Seller shall have performed in all respects all obligations required under this Agreement to be performed by Seller on or before the Closing Date, specifically including, but not limited to, Seller's observance of, compliance with, and performance of the covenants contained in Section 7, and Purchaser shall have received a certificate dated the Closing Date and signed by the President or any Vice President of Seller to that effect.

Section 12.3.  <u>Consents and Approvals</u>.  All consents, waivers, authorizations and approvals of any third parties and all governmental or regulatory authority, domestic or foreign, that are required in connection with the execution, delivery and performance of this Agreement shall have been duly obtained and shall be in full force and effect on the Closing Date, including in connection with the Bankruptcy Code, and all consents, waivers, authorizations, approvals, declarations and registrations listed on <u>Schedule 12.3</u> shall have been duly obtained and shall be in full force and effect on the Closing Date.

Section 12.4.  <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order issued by any court or governmental or regulatory authority, domestic or foreign, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any government or governmental or regulatory authority, which declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated hereby shall be in effect or be threatened.

Section 12.5.  <u>Delivery of Ancillary Agreements</u>.  Seller shall have executed and delivered to Purchaser each of the Ancillary Agreements to which Seller is a party and the Inventory Statement shall have been consented to by the Purchaser.

33

Section 12.6.  No Material Adverse Effect.  During the period from Execution Date to the Closing Date, there shall not have occurred any Material Adverse Effect.

Section 12.7.  Resolutions; Secretary's Certificate.  Purchaser shall have received a copy of resolutions adopted by the Board of Directors of Seller (on the date hereof) authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Agreements to which Seller is a party, and a certificate of the Secretary of Seller, dated the Closing Date, certifying that such resolutions were duly adopted and are in full force and effect at such date and setting forth the incumbency of each person executing this Agreement on behalf of Seller.

Section 12.8.  Permits.  All of the Permits shall have been transferred or assigned to Purchaser or, to the extent that any of the such Permits are not assignable or otherwise have not been so transferred, Purchaser shall have obtained substitute licenses and permits comparable to such non-assigned Permits, in either case to the extent necessary to enable Purchaser to lawfully conduct the Business and operate the Purchased Assets in the manner currently conducted.

Section 12.9.  Completion of Due Diligence.  Purchaser shall have completed its due diligence examination of Seller, the Leased Real Property, the Business and the Purchased Assets and the results of such examination shall be satisfactory to Purchaser in its sole and absolute discretion; provided that unless Purchaser has provided written notice to Seller of the termination of this Agreement due to the failure of this condition on the date the Breakup Fee is approved by the Bankruptcy Court, this condition shall thereafter no longer apply.

Section 12.10. Employment, Non-Competition, Non-Solicitation and Confidentiality Agreements.  Purchaser shall have entered into a Employment Agreement with Bashford in substantially the form attached hereto as Exhibit E (the "Wilkes Bashford Agreement") and a Non-Competition, Non-Solicitation and Confidentiality Agreement with all of the stockholders of the Seller substantially in the form attached hereto as Exhibit F ("Noncompete Agreement").

Section 12.11. Leased Real Property. The Purchaser and the lessors of the Leased Real Property shall have entered into Lease Assignments and Amendments (and related exhibits), on terms reasonably satisfactory to the Purchaser.

Section 12.12. Concession Arrangements.  Purchaser shall have entered into new concession agreements with the Seller's vendors set forth on Schedule 12.12 on terms reasonably satisfactory to Purchaser.

SECTION 13. CONDITIONS PRECEDENT TO PERFORMANCE BY THE PURCHASER AND THE SELLER.

The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

34

(b)     the Bankruptcy Court shall have (i) entered the Sale Order in form and substance acceptable to Seller and Purchaser and their respective counsel approving the transactions contemplated by this Agreement, including, without limitation, the Breakup Fee and the assumption of the Assumed Contracts by the Purchaser, and (ii) made all of the findings required by Section 363(m) and (n) of the Bankruptcy Code as shall be reasonably satisfactory to Purchaser.

SECTION 14. <u>BANKRUPTCY PROCEDURES.</u>

Section 14.1.   <u>Bankruptcy Court Approval of Purchaser as Stalking Horse</u>.  On the Filing Date, Seller shall file with the Bankruptcy Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and the Sale and Bidding Procedures Motion.  Seller shall use its best commercially reasonable efforts to obtain a hearing before the Bankruptcy Court regarding the entry of the Bid Procedures Order to take place as soon as practicable after the Filing Date, but in any event at the same time as the DIP Order is approved.  Seller shall seek prompt entry of the Bid Procedures Order.

Section 14.2.   <u>Motions and Notices Regarding Sale of Acquired Assets and Assumption and Assignment of Seller Contracts</u>.

(a)     <u>Sale Motion</u>.  Seller shall use its best commercially reasonable efforts to obtain a hearing before the Bankruptcy Court regarding the entry of the Sale Order (the "**Sale Hearing**") to take place on or before November 25, 2009.  Seller shall seek prompt entry of the Sale Order.

(b)     <u>Notice of Proposed Cures</u>.  Seller agrees that it will promptly serve the third parties who are parties to Assumed Contracts and the leases with respect to the Leased Real Property (such third parties being "**Cure Obligees**") with written notice of proposed Cures on the Assumed Contracts and the leases with respect to the Leased Real Property (such notice being the "**Proposed Cure Notice**"), which Proposed Cure Notice shall be mutually agreed upon by Seller and Purchaser and approved by the Bid Procedures Order.  The Proposed Cure Notice shall establish a deadline reasonably in advance of the Sale Hearing by which Cure Obligees must object to respective proposed Cures or be deemed to have waived any such objection.

(c)     Filings with the Bankruptcy Court.  Seller covenants and agrees that it will provide to Purchaser a copy of any and all material filings Seller proposes to file with the Bankruptcy Court, including, but not limited to, the Sale and Bidding Procedures Motion, not less than three (3) Business Days prior to the date on which Seller intends to make each respective filing, and that Seller shall reasonably cooperate and consult with the Purchaser prior to the filing thereof.

Section 14.3.   <u>Requests for Information</u>.  From and after the date the Bid Procedures Order is entered, (1) if Seller supplies any information regarding the Business to a potential bidder not heretofore given to Purchaser, Seller shall further provide Purchaser with a copy of such information within 24 hours of providing that information to any other potential bidder; and (2) with respect to any bid, term sheet, or written expression of interest by any other party for

35

any Purchased Assets, or any other reorganization proposal, submitted prior to the Bid Deadline, Seller shall provide Purchaser with prompt notice of such proposal and a copy of such proposal within 48 hours of Seller's receipt thereof.

Section 14.4. <u>Breakup Fee</u>. In the event of a termination of this Agreement for any reason other than as set forth in Sections 15.1(b)(i), 15(d) or 15.1(e)(ii) of this Agreement, Seller shall pay Purchaser One Hundred Thousand Dollars ($100,000) plus Purchaser's out-of-pocket expenses (not to exceed an additional Two Hundred Fifty Thousand Dollars ($250,000)) (collectively, the "**Breakup Fee**"). Such Breakup Fee shall be in addition to the return to the Purchaser of the Deposit Amount. The Bid Procedures Order shall approve the Breakup Fee as set forth in this Section. The obligation of Seller to pay the Breakup Fee:

(a) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code;

(b) shall not be subordinate to any other administrative expense claim against the Seller, other than any super-priority claim granted under any debtor-in-possession order (the "**DIP Order**"); and

(c) shall survive the termination of this Agreement in accordance with Section 15 hereof.

Section 14.5. <u>Certain Bankruptcy Undertakings by Seller.</u>

(a) Seller shall use its best efforts to effect the transactions contemplated by this Agreement in accordance with the Bid Procedures Order and the Sale Order.

(b) Seller agrees to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm or obtain Bankruptcy Court approval of the sale of the Purchased Assets or any other agreement contemplated hereby and to consummate the transaction contemplated hereby.

(c) From and after the date hereof, except as specifically set forth in this Agreement or the Bid Procedures Order, or as otherwise required by applicable law, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or any other order of the Bankruptcy Court, Seller shall not take any action, or fail to take any action, which action or failure to act would reasonably be expected to: (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification of the Bid Procedure Order or Sale Order (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder) or (B) the entry of a stay pending appeal of such Order; provided however, that Seller shall not be prevented by this Section from marketing the Purchased Assets as a whole to third parties or providing information to or responding to inquiries form potential bidders for the Purchased Assets prior to the date of the auction of the Purchased Assets pursuant to the Bid Procedures Order.

*CHI 58778967v2*

Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 61 of 144

(d)     Seller, at its sole cost and expense, shall defend the Bid Procedures Order, the Designation Order, and the Sale Order in the event that Purchaser elects, in its sole discretion, to close the purchase of the Purchased Assets notwithstanding the pendency of any motion for reconsideration or appeal of such Orders

## SECTION 15. <u>TERMINATION.</u>

Section 15.1.   <u>Conditions of Termination</u>.   Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time before the Closing Date as follows:

(a)     by mutual consent of Seller and Purchaser;

(b)     by Seller if (i) there has been a material breach by Purchaser of its representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Purchaser's part to be performed, and such breach shall not have been cured within ten (10) days after written notice thereof, or (ii) any of the conditions set forth in Section 11 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Seller breaching any of its representations, warranties or covenants contained in this Agreement);

(c)     by Purchaser if (i) there has been a material breach by Seller of its representations and warranties or in the observance, or in the due and timely performance of any of the covenants or agreements contained in this Agreement on Seller's part to be performed, and such breach shall not have been cured within ten (10) days after written notice thereof, or (ii) any of the conditions set forth in Section 12 shall become reasonably incapable of fulfillment and are not waived (unless the failure of such conditions results primarily from Purchaser breaching any of its representations, warranties or covenants contained in this Agreement);

(d)     by Purchaser (<u>provided</u> that Purchaser is not then in material breach of any representation, warranty, covenant or agreement set forth herein) if Purchaser is not satisfied with its due diligence review of the Purchased Assets and the Business; <u>provided</u> that unless Purchaser has provided written notice to Seller of the termination of this Agreement under this clause (d) as of the date the Breakup Fee is approved by the Bankruptcy Court, this termination right shall thereafter no longer apply;

(e)     by Purchaser (<u>provided</u> that Purchaser is not then in material breach of any representation, warranty, covenant or agreement set forth herein) if (i) a Material Adverse Effect event, condition or matter with respect to the Seller shall have occurred and be continuing at the time of such termination or (ii) a Material Adverse Effect event, condition or matter with respect to the Purchaser shall have occurred and be continuing at the time of such termination;

(f)     by Purchaser, if (i) the DIP Order is not entered by the Bankruptcy Court on or before November 10, 2009, (ii) the Bid Procedures Order is not entered by the

37

CHI 58778967v2

Bankruptcy Court on or before November 10, 2009, (iii) the Sale Order is not entered by the Bankruptcy Court on or before November 25, 2009, (iv) the Closing has not occurred by November 30, 2009, (v) the Bankruptcy Case is converted into a case under Chapter 7 of the Bankruptcy Code or dismissed or if the Seller files a plan of reorganization or liquidation that does not include the consummation of the transactions contemplated hereby with Purchaser or (vi) if the Seller sells, disposes or transfers any of its material assets or enters into any similar alternative transaction with respect to its assets or equity securities; or

(g)     by Purchaser or Seller, if the Purchaser is not the winning bidder at the Auction in accordance with the Bidding Procedures.

Section 15.2.  Effect of Termination.  In the event of termination pursuant to Section 15.1, this Agreement shall become null and void and have no effect, with no liability on the part of Seller or Purchaser, or their respective Affiliates, directors, officers, managers, agents, members or stockholders, with respect to this Agreement, except as set forth in Section 3.3 or 14.4, this Section 15 and Section 16; provided, however, that nothing herein shall relieve any party from any liability for any willful and material breach by such party of any of its covenants or agreements set forth in this Agreement and all rights and remedies of such nonbreaching party under this Agreement in the case of such a breach, at law or in equity, shall be preserved. Notwithstanding the foregoing, the right of the Seller to receive the Deposit shall be the sole and exclusive remedy of Seller against the Purchaser or its Affiliates, directors, officers, managers, agents, members or stockholders for any loss or damage suffered as a result of the breach by Purchaser of this Agreement or the termination of this Agreement by Seller and in no event will any Seller (or Person acting on behalf of Seller) seek to recover (or be entitled to obtain) any other money damages or any equitable relief or equitable remedies of any kind whatsoever or any other remedy from the Purchaser or its Affiliates, directors, officers, managers, agents, members or stockholders, regardless of whether such monetary damages or other remedies are based on a claim in law or equity, and Seller (on its own behalf and on behalf of its estate) hereby waive all such claims except in the case of fraud by the Purchaser.

SECTION 16.  MISCELLANEOUS.

Section 16.1.  Successors and Assigns.  Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect, provided that Purchaser may assign its rights hereunder to an Affiliate and to any party providing financing in connection with the transactions contemplated hereby, but no such assignment shall reduce or otherwise vitiate any of the obligations of Purchaser hereunder. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

Section 16.2.  Governing Law, Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof. Subject to Section 9.2, the parties hereto irrevocably elect the Bankruptcy Court as the sole judicial forum for the

CHI 58778967v2
Case: 09-33497    Doc# 16    Filed: 11/09/09    Entered: 11/09/09 21:51:26    Page 63 of 144

adjudication of any matters arising under or in connection with this Agreement and the other Ancillary Agreements, and consent to the jurisdiction thereof.

Section 16.3. <u>Expenses</u>. Except as otherwise provided herein, including pursuant to Section 14.4, Purchaser and Seller will each pay their respective fees and expenses (including fees and expenses of legal counsel) in connection with the transactions contemplated hereby whether or not the transactions contemplated hereby are consummated, including fees to its advisors. Notwithstanding the first sentence of this Section, Seller shall bear the cost of all state and local transfer, excise, value-added or other similar Taxes, and all sales and use Taxes and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets.

Section 16.4. <u>Broker's and Finder's Fees</u>. Each of the parties represents and warrants that it has not dealt with any broker or finder in connection with any of the transactions contemplated by this Agreement, and no broker or other Person is entitled to any commission or finder's fee in connection with any of these transactions.

Section 16.5. <u>Severability</u>. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

Section 16.6. <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Michael Appel
Wilkes Bashford Company
375 Sutter Street
San Francisco, CA 94108
Facsimile No.: (415) 956-3772

With a copy to:

Cecily Dumas
Friedman Dumas and Springwater LLP
150 Spear Street
Suite 1600
San Francisco, CA 94105
Facsimile No.: 415.834.1044

| If to Purchaser: | With a copy to: |
|---|---|
| Russ Mitchell | Bruce Zirinsky |
| Mitchells/Richards/Marshs | Greenberg Traurig, LLP |
| 670 Post Road East | 200 Park Avenue |
| Westport, CT 06880 | New York, NY 10166 |
| Facsimile No.: 203.291.0109 | Facsimile No.: 212.805.5517 |
| and | and |
| Jack Mitchell | Amit Mehta |
| Mitchells/Richards/Marshs | Greenberg Traurig, LLP |
| 670 Post Road East | 77 W. Wacker Drive |
| Westport, CT 06880 | Suite 3100 |
| Facsimile No.: 203.291.0109 | Chicago, IL 60601 |
| | Facsimile No.: 312.899.0361 |

Any party may change its address for the purpose of this Section by giving the other party written notice of its new address in the manner set forth above.

Section 16.7. <u>Amendments; Waivers</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 16.8. <u>Public Announcements</u>. Seller agrees not to issue any press releases or make any announcements to Seller's employees, suppliers, vendors or to the general public concerning this transaction without the prior written approval of Purchaser (which approval shall not be unreasonably withheld or delayed by Purchaser) unless, in the opinion of counsel to Seller, addressed to Purchaser, such press release or public announcement is required by law, in which case Seller shall give Purchaser prior notice and an opportunity to comment on the proposed disclosure.

Section 16.9. <u>Entire Agreement</u>. This Agreement and the Ancillary Agreements contain the entire understanding among the parties hereto with respect to the transactions contemplated hereby, and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions, including, but not limited to, the APA Term Sheet and the Sutter Street Term Sheet. All Schedules hereto and any documents and instruments delivered pursuant to any provision hereof, including the Disclosure Letter, are expressly made a part of this Agreement as fully as though completely set forth herein.

40

Section 16.10. <u>Parties in Interest</u>. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller, Purchaser, and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Seller or Purchaser. No provision of this Agreement shall give any other third Persons any right of subrogation or action over or against Seller or Purchaser.

Section 16.11. <u>Section and Paragraph Headings</u>. The section and paragraph headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 16.12. <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "include" or "including" means include or including, without limitation. All references in this Agreement to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.

Section 16.13. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts (including by facsimile and PDF email format), each of which shall be deemed an original, but all of which shall constitute the same instrument.

***[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]***

CHI 58778967v2

# SIGNATURE PAGE TO ASSET SALE AND PURCHASE AGREEMENT

**SELLER:**

The Wilkes Bashford Company,
a California corporation

By: _Michael Appel_
Name: _Michael Appel_
Title: _Interim CEO_

**PURCHASER:**

ED MITCHELL WEST LLC,
a Delaware limited liability company

By:_____
Name:_____
Title:_____

<u>SIGNATURE PAGE TO ASSET SALE AND PURCHASE AGREEMENT</u>

**SELLER:**

The Wilkes Bashford Company,
a California corporation

By:_____
Name:_____
Title:_____

**PURCHASER:**

ED MITCHELL WEST LLC,
a Delaware limited liability company

By:_____
Name:____John Russell Mitchell Jr____
Title:____Co President____

## LIST OF EXHIBITS:

| | |
|---|---|
| Exhibit A: | Form of Bill of Sale |
| Exhibit B: | Form of Trademark Assignment |
| Exhibit C: | Form of Domain Name Assignment |
| Exhibit D: | Form of Assignment and Assumption Agreement |
| Exhibit E: | Wilkes Bashford Agreement |
| Exhibit F: | Noncompete Agreement |

## LIST OF SCHEDULES

| | |
|---|---|
| 2.1(a): | Rejected Contracts |
| 2.1(a)(ii): | Fixed Assets |
| 2.1(a)(iii): | Assumed Contracts |
| 2.1(a)(vii): | Prepaid Expenses |
| 2.1(a)(xii): | Assumed Claims |
| 3.4(b): | Illustrative Calculation of Inventory Adjustment |
| 5.2: | Jurisdictions Where Qualified to Transact Business |
| 5.5: | Consents and Approvals |
| 5.6(a): | Liens and Security Interest |
| 5.7: | Certain Changes and Events |
| 5.8(a): | Leased Real Property |
| 5.8(b): | Liens on Real Property |
| 5.9(a): | Owned Intellectual Property |
| 5.9(b): | Licenses to Intellectual Property |
| 5.10: | Permits |
| 5.12: | Litigation |
| 5.13(a): | Material Contracts |
| 5.14: | Tax Liens |
| 5.15: | Seller Plans |
| 5.16: | Employee List |
| 5.17(b): | Employment Agreements |
| 5.18: | Bank Accounts |
| 5.19(a): | Environmental Compliance |
| 5.19(b): | Environmental Litigation |
| 5.20: | Affiliate Relationships |
| 5.21: | Financial Instruments |
| 5.22: | Insurance |
| 5.24: | Brokers/Finders |
| 7.7(a): | Operating Budget |
| 7.7(b): | Inventory Budget |
| 9.1: | Affiliated Leased Real Property |
| 10.2 | Vacation and Sick Time |
| 12.3: | Required Consents |
| 12.12: | Vendor Concession Arrangements |

## Exhibit A - Form of Bill of Sale

## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT (this "**Bill of Sale**"), dated as of November __, 2009, is made and entered into by and among The Wilkes Bashford Company, a California corporation ("**Seller**"), and Ed Mitchell West LLC, a Delaware limited liability company ("**Purchaser**" and, together with the Seller, the "**Parties**"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement (as defined below).

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of November __, 2009, by and among Seller and Purchaser (as the same may be amended, supplemented or otherwise modified from time to time, the "**Asset Purchase Agreement**"), the parties thereto have agreed to the sale by Seller and the purchase by Purchaser of the Purchased Assets, which sale is being conducted in accordance with Sections 363(f) and 365 and other applicable provisions of the Bankruptcy Code.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2. Except for the representations and warranties set forth in paragraph 1 above and in the Asset Purchase Agreement, Purchaser is purchasing the Purchased Assets on an "as is, where is" basis, without any representation or warranty as to condition, value, merchantability, or use for any purpose.

3. Seller hereby appoints Purchaser its true and lawful attorney to act in its name on its behalf with respect to the collection or reduction to possession of any of the Purchased Assets and to execute any documents and instruments and to do all such other acts and things as may be necessary to effectuate the foregoing; provided, that such power of attorney shall not extend to any act or thing that would create or result in any liability or obligation of Seller to any person, except as set forth in the Asset Purchase Agreement.

4. Notwithstanding anything to the contrary contained herein, Seller is not selling, assigning, transferring, conveying or delivering to Purchaser, and Purchaser is not purchasing or acquiring from Seller, any Excluded Assets.

5. If subsequent to the date of this Bill of Sale, any property or asset that is part of the Purchased Assets comes into possession of Seller or any of its Affiliates, Seller shall promptly deliver, or cause such Affiliate to deliver, such property or asset to Purchaser. If subsequent to the date of this Bill of Sale, any property or asset that is part of the Excluded Assets comes into possession of Purchaser or any of its Affiliates, Purchaser shall promptly deliver, or cause such Affiliate to deliver, such property or asset to Seller.

6.     In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall govern, supersede and prevail, and nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the provisions of the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided and subject to the limitations set forth in the Asset Purchase Agreement.

7.     This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  Any provision of this Bill of Sale may be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may be given, only with the written agreement of Purchaser and Seller.

8.     This Bill of Sale shall be governed by and construed under the internal laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

9.     This Bill of Sale may be executed in counterparts (and may be delivered by means of facsimile or other electronic transmission), each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument.

*   *   *   *   *

2

IN WITNESS WHEREOF, this Bill of Sale is duly executed and delivered as of the date first above written.

**<u>PURCHASER</u>**:

ED MITCHELL WEST LLC
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**<u>SELLER</u>**:

THE WILKES BASHFORD COMPANY
a California corporation

By:_____
Name:_____
Title:_____

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 72 of 144

## Exhibit B - Form of Trademark Assignment

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "**Assignment**"), dated as of November __, 2009 (the "**Effective Date**"), is made by and among The Wilkes Bashford Company, a California corporation ("**Assignor**"), and Ed Mitchell West LLC, a Delaware limited liability company ("**Assignee**").  All capitalized terms used but not otherwise defined herein have the meanings set forth in that certain Asset Purchase Agreement, dated as of November __, 2009, by and among Assignor and Assignee (as the same may be amended, supplemented or otherwise modified from time to time, the "**APA**").

WHEREAS, pursuant to the APA, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, the trademark registrations and applications set forth on Annex I attached hereto together with the goodwill associated therewith (collectively, the "**Marks**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee its entire right, title and interest in and to the Marks, for the United States and for all foreign countries, including, without limitation, all corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, together with all income, royalties or payments due or payable as of the Effective Date or thereafter, including, without limitation, all claims in law or equity by reason of past, present or future infringement or other unauthorized use of the Marks, with the right to sue for, and collect damages for the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives.

Assignors hereby authorize and request the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Marks.

*[Signature page immediately follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Trademark Assignment to be executed by their respective officers thereunto duly authorized as of the date first above written.

**ASSIGNEE**:

ED MITCHELL WEST LLC
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**ASSIGNOR**:

THE WILKES BASHFORD COMPANY
a California corporation

By:_____
Name:_____
Title:_____

## CERTIFICATES OF ACKNOWLEDGMENT

STATE OF CALIFORNIA      )
                                 ) SS.

COUNTY OF SAN FRANCISCO   )

         I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as a free act and deed with authority to do so.  IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this ____ day of November, 2009.

_____
Notary Public

Commission Expires:_____

STATE OF CALIFORNIA      )
                                 ) SS.

COUNTY OF SAN FRANCISCO   )

         I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as a free act and deed with authority to do so.  IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this ____ day of November, 2009.

_____
Notary Public

Commission Expires:_____

# ANNEX I

## TRADEMARK REGISTRATIONS/APPLICATIONS

| *Trademark* | *Registration/Application Number* | *Registration/Filing Date* | *Jurisdiction* |
|---|---|---|---|
| WILKES SAN FRANCISCO | 2493550 | September 25, 2001 | United States Federal Registration |
| WILKESHOME | 1773881 | May 25, 1993 | United States Federal Registration |
| WILKES SPORT | 1660827 | October 15, 1991 | United States Federal Registration |
| WILKES SPORT | 1677685 | March 3, 1992 | United States Federal Registration |
| WILKES BASHFORD | 1485828 | April 26, 1988 | United States Federal Registration |
| WB (Logo - Dog & Ball with "WB") | 1459300 | September 29, 1987 | United States Federal Registration |

*Annex I to the Trademark Assignment*

## Exhibit C - Form of Domain Name Assignment

## ASSIGNMENT OF DOMAIN NAMES

This ASSIGNMENT OF DOMAIN NAMES (this "**Assignment**"), dated as of November __, 2009 (the "**Effective Date**"), is made by and among The Wilkes Bashford Company, a California corporation ("**Assignor**"), and Ed Mitchell West LLC, a Delaware limited liability company ("**Assignee**"). All capitalized terms used but not otherwise defined herein have the meanings set forth in that certain Asset Purchase Agreement, dated as of November __, 2009, by and among Assignor and Assignee (as the same may be amended, supplemented or otherwise modified from time to time, the "**APA**").

WHEREAS, Assignor is the owner of the domain names as shown on Schedule A, including all sub-domain names and extensions thereof and thereto (collectively, the "**Domain Names**"); and

WHEREAS, pursuant to the APA, Assignor wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, the Domain Names, together with the goodwill associated therewith.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby assign and transfer to Assignee, effective as of Effective Date, all right, title, and interest in and to the Domain Names, and hereby instructs, authorizes, and directs any and all registrars thereof (which registrars are listed on Schedule A) to transfer the Domain Names to an account as directed by the Assignor. Assignor agrees to cooperate with Assignee and to follow Assignee's reasonable instructions in order to effectuate the transfer of the Domain Name registrations in a timely manner, and Assignor is hereby expressly permitted and authorized to provide a copy of this Assignment to any such registrar as necessary to accomplish such transfer.

In the event it becomes necessary, Assignor shall, at any time before [_____ __, 2010], prepare and transmit any and all Registrant Name Change Agreements (RNCA's) or other written authorizations and/or instructions and or to correspond with the applicable registrars to instruct and authorize transfer of the Domain Names, including to provide to Assignee a functioning user name and password, where available, sufficient for Assignee to immediately begin to administer the Domain Names, as well as to cooperate with Assignee in obtaining and/or providing information required in any proceedings relating to the Domain Names, in each case, as reasonably requested by Assignee.

*[Signature page immediately follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment of Domain Names to be executed by their respective officers thereunto duly authorized as of the date first above written.

**ASSIGNEE**:

ED MITCHELL WEST LLC
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**ASSIGNOR**:

THE WILKES BASHFORD COMPANY
a California corporation

By: _____
Name: _____
Title: _____

# CERTIFICATES OF ACKNOWLEDGMENT

STATE OF CALIFORNIA       )

                                    ) SS.

COUNTY OF SAN FRANCISCO    )

        I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as a free act and deed with authority to do so.  IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this ____ day of November, 2009.

_____
Notary Public

Commission Expires:_____

STATE OF CALIFORNIA       )

                                    ) SS.

COUNTY OF SAN FRANCISCO    )

        I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said instrument as a free act and deed with authority to do so.  IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal, this ____ day of November, 2009.

_____
Notary Public

Commission Expires:_____

**Schedule A**

**DOMAIN NAMES**

| Domain Name | Country of registration | Registrar | User Name and Password, if necessary |
|---|---|---|---|
| www.wilkesbashford.com | United States | NETWORK SOLUTIONS, LLC | |

## Exhibit D - Form of Assignment and Assumption Agreement

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of November __, 2009, is made and entered into by and among The Wilkes Bashford Company, a California corporation ("**Seller**"), and Ed Mitchell West LLC, a Delaware limited liability company ("**Purchaser**").  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement (as defined below).

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of November __, 2009, by and among Purchaser and Seller (as the same may be amended, supplemented or otherwise modified from time to time, the "**Asset Purchase Agreement**"), the Purchaser and Seller have agreed to the sale by Seller and the purchase by Purchaser of substantially all of the Purchased Assets and, in connection therewith, Purchaser has agreed to assume the Assumed Liabilities as set forth in the Asset Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing premises, the parties hereby agree as follows:

1.      Pursuant to Section 2.3 of the Asset Purchase Agreement, Purchaser hereby assumes the Assumed Liabilities to the extent provided in the Asset Purchase Agreement.

2.      Notwithstanding anything to the contrary contained herein, Purchaser is not assuming any Excluded Liabilities and the parties agree that all such Excluded Liabilities shall remain solely the responsibility of Seller.

3.      In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement shall govern, supersede and prevail, and nothing in this Agreement shall be deemed to supersede, enlarge or modify any of the provisions of the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement.

4.      All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon Purchaser, Seller and their respective successors and assigns.  Any provision of this Agreement may be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may be given, only with the written agreement of Purchaser and Seller.

5.      This Agreement shall be governed by and construed under the internal laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

6.       This Agreement may be executed in counterparts (and may be delivered by means of facsimile or other electronic transmission), each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

*   *   *   *   *

*CHI 58,740,644v6*

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment and Assumption Agreement as of the date first above written.

**<u>PURCHASER</u>**:

ED MITCHELL WEST LLC
a Delaware limited liability company

By:_____
Name:_____
Title:_____

**<u>SELLER</u>**:

THE WILKES BASHFORD COMPANY
a California corporation

By:_____
Name:_____
Title:_____

*Signature Page to the Assignment and Assumption Agreement*

## Exhibit E - Wilkes Bashford Agreement

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is entered into as of November __, 2009 by and between Wilkes Bashford, an individual resident of California ("Employee") and Ed Mitchell West LLC, a Delaware limited liability company (the "Company") and effective (the "Effective Date") on the Closing Date (as defined in the Purchase Agreement). The Company and Employee are sometimes collectively referred to herein as the "Parties" and individually as a "Party".

The Company and The Wilkes Bashford Company, a California corporation (the "Seller"), entered into that certain Asset Sale and Purchase Agreement, dated as of November __, 2009 (the "Purchase Agreement"), whereby the Company intends to acquire substantially all of the assets of the Seller subject to applicable approval by the bankruptcy court and entry of a sale order on terms acceptable to the Company (the "Acquisition"). Upon, and subject to, the consummation of the Acquisition, the Company desires to hire the Employee, and the Employee desires to be employed by the Company. Notwithstanding anything herein to the foregoing, this Agreement shall become effective only upon the consummation of the transactions contemplated by the Purchase Agreement and if Purchase Agreement is terminated or such transactions are not consummated for any reason, this Agreement shall terminate in all respects with no liability on the part of either party hereto. Definitions used herein and not otherwise defined are set forth in Section 3.

In consideration of the mutual covenants and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Employment.

(a)    On the Effective Date, the Company will hire Employee, and Employee will accept employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on Effective Date and ending as provided in Section 1(b) below (the "Employment Period").

(b)    Unless renewed by the mutual agreement of the Company and Employee, the Employment Period shall commence on the Effective Date and terminate on the earlier of: (i) December 31, 2010 (provided that unless otherwise terminated pursuant to the terms herein, the Employment Period shall automatically extend for two additional one-year periods unless either Party gives written notice to the other Party of its desire to terminate the Employment Period no later than 30 days prior to the end of such current one-year term); (ii) mutual agreement of the Parties; (iii) Employee's death or Disability; (iv) termination by the Company with or without Cause or (v) termination by the Employee for any reason. Employee shall give the Company at least 60 days prior written notice of any resignation.

2.    Position and Duties.

(a)    During the Employment Period, Employee will be employed to provide certain services as requested by the Company, including with respect to client development, sales and marketing.

(b)    During the Employment Period, Employee shall report to the co-Presidents of the Company (or such officer having similar rights, duties and obligations to the President or as otherwise directed by the Company) and shall devote his best efforts and reasonable attention to the business and affairs of the Company.  Employee shall perform his duties, responsibilities and functions to the Company hereunder to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.  Employee shall not have any authority to bind or act on behalf of the Company or any of its Affiliates.

3.    Compensation; Reimbursement.

(a)    In consideration of Employee's services set forth in Section 2 above, the Company shall pay to Employee a monthly salary of $9,583.33 for each month (pro rated for any partial month and subject to applicable taxes and withholdings) of the Employment Period (the "Salary").  If Employee's employment is terminated by the Company without Cause (and for no other reason) pursuant to Section 1(b)(iv) during the first year of the Employment Period, Employee shall be entitled to the remaining Salary for the then remaining months of such year paid at the times set forth in the immediately succeeding sentence, if and only if, (i) Employee has delivered to the Company a complete release of any claims against the Company, its affiliates and their directors, officers and affiliates (other than for payment of the remaining Salary pursuant to this Section 2(a) following the termination), in form and substance reasonably satisfactory to the Company and (ii) Employee has not breached, and does not breach, any surviving provisions of this Agreement.  The initial payment of any Salary after the end of the Employment Period pursuant to this Section 2(a) shall begin on the eighth day after Employee has signed (and not revoked) the aforementioned release.  If the Employment Period is terminated for any other reason, including by the Employee's termination for any reason at any time, by the Company with Cause at any time, by the Company with or without Cause after the first anniversary of the Effective Date, or by Death or Disability, no further Salary (nor budgeted expense reimbursements) shall be due or owing (except for Salary accrued but not yet paid for prior work, any earned and accrued Volume Bonus and any remaining accrued and approved expense reimbursement).  The Salary shall be paid on the Company's regularly scheduled payroll date following the period for which such payments are earned and calculated (with respect to the Bonus Payment).  Employee shall only be entitled to such other employee benefits from the Company as offered to similarly situated employees.

(b)    As additional consideration of Employee's employment set forth in Section 2 above and solely to the extent the Employment Period is then in effect as of the applicable year-end measurement date, the Employee will be eligible to receive an annual bonus, without duplication, equal to (i) $50,000 if the Annual Sales Volume for the Company is between $30,000,000 and $34,999,999 for each of the calendar years ending December 31, 2010, 2011 and 2012 and (ii) $100,000 if the Annual Sales Volume for the Company for such calendar years is equal to or greater than $35,000,000 (the "Volume Bonus").  The Volume Bonus, if any, payable

- 2 -

under this Section 3(b) shall be payable within 30 days following receipt of the Company's audited financial statements for the applicable year but in no event later than March 15 of the subsequent calendar year, unless such payment is delayed due to an unforeseeable administrative impracticability, in which case, such Volume Bonus will be paid as soon as administratively practicable thereafter, but in no event later than the end of such year. The Volume Bonus targets will be equitably adjusted by the Company upward or downward based on any acquisitions or divestitures. "Annual Sales Volume" means the entire amount or other consideration charged, whether wholly or partly for cash or on credit, for all merchandise sold, all services performed, and all other receipts whatsoever of all business conducted by the Company, including, without limiting the generality of the foregoing, the amount allowed for any "trade-in"; the retail price of any merchandise delivered on redemption of gift certificates, trading stamps, coupons or other vouchers; all deposits not refunded to purchasers; and all orders taken by the Company that it would in the normal course of its operations credit or attribute to its business, even though such order may be filled elsewhere. Annual Sales Volume receipts from sales made and orders taken by the Company shall be included in Annual Sales Volume even though the account may be transferred elsewhere for collection or the delivery of merchandise sole or the performance of services ordered may be made elsewhere. Every transaction on a deferred payment basis shall be treated as a sale for the full price at the time such transaction is entered, irrespective of the time for payment or the time when title passes.

(c)     During the Employment Period, the Employee shall have access to (i) a $25,000 entertainment budget for each 12-month period of the Consulting Term to be used in the reasonable discretion of the Employee solely for entertaining clients and customers for the benefit of the Company (the "Entertainment Budget"), (ii) a driver (for a car owned by Employee), reasonably chosen by the Employee, during the Employment Term to be used in the reasonable discretion of the Employee to drive his car in the manner that is consistent with past practice, (iii) reimbursement for mileage at the rate the Company reimburses employees for use of their cars when used for Company business and (iv) a $10,000 charitable giving budget for each 12-month period of the Employment Term to be used in the reasonable discretion of the Employee solely for charitable donations given on behalf of the Company (the "Charitable Budget"), in each case subject to the Company's requirements with respect to reporting and documentation of such expenses for purposes of complying with and demonstrating compliance with applicable rules of federal, state and local taxing authorities. In addition, the Employee Each of the foregoing budgeted items shall be limited to the amount allocated to each budgeted category and to the extent not utilized for such budgeted category, such remaining amounts will not be available for any other expenses (including any other budgeted category).

(d)     Except as otherwise expressly provided herein, all of Employee's rights to salary, bonuses, benefits and other compensation hereunder which might otherwise accrue or become payable after the termination or expiration of the Employment Period shall cease upon such termination or expiration, other than those expressly required under applicable law (such as COBRA). All amounts payable to Employee as compensation hereunder shall be subject to all required withholdings by the Company. If additional guidance is issued under, or modifications are made to, Section 409A of the Internal Revenue Code or any other law affecting payments to be made under the Agreement, the Employee agrees that the Company may take such reasonable actions and adopt such amendments as the Company believes are necessary to ensure continued compliance with the Internal Revenue Code, including Section 409A thereof. However, the

- 3 -

Company does not hereby or otherwise represent or warrant that any payments hereunder are or will be in compliance with Section 409A, and Employee shall be responsible for obtaining his own tax advice with regard to such matters.

4.  Definitions:

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person. For the purposes of this definition, "control" means (a) the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise, or (b) the ownership of more than 50% of the voting securities or other voting interests of any Person.

"Cause" means (i) the commission of a felony or other crime involving moral turpitude or the commission of any other act or omission involving theft, dishonesty, disloyalty or fraud with respect to the Company or any of its affiliates or any of their customers or suppliers, (ii) reporting to work intoxicated or under the influence of illegal drugs, the use of illegal drugs (whether or not at the workplace) or other conduct causing the Company substantial public disgrace or disrepute or economic harm, (iii) material and repeated refusal to perform duties as reasonably directed by the Company which is not cured to the Company's reasonable satisfaction within 15 days after written notice thereof to Employee, to the extent that such breach is capable of being cured, (iv) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company, (v) chronic absenteeism ("chronic absenteeism" shall be deemed to have occurred if Employee has at least ten absences unrelated to disability or illness in any ten week period, or (vi) any other material breach of this Agreement which is not cured to the Company's reasonable satisfaction within 15 days after written notice thereof to Employee, to the extent that such breach is capable of being cured.

"Disability" means inability to perform his full time services described herein for a period of sixty (60) consecutive days or one hundred and eighty (180) total days (whether or not consecutive) in any twelve-month period.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental authority or any department, agency or political subdivision thereof.

5.  Confidential Information. Employee acknowledges that the information and data (including, but not limited to, trade secrets, designs, ideas, products, research, software, financial and sales data, pricing and customer identity) obtained by him while employed or otherwise engaged by the Company (or its predecessor) or its Affiliates concerning the business or affairs of the Company or any Affiliate ("Confidential Information") are the property of the Company or such Affiliate; provided, however, "Confidential Information" does not include information which (a) is or has become publicly known through no breach by Employee of the confidentiality obligation hereunder, (b) became known to Employee through a third party who is not under an obligation of confidentiality, (c) is approved for disclosure by prior written consent of the Company or (d) is required to be disclosed by court order or other legal requirement. The

- 4 -

Employee acknowledges that the Confidential Information has been generated at great effort and expense by the Company, its Affiliates and their predecessors and their predecessors' Affiliates and has been maintained in a confidential manner by such persons. The Employee does not claim any rights to or lien on any Confidential Information. The Employee will immediately notify the Company of any unauthorized possession, use, disclosure, copying, removal or destruction, or attempt thereof, of any Confidential Information by the Employee. The Employee shall take all reasonably appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. Employee agrees that he shall not disclose to any unauthorized person or use for his own purposes any Confidential Information without the prior written consent of the Company, unless and to the extent that the Confidential Information becomes, or could become, generally known to and available for use by the public other than as a result of Employee's acts or omissions or as otherwise required by applicable law. Employee shall deliver to the Company at the termination or expiration of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, computers, printouts and software and other documents and data (and copies thereof) embodying or relating to the Confidential Information, Work Product (as defined below) or the business of the Company or any Affiliates which he may then possess or have under his control.

> 6.     Inventions and Patents.

(a)     Employee acknowledges that all Confidential Information, inventions, innovations, patents, trademarks, copyrights, intellectual property, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable) which relate to the Company's or any of its Affiliates' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by Employee while engaged by the Company or its Affiliates ("Work Product") belong to the Company or such Affiliate. Employee shall promptly disclose such Work Product to the Company and, at the Company's expense, perform all actions reasonably requested by the Company (whether during or after the Employment Period) to establish and confirm such ownership (including, without limitation, executing any necessary assignments, consents, powers of attorney and other instruments). All Work Product shall constitute "work for hire" under Section 201 of Title 17 of the United States Code.

(b)     Notwithstanding anything to the contrary herein, pursuant to Section 2870 of the California Labor Code, this Agreement does not apply to any Work Product for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on Employee's own time, and (i) which does not relate at the time of conception or reduction to practice of the invention either to the business of the Company or to the Company's actual or demonstrably anticipated research or development, or (ii) which does not result from any work performed by Employee for the Company

> 7.     Non-Solicitation.

(a)     Employee hereby acknowledges that he is familiar with the Company's trade secrets and with other Confidential Information and that Employee's services shall be of special, unique and extraordinary value to the Company and its Affiliates. Employee acknowledges and agrees that the Company would be irreparably damaged if Employee were to

- 5 -

provide services to or otherwise participate in the business of any Person competing with the Company in a similar business and that any such competition by Employee would result in a significant loss of goodwill by the Company. Employee further acknowledges and agrees that the covenants and agreements set forth in Sections 5 through 7 were accompanied by good and sufficient consideration for Employee and were a material inducement to the Company to enter into this Agreement and the Purchase Agreement and to perform its obligations hereunder, and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if Employee breached the provisions of Sections 5 through 7. Therefore, Employee agrees that during the period beginning on the Effective Date and ending on the second anniversary after the end of the Employment Period (the "Restricted Period"), Employee shall not (i) induce or attempt to induce any employee of the Company or any of its Affiliates to leave its or their employ or in any way interfere with the relationship between the Company or any of its Affiliates and any of their respective employees, (ii) hire any person who was an employee of the Company or any of its Affiliates at any time during the Employment Period or (iii) call on, solicit or service any current customer, supplier, licensee, licensor, franchisee, distributor, shareholder or other business relation of the Company or any of its Affiliates to cease doing business with them or in any way interfere with the relationship between the Company or any of its Affiliates and any such person or business relation (including, without limitation, making any negative statements or communications about the Company or its Affiliates).

(b)     The Parties hereto agree that the Company would suffer irreparable harm from a breach by Employee of any of the covenants or agreements contained herein and that money damages would not be an adequate remedy for any such breach. In the event of a breach or threatened breach by the Employee of any of the provisions of this Section 7, the Company or its successors or assigns, in addition and supplementary to all other rights and remedies existing in its favor, shall be entitled to specific performance and/or injunctive or other equitable relief from any court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (including the extension of the Restricted Period by a period equal to the length of the violation of this Section 7), without posting any bond or other security. In the event of an alleged breach or violation by Employee of any of the provisions of this Section 7, the Restricted Period described above shall be tolled until such alleged breach or violation has been duly cured.

(c)     If, at the time of enforcement of any of the provisions of Section 7, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the Parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restriction contained herein to cover the maximum period, scope and area permitted by law. Employee acknowledges that the restrictions contained in this Section 7 are reasonable and that Employee has reviewed the provisions of this Agreement with Employee's legal counsel.

(d)     Employee agrees that the covenants made in Section 7(a) shall be construed as an agreement independent of any other provision of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision of this Agreement.

- 6 -

(e)     In the event that the application of Section 7 would, in the Company's reasonable judgment, cause undue hardship to Employee, the Company shall, upon written request by Employee, provide to Employee a written instrument authorizing such specific exceptions to the provisions of Section 7 as the Company shall determine are reasonably necessary to prevent such undue hardship, the provisions of which instrument shall thereafter be deemed to supersede the corresponding provisions of Section 7.

(f)     Nothing contained in this Agreement shall be deemed to weaken or waive any of the Company's rights or protections that may be accorded by statute or common law as regards the conduct of Employee with respect to the Company's business, investors, customers, clients, joint venture partners, employees, Employees, or contractors.  Upon reasonable notice to Employee, Employee authorizes the Company to disclose this Agreement to any employer or prospective employer of Employee to protect the Company's continuing rights hereunder.  In addition, Employee agrees that he shall enter into a separate noncompete, nonsolicitation and confidentiality agreement in connection with the consummation of the transactions contemplated by the Purchase Agreement on terms similar to those set forth in Sections 5, 6 and 7 herein except the period covered thereby shall be five (5) years from the consummation of such transactions.

8.     Employee's Representations.  Employee hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Employee do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Employee is a party or by which Employee is bound, (ii) Employee is not a party to or bound by any employment agreement, noncompete agreement, consulting agreement or confidentiality agreement with any other person or entity (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Employee, enforceable in accordance with its terms.  Employee hereby acknowledges and represents that Employee has consulted with independent legal counsel regarding Employee's rights and obligations under this Agreement and that Employee fully understands the terms and conditions contained herein.  As a condition to hiring the Employee, the Company has required Employee to enter into Sections 5, 6, 7 and 8 of this Agreement and, Employee's performance of all of his obligations under such Sections are a condition to Employee's employment by the Company.

9.     Survival.  Sections 3 through 19 shall survive and continue in full force in accordance with their terms notwithstanding the expiration or termination of the Employment Period.

10.     Notices.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, sent by telecopy (with hard copy to follow by regular mail), mailed by first class mail, return receipt requested or sent by pdf email transmission, to the recipient at the address below indicated:

Notices to the Employee:

_____
_____
_____
Fax No.: _____

- 7 -

Email: _____

Notices to the Company:

Russ Mitchell
Jack Mitchell
Mitchells/Richards/Marshs
670 Post Road East
Westport, CT 06880
Fax No.: 203.291.0109

with a copy to (which shall not constitute notice to the Company):

Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Attn:   Amit Mehta
Fax No.:  (312) 456-8435

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when so delivered, sent or mailed.

      11.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

      12.    Complete Agreement.  This Agreement and those documents expressly referred to herein and other documents of even date herewith and the Effective Date embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way (except for any separate noncompetition, nonsolicitation and confidentiality agreement entered into by the Employee and the Company separate and apart from this Agreement).

      13.    No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

      14.    Counterparts.  This Agreement may be executed in separate counterparts (including by manual telecopied signature pages), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

- 8 -

15. <u>Delivery by Facsimile or Electronic Mail</u>.  This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or pdf email transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute original forms thereof and deliver them to the other party.  No party hereto shall raise the use of a facsimile machine or pdf email transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or pdf email transmission as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

16. <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of and be enforceable by Employee, the Company and their respective successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder without the prior written consent of the Company.  The Company may not assign this Agreement without consent of the Employee except it may (without Employee's consent) assign its respective rights hereunder in connection with the sale of all or substantially all of its business or assets (whether by merger, sale of stock or assets, recapitalization or otherwise).  No other Person is intended to be a third party beneficiary under this Agreement and therefore shall have no rights hereunder.

17. <u>Choice of Law; Venue</u>.  Each of the parties hereto expressly, knowingly and voluntarily acknowledges and agrees that all issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California. The venue for any litigation arising under, out of, or pursuant to, this Agreement shall be in the federal or state courts having jurisdiction over disputes arising in the City of San Francisco, State of California.

18. <u>Waiver of Jury Trial; Attorneys Fees</u>.  AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.  THE PREVAILING PARTY IN ANY LITIGATION UNDER, OUT OF OR PURSUANT TO THIS AGREEMENT SHALL BE AWARDED AGAINST THE OTHER PARTY ITS OR HIS, AS THE CASE MAY BE, COSTS AND EXPENSES, INCLUDING REASONABLE ATTORNEYS FEES, OF SUCH LITIGATION.

19. <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Employee, and no course of conduct or course of dealing or failure or delay by any party hereto in enforcing or exercising any of the provisions of this Agreement shall affect the validity, binding effect or

- 9 -

enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

* * * * *

CHI 58,775,307v3

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above to be effective on the Effective Date.

**<u>COMPANY:</u>**

ED MITCHELL WEST LLC
a Delaware limited liability company

By: _____
Name: _____
Its: _____

**<u>Employee</u>**

_____
Wilkes Bashford

# Exhibit F - Noncompete Agreement

## CONFIDENTIALITY, NONCOMPETE, NONSOLICIT AND NONDISPARAGEMNT AGREEMENT

THIS AGREEMENT is made as of November __, 2009, between Ed Mitchell West LLC, a Delaware limited liability company (the "Company") and _____ (the "Covered Party").

WHEREAS, the Covered Party is one of the Company's predecessor's **[founders, employees and stockholders]** and acknowledges that he is familiar with the Company's trade secrets and with other confidential information concerning the Company, including the Company's (i) inventions, technology and research and development, (ii) customers and vendors and customer and vendor lists, (iii) products and services (including those under development) and related costs and pricing structures, (iv) accounting and business methods and practices, and (v) similar and related confidential information and trade secrets;

**[WHEREAS, the Covered Party acknowledges that his services have been and shall continue to be of special, unique and extraordinary value to the Company and that he has been substantially responsible for the growth and development of the Company and the creation and preservation of the Company's goodwill; and]**

WHEREAS, the Covered Party further acknowledges and agrees that: (i) the covenants and agreements set forth in this Agreement are a material inducement to, and a condition precedent of, the Company entering into the Asset Sale and Purchase Agreement, dated November __, 2009 (as amended from time to time, the "Purchase Agreement") by and between the Company and The Wilkes Bashford Company (the "Seller") and consummate the transactions contemplated thereby, (ii) the Covered Party shall receive substantial direct and indirect benefits by virtue of the transactions contemplated by the Purchase Agreement and the transactions contemplated thereby and (iii) the Company and would not obtain the benefit of its bargain set forth in the Purchase Agreement as specifically negotiated by the parties thereto if the Covered Party breached any of the provisions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Covered Party hereby agree as follows:

1.      Definitions.

Reference is hereby made to the Purchase Agreement.  All terms not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

## 2. Nondisclosure and Nonuse of Confidential Information.

(a)     The Covered Party shall not disclose or directly or indirectly use at any time any Confidential Information (as defined below) of which the Covered Party is or becomes aware, whether or not such information is developed by him, except to the extent that such disclosure or use is directly related to and required by the Covered Party's performance of any duties assigned to the Covered Party by the Company at any time on or after the date hereof.  The Covered Party shall take all appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)     As used in this Agreement, the term "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Company or its business relations and its business activities (including those of its predecessor).  Confidential Information includes, but is not limited to, the following:  (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business methods); (ii) identities and individual requirements of, and specific contractual arrangements with, the Company's customers, independent contractors, joint venture partners and other business relations and their confidential information; (iii) trade secrets, know how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable) and (v) other Intellectual Property.  Confidential Information shall not include any information that has been published (other than by the Covered Party, or an Affiliate of the Covered Party prior to the date hereof) in a form generally available to the public prior to the date the Covered Party proposes to disclose or use such information.  Information shall not be deemed to have been published merely because individual portions of the information have been separately published, but only if all material features comprising such information have been published in combination.

## 3. The Company's Ownership of Intellectual Property.

In the event that the Covered Party, as part of his activities on behalf of the Company (and its predecessor) on or prior to the date hereof has generated, authored or contributed to any invention, design, new development, device, product, method or process (whether or not patentable or reduced to practice or comprising Confidential Information), any copyrightable work (whether or not comprising Confidential Information) or any other form of Confidential Information (collectively, "Intellectual Property"), the Covered Party acknowledges that such Intellectual Property is the exclusive property of the Company and hereby assigns all right, title and interest in and to such Intellectual Property to the Company.  Any copyrightable work prepared in whole or in part by the Covered Party will be deemed "a work made for hire" under Section 201(b) of the 1976 Copyright Act, and the Company shall own all of the rights comprised in the copyright therein.  The Covered Party shall promptly and fully disclose all Intellectual Property to the Company and shall cooperate with the Company to protect the Company's interests in and rights to such Intellectual Property (including, without limitation, providing reasonable assistance in

CHI 58745114v1

Case: 09-33497     Doc# 16     Filed: 11/09/09     Entered: 11/09/09 21:51:26     Page 96 of 144

securing patent protection and copyright registrations and executing all documents as reasonably requested by the Company).

4. <u>Noncompetition; Nonsolicitation.</u>

(a)    In further consideration of (i) the payment of the Purchase Price under the Purchase Agreement which releases the Covered Party under certain guarantees executed by the Covered Party, (ii) the benefits received by the Covered Party pursuant to any real estate leases entered into by the Company and Affiliates of the Covered Party and (iii) other good and valuable consideration, the Covered Party covenants and agrees with the Company that during the period commencing with the date of this Agreement and ending on the fifth anniversary of the date hereof (the "<u>Noncompetition Period</u>"), the Covered Party shall not, directly or indirectly, either for himself or for any other individual, corporation, partnership, joint venture or other entity, participate in any business (including, without limitation, any division, group or franchise of a larger organization) which is either located within, or does business within, the State of California, which engages or which proposes to engage in the business conducted or proposed to be conducted by the Company.  For purposes of this Agreement, the term "participate in" shall include, without limitation, having any direct or indirect interest in any corporation, partnership, joint venture or other entity, whether as a sole proprietor, owner, stockholder, partner, joint venturer, creditor or otherwise, or rendering any direct or indirect service or assistance to any individual, corporation, partnership, joint venture and other business entity (whether as a director, officer, manager, supervisor, employee, agent, consultant or otherwise).  The Covered Party has consulted with legal counsel regarding the restrictions of this Section 4 and based upon such consultation has determined and hereby acknowledges that such restrictions are reasonable in terms of duration, scope and area restrictions and are necessary to protect the goodwill of the Company's business.  Nothing herein shall prohibit the Covered Party from being a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded, so long as the Covered Party has no active participation in the business of such corporation.

(b)    During the Noncompetition Period, the Covered Party shall not (either directly or indirectly, either for himself or for any other individual, corporation, partnership, joint venture or other entity) (i) induce or attempt to induce any employee of the Company to leave the employ of the Company, or in any way interfere with the relationship between the Company and any employee thereof, (ii) hire directly or through another entity any person who was an employee of the Company at any time during the Noncompetition Period, or (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company (including, without limitation, making any negative statements or communications concerning or related to the Company).

(c)    The Parties hereto agree that the Company would suffer irreparable harm from a breach by The Covered Party of any of the covenants or agreements contained herein and that money damages would not be an adequate remedy for any such breach.  In the event of a breach or threatened breach by the Covered Party of any of the provisions of this Section 4, the

- 3 -

Company or its successors or assigns, in addition and supplementary to all other rights and remedies existing in its favor, shall be entitled to specific performance and/or injunctive or other equitable relief from any court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (including the extension of the Restricted Period by a period equal to the length of the violation of this Section 4), without posting any bond or other security. In the event of an alleged breach or violation by The Covered Party of any of the provisions of this Section 4, the Restricted Period described above shall be tolled until such alleged breach or violation has been duly cured.

(c)     If, at the time of enforcement of any of the provisions of Section 4, a court holds that the restrictions stated therein are unreasonable under the circumstances then existing, the Parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restriction contained herein to cover the maximum period, scope and area permitted by law.  The Covered Party acknowledges that the restrictions contained in this Section 4 are reasonable and that the Covered Party has reviewed the provisions of this Agreement with the Covered Party's legal counsel.

(d)     The Covered Party agrees that the covenants made in Section 4(a) shall be construed as an agreement independent of any other provision of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision of this Agreement.

(e)     In the event that the application of Section 4 would, in the Company's reasonable judgment, cause undue hardship to the Covered Party, the Company shall, upon written request by the Covered Party, provide to the Covered Party a written instrument authorizing such specific exceptions to the provisions of Section 4 as the Company shall determine are reasonably necessary to prevent such undue hardship, the provisions of which instrument shall thereafter be deemed to supersede the corresponding provisions of Section 4.

(f)     Nothing contained in this Agreement shall be deemed to weaken or waive any of the Company's rights or protections that may be accorded by statute or common law as regards the conduct of the Covered Party with respect to the Company's business, investors, customers, clients, joint venture partners, employees, consultants, or contractors.  Upon reasonable notice to the Covered Party, the Covered Party authorizes the Company entities to disclose this Agreement to any employer or prospective employer of the Covered Party to protect the Company's continuing rights hereunder.

5.     Notices.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, sent by telecopy (with hard copy to follow by regular mail), mailed by first class mail, return receipt requested or sent by pdf email transmission, to the recipient at the address below indicated:

To the Company:

Russ Mitchell

CHI 58745114v1

Case: 09-33497     Doc# 16     Filed: 11/09/09     Entered: 11/09/09 21:51:26     Page 98 of 144

Jack Mitchell
Mitchells/Richards/Marshs
670 Post Road East
Westport, CT 06880
Fax No.: 203.291.0109

<u>With a copy to</u>:

Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Attn:   Amit Mehta
Fax No.:  (312) 456-8435

To the Covered Party:

[_____]
c/o [_____]
[_____]
Attn:  [_____]
Telecopy No.: [_____]

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when so delivered or sent or, if mailed, five days after deposit in the U.S. mail.

6.      <u>General Provisions.</u>

(a)      <u>Not an Employment Agreement</u>.  The Covered Party and the Company acknowledge and agree that this Agreement is not intended and should not be construed to grant the Covered Party any right to employment with the Company.

(b)      <u>Absence of Conflicting Agreements</u>.  The Covered Party hereby warrants and covenants that (i) his execution, delivery and performance of this Agreement do not and shall not result in a breach of the terms, conditions or provisions of any agreement, instrument, order, judgment or decree to which the Covered Party is subject, (ii) the Covered Party is not a party to or bound by any agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Covered Party, enforceable in accordance with its terms.

(c)      <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under

- 5 -

any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. The parties agree that a court of competent jurisdiction making a determination of the invalidity or unenforceability of any term or provision of Section 4 or Section 5 of this Agreement shall have the power to reduce the scope, duration or area of any such term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision in Section 4 or Section 5 with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

(d)     _Complete Agreement_.     This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(e)     _Counterparts_.     This Agreement may be executed in separate counterparts (including by means of telecopied signature pages), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(f)     _Successors and Assigns_.     Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Company and the Covered Party and their respective successors and assigns; provided that the rights and obligations of the Covered Party under this Agreement may not be assigned or delegated without the prior written consent of the Company.

(g)     _Choice of Law_.     All questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits hereto shall be governed by the internal law, and not the law of conflicts, of the State of Delaware.

(h)     _Remedies_.     Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorneys fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The parties hereto agree and acknowledge that the Covered Party's breach of any term or provision of this Agreement shall materially and irreparably harm the Company, that money damages shall accordingly not be an adequate remedy for any breach of the provisions of this Agreement by the Covered Party and that the Company in its sole discretion and in addition to any other remedies it may have at law or in equity shall be entitled to specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction in order to enforce or prevent any violations of the provisions of this Agreement (without posting any bond or deposit). In addition, in the event of an alleged breach or violation by the Covered Party of Section 4 or Section 5, the restricted periods set forth in Section 4 shall be tolled until such breach or violation has been duly cured.

- 6 -

Case: 09-33497     Doc# 16     Filed: 11/09/09     Entered: 11/09/09 21:51:26     Page 100 of 144

(i)     <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and the Covered Party.

(j)     <u>Third Party Beneficiaries</u>.  No Person, except the parties hereto and their permitted successors and assigns are intended to be a third party beneficiary of this Agreement.

(k)     <u>Delivery by Facsimile</u>.  This Agreement and each other agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

\*   \*   \*   \*   \*

CHI 58745114v1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

**ED MITCHELL WEST LLC**
a Delaware limited liability company


By _____
Its _____


_____
[the Covered Party]

*CHI 58745114v1*

<u>**Schedule 2.1(a) - Rejected Contracts**</u>

Purchaser has not been provided with a true and correct signed copy of agreements other than those agreements noted with an asterisk (*).

1.  Vendor Terms Agreements with the vendors indicated on the attached list.

2.  Supplier Terms Agreements with the suppliers indicated on the attached list.

3.  Side Letter Agreements with:

    a.  Brioni USA Roman Style Corp.
    b.  Art Fashion Corp. d/b/a/ Roberto Cavalli, dated May 22, 2009*

4.  Account Purchase Agreement dated as of October 24, 1992 between Seller and RAI Credit Corporation related to the purchase by RAI Credit Corporation of certain Accounts (as defined in the Account Purchase Agreement)*

5.  September 21, 2009 Letter agreement with Stephens Inc. regarding professional services of financial advisor.

6.  May 12, 2008 Letter agreement with North Point Advisors LLC regarding professional services of financial advisor.

7.  March 19, 2009 Letter agreement with Quest Turnaround Advisors, L.L.C. for consulting services.

8.  Equipment Leases with:

    a.  Lease with Qi Exchange, LLC, Ford Credit, related to Ford Truck (Warehouse #1, truck #1)
    b.  Lease with Qi Exchange, LLC, Ford Credit, related to Ford Truck (Warehouse #1, truck #2)
    c.  Lease with Ford Credit, related to Ford Truck (Visual presentation truck #1)
    d.  Lease with Ford Credit, related to Ford Truck  (Visual presentation truck #2)
    e.  Lease with Ford Credit, related to Ford Truck  (Visual presentation truck #3)
    f.  Lease with BMW Financing, related to a BMW (for Bashford)

9.  Real Property Leases with:

    a.  Lee/Lum Living Trust dated July 21, 1988 - Mill Valley store (closed effective September 17, 2009) *
    b.  Macerich Carmel L.P. dated October 12, 2005 - Carmel store (closed effective October 26, 2009)*

10. Trademark Assignments with:

    a.  Taka-Q Co., Ltd. - December 20, 1991 Assignment Agreement regarding use of the "Wilkes Bashford" trademark in Japan

b. Taka-Q Co., Ltd. - February 23, 1998 Assignment Agreement regarding use of the "Wilkes Bashford" trademark in the People's Republic of China, the Republic of China, Hong Kong, and the Republic of Korea

11. Insurance Contracts:

a. All Seller Plans disclosed on Schedule 5.15, other than the Access+ HMO Insurance Contract disclosed on Schedule 2.1(a)(iii)

b. All Insurance Contracts related to the Seller insurance disclosed on Schedule 5.22

## Schedule 2.1(a)(ii) - Fixed Assets

1.    All machinery/equipment, which is the personal property of Seller, including, without limitation, all of Seller's machinery/equipment located at any of Seller's retail locations in San Francisco, California, or Palo Alto, California, or at Seller's business office, warehouse, or display warehouse located in San Francisco, California, including, but not limited to:

> Furniture & Fixtures
> Pressing Equipment
> Sewing Machine
> Tailor Shop Equipment
> Mannequins

2.    All furniture, fixtures, and equipment (FF&E), which is the personal property of Seller, including, without limitation, all of Seller's FF&E located at any of Seller's retail locations in San Francisco, California, or Palo Alto, California, or at Seller's business office, warehouse, or display warehouse located in San Francisco, California, including, but not limited to:

> Office Equipment
> Software
> POS/Hardware

3.    All other tangible assets of Seller, whether located at any of Seller's retail locations in San Francisco, California, or Palo Alto, California, or at Seller's business office, warehouse, or display warehouse located in San Francisco, California, or at any other location operated, leased, owned, maintained, or otherwise used by Seller.

## Schedule 2.1(a)(iii) - Assumed Contracts

Purchaser has not been provided with a true and correct signed copy of agreements other than those agreements noted with an asterisk (*).

1.     Concession Agreements:

   a.  Exclusive Concession Agreement, dated December 6, 1988, with Wilson & Dean Shoes, Inc.*
   b.  Pratesi

2.     Consignment Agreement with:

   a.  Frank Ancona
   b.  Katherine Dughi

3.     Lease Agreement Number WI082404, between Seller and Winthrop Resources Corporation with respect to certain leased equipment, including or as modified by:

   a.  Lease Schedule Number 001 to Item 7.a.

   b.  Lease Schedule Number 001X to Item 7.a.

   c.  Lease Schedule Number A01 to Item 7.a.

   d.  Lease Schedule Number A02 to Item 7.a.

   e.  Lease Schedule Number A03 to Item 7.a.

4.     Real Property Leases (as amended) with:

   a.  Wilkes Bashford 375 Sutter Street, LLC (c/o Callahan Property Company), subject to Lease Assignment and Amendment - S.F. store *
   b.  Board of Trustees of the Leland Stanford Junior University, subject to Lease Assignment and Amendment - Palo Alto store *
   c.  Neu Investment Corporation - S.F. warehouse at 2200 Jerrold Avenue, San Francisco, CA*
   d.  560 Sutter LLC - S.F. office at 560 Sutter Street, San Francisco, CA*
   e.  Rico Realty - S.F. display warehouse at 501 Mendell Street, San Francisco, CA

5.     Insurance Contracts:

   a.  Blue Shield of California Access+ HMO Insurance Contract

## Schedule 2.1(a)(vii) - Prepaid Expenses

1. Security Deposits:
   $350 - with Rico Realty related to display warehouse

2. Rent Deposits:
   $2,700 - with 560 Sutter LLC related to S.F. office lease
   $5,103 - with Neu Investment Corp. related to units U & W - Jerrold Avenue warehouse
   $4,499 - with Neu Investment Corp. related to Jerrold Avenue warehouse
   $2,116.80 - with Learner Investment Co. related to unit V - Jerrold Avenue lease
   $800 - with Rico Realty related to Mendell Street warehouse

3. Equipment Deposits:
   $37,170 - with Winthrop Resources Corp. related to software and hardware
   $11,104 - with Winthrop Resources Corp. related to software and hardware
   $1,562 - with Winthrop Resources Corp. related to software and hardware
   $59 - with American Data Com Leasing related to credit reporting machine

4. Miscellaneous Deposits:
   $50 - with Sutter-Stockton Garage related to S. Sangimino parking pass

## Schedule 2.1(a)(xii) - Assumed Claims

None.

<u>**Schedule 3.4(b) - Illustrative Calculation of Inventory Adjustment**</u>

**Process:**

1.  14 days prior to Closing, Seller hires Firm X to conduct Physical Inventory Review simultaneously at all Seller's locations and is overseen by Purchaser. Firm X will utilize current industry standards, including scanning devices to capture all items.

2.  Seller provides Firm X with a master list of all items and types of Adjustment Inventory that Firm X should expect to come across during the Physical Inventory Review.

3.  On the day following the Physical Inventory Review, Firm X provides Purchaser and Seller with a listing of all Adjustment Inventory existing as of the time of the Physical Inventory Review, which listing includes all UPC codes of such items.

4.  Seller (a) compares Firm X's list with Seller's own master Adjustment Inventory list (which contains item invoice cost, retail price, and season code for all Adjustment Inventory), (b) identifies each item as either Old Inventory, Fall 2009 Inventory or New Inventory and (c) provides Purchaser with this list within two days of the Physical Inventory Review.

5.  Each day following the date of the Physical Inventory Review, Seller updates the list in Item 4 above to reflect new sales of any Adjustment Inventory, and new arrivals of New Inventory, and provide Purchaser with the updated information the following day. On the day that is two Business Days before the Closing, Seller and Purchaser shall prepare the Inventory Statement based upon the most recently updated list delivered by Seller, which Inventory Statement shall then be updated as of the Closing Date and then used for the calculation of the Inventory Adjustment.

**Assumptions:**

1.  On the date of the Physical Inventory Review, Old Inventory = $5,000,000; Fall 2009 Inventory = $900,000; and New Inventory = $200,000.

2.  Collectively, between the date of Physical Inventory Review and the final update to the Inventory Statement, (a) $100,000 of Old Inventory, $100,000 of Fall 2009 Inventory, and $100,000 of New Inventory is sold, (b) $700,000 of New Inventory is received, and (c) the Assumed Liabilities with respect to each of Old Inventory, Fall 2009 Inventory, and New Inventory is $0.

**Calculations:**

1. Old Inventory portion of Inventory Adjustment:

   a. $5,000,000 <u>minus</u> $100,000 = $4,900,000;

   b. $5,300,000 <u>minus</u> $4,900,000 = $400,000; and

   c. $400,000 x 0.50 = **$200,000**

2. Fall 2009 Inventory portion of Inventory Adjustment:

   a. $900,000 <u>minus</u> $100,000 = $800,000; and

   b. $1,045,000 <u>minus</u> $800,000 = **$245,000**

3. New Inventory portion of Inventory Adjustment:

   a. $200,000 <u>minus</u> $100,000 = $100,000; and

   b. $100,000 <u>plus</u> $700,000 = **$800,000**

4. Inventory Adjustment:

   a. $800,000 <u>minus</u> $200,000 <u>minus</u> $245,000 = **$355,000**

5. Purchase Price following Inventory Adjustment (determination of Cash Purchase Price):

   a. $4,600,000 <u>plus</u> $355,000 = **$4,955,000**

## Schedule 5.2 - Jurisdictions Where Qualified to Transact Business

Seller is incorporated in the State of California, and maintains the following business licenses in San Francisco, California, Carmel, California, and Mill Valley, California:

1.  Business license number 942944325, issued by the San Francisco Tax Collector and effective on July 1, 2009 for a 12-month term expiring on June 30, 2010, covering the property located at 375 Sutter Street, San Francisco, CA.

2.  Business license number SRBH 19703064, issued by the City of Mill Valley and effective on July 1, 2009 for a 12-month term expiring on June 30, 2010, covering the property located at 57 Throckmorton Ave., Mill Valley, CA.

3.  Business license number 0000022087, issued by the City of Carmel-By-the-Sea and effective on July 1, 2009 for a 12-month term expiring on June 30, 2010, covering the property located at Carmel Plaza.

## Schedule 5.5 - Consents and Approvals

As set forth in the Agreement, the Seller shall be required to obtain approval of the Bankruptcy Court in the Bankruptcy Case of the Bid Procedures Order and Sale Order prior to consummation of the transactions contemplated.

## Schedule 5.6(a) - Liens and Security Interests

The Purchased Assets are subject to only the following Liens, and no others:

1.  Liens existing as of the Execution Date, or which may be created between the Execution Date and the Closing Date, in favor of the Purchaser as DIP Agent, which in any and all cases shall be released on or prior to the Closing Date.

2.  Liens existing as of the Execution Date in favor of the Agent, which in any and all cases shall be released on or prior to the Closing Date.

3.  Liens related to the shareholder loans, disclosed on Schedule 5.7, all of which in any and all cases shall be released on or prior to the Closing Date.

4.  Liens on the equipment leased by Seller from Winthrop Resources Corporation

5.  Liens related to the Account Purchase Agreement with RAI Credit Corporation, all of which in any and all cases shall be released on or prior to the Closing Date.

**Schedule 5.7 - Certain Changes and Events**

1.  On or about August 26, 2009, Wilkes Bashford, Joseph Callahan, and Joseph Keenan made secured loans to Seller in the aggregate amount of $750,000, resulting in the creation of Liens in favor of such shareholders.

2.  Beginning in April 2009, Seller entered into Vendor Terms Agreements and Supplier Terms Agreements with vendors and suppliers, as disclosed on Schedule 2.1(a), some of which were amended on various dates, and which established deferred payment arrangements with such vendors and suppliers.

3.  In addition to Item 2 above, beginning on or about September 15, 2009, Seller has delayed the payment of all undisputed accounts payable with the exception of payments due for taxes, employee benefits and payroll, employee expense reimbursements, independent contractors, certain utilities, certain vendors for delivery of custom merchandise, and professional services to Quest.

## Schedule 5.8(a) - Leased Real Property

Addresses of Leased Real Property:

      i.  375 Sutter Street, San Francisco, CA 94108

      ii.  450 Stanford Shopping Center, Palo Alto, CA 94309

      iii.  560 Sutter Street, San Francisco, CA 94108

      iv.  2200 Jerrold # U, V, W, San Francisco, CA 94124

      v.  501 Mendell Street, Unit C, San Francisco, CA 94124

Addresses of other leased property that does not constitute Leased Real Property and will not be assigned to Purchaser:

      i.  57 Throckmorton, Mill Valley, CA 94941

      ii.  Ocean and Junipero Serra, Carmel, CA 93921

## <u>Schedule 5.8(b) - Liens on Real Property</u>

None.

CHI 58,744,230v8

## Schedule 5.9(a) - Owned Intellectual Property

Trademarks:

| Trademark | Registration/Application Number | Registration/Filing Date | Jurisdiction |
|---|---|---|---|
| WILKES SAN FRANCISCO | 2493550 | September 25, 2001 | United States Federal Registration |
| WILKESHOME | 1773881 | May 25, 1993 | United States Federal Registration |
| WILKES SPORT | 1660827 | October 15, 1991 | United States Federal Registration |
| WILKES SPORT | 1677685 | March 3, 1992 | United States Federal Registration |
| WILKES BASHFORD | 1485828 | April 26, 1988 | United States Federal Registration |
| WB (Logo - Dog & Ball with "WB") | 1459300 | September 29, 1987 | United States Federal Registration |

Domain Names:

| Domain Name | Country of registration | Registrar |
|---|---|---|
| www.wilkesbashford.com (including all sub-domain names and extensions thereof and related thereto) | United States | NETWORK SOLUTIONS, LLC |

Other Intellectual Property:  None

## Schedule 5.9(b) - Licenses to Intellectual Property

None, other than licenses granted generally in conjunction with the purchase of retail or "off the shelf" software and hardware, which are freely assignable to the Purchaser in conjunction with the Purchased Assets.

## <u>Schedule 5.10 - Permits</u>

1.  The retail business licenses disclosed on Schedule 5.2

2.  Seller maintains Federal Fish and Wildlife Permit number LE784083-0, issued by the Department of the Interior, U.S. Fish & Wildlife Service pursuant to 16 U.S.C. 1538(d) and 50 CFR Parts 13 and 14, effective October 1, 2009 through September 30, 2010, for the import/export of goods at any designated port per 50 CFR 14.

## Schedule 5.12 - Litigation

| Caption of Suit | Case Number | Nature of Proceeding | Court | Status or Disposition |
|---|---|---|---|---|
| Dusan S.R.L. v. The Wilkes Bashford Company | CGC 09-487946 | Collection | Superior Court for the State of California, San Francisco Division | Pending |
| Milberg v. The Wilkes Bashford Company | CGC 09-485712 | Collection | Superior Court for the State of California, San Francisco Division | Pending; stipulation |
| Rosenthal & Rosenthal v. The Wilkes Bashford Company | CGC 09-493407 | Collection | Superior Court for the State of California, San Francisco Division | Pending |

## Schedule 5.13(a) - Material Contracts

1.  The 401k plan disclosed on Schedule 5.15 and maintained by Seller

2.  The employee medical, dental, and vision plans disclosed on Schedule 5.15 and maintained by Seller

3.  All of the Contracts disclosed on Schedules 2.1(a) and 2.1(a)(iii); provided, however, that Purchaser has been provided with true and correct copies of only those Contracts noted with an asterisk (*).

## Schedule 5.14 - Tax Liens

None.

## Schedule 5.15 - Seller Plans

1.     Seller maintains a "no match contribution" 401k plan for the benefit of its employees, under which ADP / Merrill Lynch acts as the provider. Purchaser has not been provided with a true and correct copy of such plan.

2.     Seller maintains the employee medical, dental, and vision plans listed below for the benefit of its employees. Purchaser has been presented with a summary of such plans, but has not been provided with a true, correct, and complete copy thereof.

    a.  Medical: Seller maintains an HMO and a PPO plan, each provided by Blue Shield

    b.  Dental: Seller maintains a DHMO and a PPO plan, each provided by United Concordia

    c.  Vision: Seller maintains a PPO provided by Vision Service Plan

## Schedule 5.16 - Employee List

| | |
|---|---|
| Anthony | Alvarado |
| Wilkes | Bashford |
| Olivia | Basiw |
| Randall | Candler |
| Barbara | Carey |
| Sheree | Chambers |
| John | Clayton |
| Russ | Clower |
| Elizabeth | Crocker |
| Paul | Defacio |
| William | Downes |
| Joseph | Durst |
| Cathy | Eillenberger-Ubel |
| Mena | Farakos |
| Furlee | Farlough-Mulazim |
| Faustino | Fuentes |
| Arnaud | Geble |
| Gregory | Gonzales |
| Faran | Hajisheikh |
| Jeff | Holland |
| Yvonne | Hughes |
| Nancy | Huie |
| Debbie | Hunter |
| Ross | Hunter |
| William | Jackson |
| Shigeko | Kanai-Pitman |
| Nina | Kirilova |
| Toby | Ko |
| Alexander | Koutsoyannis |
| Frank | Kuscak |
| Andy | Lam |
| James Karwor | Lee |
| Martha | Loyola |
| Allan | Mallari |
| Manuel | Marquez |
| Nadine | Martin |
| Rachel | Martinez |
| Edward | Ng |
| Tiare | Osborn |
| Antonell | Pagliuca |
| Errika | Pascual |
| Cesar | Rivero |
| Michael | Rizzo |
| Christine | Robbins |
| Sandy | Ross |
| Max | Salvador |
| Serita | Sangimino |
| John | Shen |

| | |
|---|---|
| Robert | Simmons |
| Karen | Sussman |
| Eric | Tanphanich |
| Kathleen | Tran |
| Simin | Vahedian-Motalebi |
| Charles | Villanueva |
| Renee | Willis |
| Shek Lim | Yu |

## Schedule 5.17(b) - Employment Agreements

None.

## <u>Schedule 5.18 - Bank Accounts</u>

Seller maintains the following bank accounts with Comerica Bank, N.A., 1289 Park Victoria Drive, Milpitas, CA 95035:

| Account # | Cost Ctr | Description |
|---|---|---|
| 189-049-4154 | Main | Concentration |
| 189-218-7780 | Payroll | ZBA account |
| 189-433-9793 | AMEX | Depository- ZBA account |
| 189-433-9819 | Visa/MC/Disc San | Depository- ZBA account |
| 189-433-9801 | Francisco | Depository- ZBA account |
| 189-433-9827 | Mill Valley | Depository- ZBA account |
| 189-433-9835 | Palo Alto | Depository- ZBA account |
| 189-433-9843 | Carmel | Depository- ZBA account |
| 189-433-9983 | WBC Deposit | Depository |

Authorized signatories to the accounts are Wilkes Bashford, Toby Ko and Paul Defacio

## Schedule 5.19(a) - Environmental Compliance

None.

## Schedule 5.19(b) - Environmental Litigation

None.

## Schedule 5.20 - Affiliate Relationships

1. The shareholders of Seller constitute all of the members of Wilkes Bashford 375 Sutter Street LLC, the lessor of the Leased Real Property having the same address and set forth on Schedule 5.8(a). The current obligation is $113,516 minimum monthly rent, plus 5% of sales less the minimum monthly rent, with an expiration date of February 1, 2025.

2. Seller has outstanding debt in the amount of $750,000, plus accrued interest, owed to certain of Seller's shareholders, as disclosed on Schedule 5.7.

3. Seller has outstanding debt in the initial principal amount of $722,217.90, plus accrued interest, owed to each of Joseph Callahan and Joseph Keenan, each of whom is a shareholder of Seller.

## Schedule 5.21 - Financial Instruments

1.      Seller maintains a $50,000 continuous U.S. Customs Bond effective as of July 17, 2009 under importer number 94-294432500, with Washington International Insurance Company acting as surety, allowing for the import of certain merchandise sold by Seller in the Business and assuring that the United States government is paid if Seller defaults on customs and duties.

## Schedule 5.22 - Insurance

| DESCRIPTION | CARRIER | POLICY NUMBER |
| --- | --- | --- |
| General Liability/Commercial Package | Fireman's Fund Insurance Co. | MZX-80908014 |
| General Liability Umbrella | Fireman's Fund Insurance Co. | XAU-91451732 |
| Worker's Compensation | Republic Indemnity | 177491-01 |
| Cargo | Fireman's Fund Insurance Co. | OC-94616300 |
| Difference in Conditions (including Earthquakes and Flood) | Underwriters at Lloyd's | 0475-000-212-22-L00 |
| Directors & Officers Liability, Employment Practices and Fiduciary Liability | Federal Insurance Company | 820-90291 |

## Schedule 5.24 - Brokers/Finders

1.      Seller has a broker/finder relationship with Quest Turnaround Advisors, LLC, as identified on Schedule 2.1(a), which will be provided for in the application to employ Quest in the Chapter 11 case.

2.      Seller previously had a financial advisor relationship with North Point Advisors, LLC, as disclosed on Schedule 2.1(a). Any obligations related thereto have been terminated.

3.      Seller has a financial advisor relationship with Stephens, Inc., which is disclosed on Schedule 2.1(a); however, Seller will owe no fees or obligations to Stephens, Inc. related to the transactions contemplated by the Agreement.

## Schedule 7.7(a) - Operating Budget

Attached.

CHI 58,744,230v8

**WILKES BASHFORD CO.**
**CASH MANAGEMENT/FORECAST**                    **PRE-PETITION   POST-PETITION**                              **FILING**
**90 DAYS FORECAST**

WEEK ENDING:

| Comerica Acct | 11/7/09 4:33 PM | 10/03 Sat | 10/10 Sat | 10/17 Sat | 10/24 Sat | 10/31 Sat | 11/07 Sat | 11/14 Sat | 11/21 Sat | 11/28 Sat |
|---|---|---|---|---|---|---|---|---|---|---|
| BEGINNING BANK BALANCE | | 232,806 | 153,359 | 279,715 | 327,719 | 454,091 | 57,431 | 95,156 | (387,089) | (485,767) |
| **DEPOSITS:** 189-0494154 | | | | | | | | | | |
| AMEX- 793 | | 14,936 | 199,053 | 237,659 | 249,233 | 180,139 | 218,096 | 138,588 | 228,687 | 136,497 |
| MC/ VISA/ Disc- 819 | | 57,037 | 187,752 | 174,625 | 151,426 | 175,631 | 209,858 | 160,551 | 194,420 | 129,632 |
| Other- Settlement Fee (Visa) | | - | - | - | (100) | - | - | (7,000) | - | - |
| Commercial Deposit | | 1,044 | 371 | 20,174 | 12,707 | 70,676 | 1,679 | - | - | - |
| Deposits- SF 1 | | 2,652 | 3,124 | 9,717 | 998 | 5,000 | 15,400 | 5,000 | 5,000 | 5,000 |
| Deposits- PA 5 | | 5,341 | - | 8,207 | - | 3,178 | - | - | - | - |
| Deposits- CM 3 | | 67 | 212 | 509 | 790 | - | - | - | - | - |
| **TOTAL RECEIPTS** | | 81,077 | 390,511 | 450,892 | 415,054 | 434,624 | 445,094 | 297,138 | 428,108 | 271,129 |
| **DISBURSEMENTS:** | | | | | | | | | | |
| A/P- Disb Checks (Cleared/Released) | | 15,836 | 54,898 | 32,866 | 76,194 | 34,498 | 76,821 | - | - | - |
| A/P- Disb Checks (Held) | | - | - | - | - | - | - | - | - | - |
| Account Analysis Fee | | - | - | 2,861 | - | - | - | 1,500 | - | - |
| ACH Debit- AT&T | | 3,809 | 581 | 551 | 468 | 3,957 | 4,500 | 850 | 100 | 300 |
| ACH Debit- PG&E | | 880 | - | - | 574 | 10,689 | 2,400 | 1,500 | 12,000 | - |
| ACH Debit- UPS | | 1,744 | 1,321 | 1,576 | 1,207 | 1,318 | 2,500 | 5,000 | - | 2,500 |
| Insurance Benefits | | - | 757 | 30,525 | 19,278 | - | 32,607 | 27,500 | - | - |
| Lease- Winthrop | | (0) | - | - | - | - | - | - | - | - |
| Operating Expense | | - | - | - | - | - | - | 50,000 | 100,000 | 25,000 |
| Rent | | - | - | - | - | - | 5,000 | - | - | - |
| Total- Operating | | 22,269 | 57,557 | 68,378 | 97,720 | 50,462 | 123,828 | 86,350 | 112,100 | 27,800 |
| A/P- Mdse | | 12,228 | - | - | - | - | 7,502 | 385,034 | 165,548 | - |
| A/P- Special Orders | | - | - | 1,856 | - | 27,717 | 17,984 | 20,000 | 20,000 | 20,000 |
| A/P- Deposit to Trust Acct | | - | - | - | - | 196,051 | - | - | - | - |
| A/P- Weekly (50%) | | 27,392 | 22,975 | 24,383 | 30,040 | - | - | - | - | - |
| A/P- Weekly (Pratesi/ Consign) | | - | - | - | - | - | 62,000 | - | - | 15,000 |
| A/P- Weekly (Wilson & Dean) | | - | 89,554 | 70,937 | 66,289 | 52,919 | 63,721 | 55,000 | 55,000 | 55,000 |
| Total- Trade | | 39,620 | 112,530 | 97,176 | 96,329 | 276,687 | 151,207 | 460,034 | 240,548 | 90,000 |
| Payroll Fees | | 818 | 100 | 396 | - | - | 1,900 | - | - | - |
| Payroll Regular | | - | - | 190,175 | 54 | 199,754 | 565 | 170,000 | - | 185,000 |
| Payroll Taxes | | - | 12,455 | - | 10,456 | - | 39,410 | - | 14,000 | - |
| SUT/ Income/ Other Taxes | | - | - | - | - | 194,381 | - | - | 157,138 | - |
| Total- Payroll & Taxes | | 818 | 12,554 | 190,571 | 10,509 | 394,135 | 41,875 | 170,000 | 171,138 | 185,000 |
| Comerica- Loan Pymt/ Fees | | 97,817 | 10,000 | 10,000 | 10,000 | 10,000 | 90,398 | - | - | - |
| Millberg | | - | 5,000 | 5,000 | 5,000 | - | - | - | - | - |
| Prof Fees- Dumas | | - | - | 30,000 | 50,000 | 100,000 | - | - | - | 100,000 |
| Prof Fees- Others | | - | - | - | 7,000 | - | 60 | - | - | - |
| Prof Fees- Quest | | - | 66,515 | 1,762 | 12,124 | - | - | 63,000 | 3,000 | 3,000 |
| Total- Corporate | | 97,817 | 81,515 | 46,762 | 84,124 | 110,000 | 90,458 | 63,000 | 3,000 | 103,000 |
| **TOTAL DISBURSEMENTS** | | 160,524 | 264,156 | 402,888 | 288,683 | 831,284 | 407,368 | 779,384 | 526,786 | 405,800 |
| **ENDING BANK BALANCE** | | 153,359 | 279,715 | 327,719 | 454,091 | 57,431 | 95,156 | (387,089) | (485,767) | (620,438) |

Case: 09-33497   Doc# 16   Filed: 11/09/09   Entered: 11/09/09 21:51:26   Page 135 of 144

## Schedule 7.7(b) - Inventory Budget

Attached.

| VENDOR | AMT | | NOV |
|---|---|---|---|
| | TO SHIP | | |
| LUCIANO BARBERA | 47000 | ITALY | 47000 |
| CUCINELLI | 76500 | US | 76500 |
| BELVEST | 87600 | ITALY | |
| ZEGNA | 88722 | ITALY | 46000 |
| OXXFORD TROUSER | 33000 | US | 33000 |
| BIELLA | 6300 | ITALY | |
| LORENZINI | 12500 | US | 12500 |
| INCOTEX | 5400 | US | 5400 |
| FINAMORE | 65000 | ITALY | |
| J BRAND JEANS | 10000 | US | 10000 |
| PANTHARELLA | 2800 | | 2800 |
| NICKI TIES | 12500 | US | 12500 |
| BRIONI | 89000 | US | 50000 |
| | | | |
| **MEN'S TOTAL** | **536322** | | **295700** |
| | | | NOV |
| BOGNER | 107000 | | 45000 |
| PIAZZA SEMPIONE | 30000 | | 30000 |
| ISSEY MIYAKE | 18470 | | 14500 |
| CHEAP N CHIC | 13400 | | 13400 |
| MANISH | 6990 | | 0 |
| MANENTI | 9000 | | 0 |
| MELINDA ENG | 5000 | | 0 |
| J. MENDEL | 15000 | | 15000 |
| LA FEE PARISENNE | 10770 | | 10770 |
| C. REGEHR | 10835 | | 0 |
| BENEDETTA NOVE | 16778 | | 16778 |
| ROLAND NIVELAIS | 3400 | | 0 |
| LUPETTA | 9100 | | 4550 |
| CUCINELLI | 18000 | | 18000 |
| C. MALANDRINO | 22961 | | 11480 |
| AGNONA | 23404 | | 23404 |
| FUZZI | 22000 | | 22000 |
| OSCAR DELA RENTA | 30000 | | 30000 |
| **WOMEN'S TOTAL** | **372108** | | **254882** |
| | | | |
| | | | |
| **GRAND TOTAL** | **908430** | | **550582** |

## Schedule 10.2 - Vacation and Sick Time

In the event that the following of Seller's employees become Transferred Employees, each such Transferred Employee will be credited with the accrued vacation time and accrued sick as set forth adjacent to his or her name:

| EMPLOYEE | | Accrued Vacation | Accrued Sick |
|---|---|---|---|
| Alvarado | Anthony | 78.46 | 40.00 |
| Bashford | Wilkes | 80.00 | 72.00 |
| Baziw | Olivia | 80.00 | 72.00 |
| Candler | Randall | 63.46 | 35.00 |
| Carey | Barbara | 80.00 | 67.00 |
| Chambers | Sheree | 80.00 | 72.00 |
| Clayton | John | 80.00 | 40.00 |
| Crocker | Elizabeth | 63.46 | 72.00 |
| Defacio | Paul | 80.00 | 72.00 |
| Downes | William | 39.46 | 57.00 |
| Durst | Joseph | 31.46 | 71.00 |
| Eilenberger-Ubell | Cathy | 71.46 | 72.00 |
| Farakos | Mena | 80.00 | 72.00 |
| Farlough-Mulazim | F. | 80.00 | 38.00 |
| Fuentes | Faustino | 80.00 | 72.00 |
| Geble | Arnaud | 80.00 | 72.00 |
| Gonzales | Gregory | - | - |

| | | | |
|---|---|---|---|
| Hajisheikh | Faranak | 80.00 | 23.73 |
| Holland | Jeff | 80.00 | 72.00 |
| Hughes | Yolanda | 80.00 | 68.00 |
| Huie | Nancy | 80.00 | 48.00 |
| Hunter | Debbie | 51.46 | 72.00 |
| Hunter | Ross | 80.00 | 72.00 |
| Jackson | William | 30.06 | 15.03 |
| Kanai-Pittman | Shegeko | 80.00 | 72.00 |
| Kirilova | Nina | 63.46 | 65.00 |
| Ko | Toby | 63.46 | 26.00 |
| Koutsoyannis | Alexander | 63.46 | 40.00 |
| Kucsak | Frank | 75.46 | 40.00 |
| Lam | Andy | 80.00 | 72.00 |
| Loyola | Martha | 80.00 | 62.00 |
| Mallari | Allen | 80.00 | 72.00 |
| Marquez | Manuel | 80.00 | 72.00 |
| Martin | Nadine | 80.00 | 40.00 |
| Martinez | Rachel | 80.00 | 31.73 |
| Misyuk | Anna | - | - |
| Ng | Ed | - | 5.00 |
| Osborn | Tiare | 80.00 | 72.00 |
| Pagliuca | Antonello | 63.46 | 72.00 |

| | | | |
|---|---|---|---|
| Pascual | Errika | 63.46 | 40.00 |
| Rizzo | Michael | 80.00 | 72.00 |
| Robbins | Christine | 80.00 | 72.00 |
| Ross | Sanford | - | - |
| Salvador | Max | 80.00 | 40.00 |
| Sangimino | Serita | 80.00 | 40.00 |
| Shen | John | 80.00 | 72.00 |
| Simmons | Robert | 80.00 | 40.00 |
| Sussman | Karen | 80.00 | 50.00 |
| Tanphanich | Eric | 80.00 | 72.00 |
| Tran | Kathleen | 80.00 | 27.00 |
| Vahedian | Simin | 80.00 | 40.00 |
| Villanueva | Charles | 80.00 | 72.00 |
| Willis | Renee | - | 51.00 |
| Yu | Shek Lim | 80.00 | 72.00 |

## Schedule 12.3 - Required Consents

1.      Consent of the Bankruptcy Court.

2.      Consent of Agent to the DIP Credit Agreement and related transactions

## **Schedule 12.12 - Vendor Concession Agreements**

Wilson & Dean Shoes, Inc.

Pratesi

Frank Ancona

Katherine Dughi

# EXHIBIT B

**EXHIBIT B**

**CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED[4]**

| Non-Debtor Party to Agreement | Description of Agreement | Cure amount |
|---|---|---|
| 550 Sutter LLC / 560 Sutter LLC | Real property lease for 560 Sutter Street, San Francisco, CA | $0_ |
| Blue Shield of California | Access+HMO Insurance Contract | $0 |
| Board of Trustees of the Leland Stanford Junior University/ Simon Property Group | Real property lease for Palo Alto store (Stanford Shopping Center) | $106,560.62 |
| Frank Ancona | Consignment Agreement | $0 |
| Katherine Dughi | Consignment Agreement | $0 |
| Neu Investment Corporation | Real property lease for 2200 Jerrold Avenue, San Francisco, CA | $32,934 |
| Pratesi | Concession Agreement | $0 |
| Rico Realty Co. | Real property lease for 501 Mendell Street, San Francisco, CA | $3,585 |
| Wilkes Bashford 375 Sutter Street, LLC | Real Property lease for 375 Sutter Street (San Francisco store) | $227,092 |
| Wilson & Dean Shoes, Inc. | Concession Agreement, dated December 6, 1988 | $0 |
| Winthrop Resources Corporation | Lease Agreement Number WI082404 (equipment lease) | $112,500 |

---

[4] Nothing contained herein shall be deemed a waiver of the Debtor's right to assert that any agreement listed on Exhibit B is not an executory contract or unexpired lease.

MOTION FOR ORDER AUTHORIZING SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS PURSUANT TO
BANKRUPTCY CODE § 363 ET AL.